Mark T. Power, Esq.
John P. Amato, Esq.
**HAHN & HESSEN LLP**
488 Madison Avenue, Suite 1400
New York, New York 10022
Telephone: (212) 478-7200
E-mail:    mpower@hahnhessen.com
            jamato@hahnhessen.com

*Proposed Special Counsel to the Debtors and
Debtors in Possession*


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Orion HealthCorp, Inc. | : | Case No. 18-71748 (AST) |
| Constellation Healthcare Technologies, Inc. | : | Case No. 18-71749 (AST) |
| NEMS Acquisition, LLC | : | Case No. 18-71750 (AST) |
| Northeast Medical Solutions, LLC | : | Case No. 18-71751 (AST) |
| NEMS West Virginia, LLC | : | Case No. 18-71752 (AST) |
| Physicians Practice Plus, LLC | : | Case No. 18-71753 (AST) |
| Physicians Practice Plus Holdings, LLC | : | Case No. 18-71754 (AST) |
| Medical Billing Services, Inc. | : | Case No. 18-71755 (AST) |
| Rand Medical Billing, Inc. | : | Case No. 18-71756 (AST) |
| RMI Physician Services Corporation | : | Case No. 18-71757 (AST) |
| Western Skies Practice Management, Inc. | : | Case No. 18-71758 (AST) |
| Integrated Physician Solutions, Inc. | : | Case No. 18-71759 (AST) |
| NYNM Acquisition, LLC | : | Case No. 18-71760 (AST) |
| Northstar FHA, LLC | : | Case No. 18-71761 (AST) |
| Northstar First Health, LLC | : | Case No. 18-71762 (AST) |
| Vachette Business Services, LTD. | : | Case No. 18-71763 (AST) |
| MDRX Medical Billing, LLC | : | Case No. 18-71764 (AST) |
| Vega Medical Professionals, LLC | : | Case No. 18-71765 (AST) |
| Allegiance Consulting Associates, LLC | : | Case No. 18-71766 (AST) |
| Allegiance Billing & Consulting, LLC | : | Case No. 18-71767 (AST) |
| Phoenix Health, LLC, | : | Case No. 18-71789 (AST) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

----------------------------------------------------------------------------- x

```
---------------------------------------------------------------------------x
Orion Healthcorp, Inc., et al.,                    :
                                                   :
                              Plaintiffs,          :
                v.                                 :
                                                   :    Adv. Pro. No. 18-_____ (AST)
Parmjit Singh Parmar (a/k/a Paul Parmar), Ravi     :
Chivukula, Sotiros Zaharis, Naya Constellation     :
Health, LLC, Alpha Cepheus, LLC, Constellation     :
Health Investment, LLC, First United Health, LLC,  :
Taira no Kiyomori LLC, Blue Mountain Healthcare,   :
LLC, Destra Targeted Income Unit Investment Trust, :
on behalf of unitholders, a Delaware Statutory Trust, :
Constellation Health Group, LLC, Constellation     :
Health, LLC, United States of America and Young    :
Conaway Stargatt & Taylor, LLP (in its capacity as :
Escrow Agent),                                     :
                              Defendants.          :
--------------------------------------------------------------------------- x
```

## ADVERSARY PROCEEDING COMPLAINT

Orion HealthCorp, Inc. ("Orion") and its affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases, and as plaintiffs in the above-captioned adversary proceeding (collectively, the "Debtors" or the "Plaintiffs"), as and for their Complaint, respectfully allege as follows:

## NATURE OF THE ACTION

1.       The Plaintiffs are the victims of a large, complex and brazen fraud that was subject to an intricate and deliberate concealment effort perpetrated by their former management.  This action, among other things, seeks to recover funds that were stolen from and rightfully belong to the Debtors in connection with the final chapter of that fraud and, specifically, in connection with a "go-private" merger transaction (the "Merger"), pursuant to which CHT Holdco, LLC ("CHT Holdco") acquired the stock of Plaintiff Constellation Healthcare Technologies, Inc. ("CHT").

2.      The Merger was led by defendant Parmjit "Paul" Parmar ("Parmar"), and was implemented through (among other things) looting the Debtors' assets for his own benefit and the benefit of others, including certain unitholders of the Destra Targeted Unit Investment Trust, a Delaware Statutory Trust (the "Destra Trust").

3.      At all times relevant to this Complaint, Parmar was Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of CHT.  Parmar controlled CHT through his ownership of CHT shares, his control over entities owning CHT shares, including, but not limited to Blue Mountain Healthcare, LLC ("Blue Mountain"), Taira no Kiyomori LLC ("Kiyomori"), Naya Constellation Health LLC ("Naya"), Alpha Cepheus, LLC ("Alpha"), First United Health, LLC ("First United") and Constellation Health Investment, LLC ("Constellation Investment") (collectively, the "Parmar Entities") and his position as CEO and Chairman of the Board of CHT.

4.      Parmar was assisted in the commission of the acts complained of herein by Sotiros "Sam" Zaharis ("Zaharis") and Ravi Chivukula ("Chivukula").   At all times relevant to this Complaint, Zaharis was the Chief Financial Officer ("CFO") of CHT and a member of its Board, and Chivukula, was the CFO of Orion and a member of its Board.

5.      To secure an inflated stock purchase price in connection with the Merger, Parmar, with the aid and assistance of Zaharis and Chivukula, falsified and altered financial documents, created fictitious customers and invoices, and fabricated the operations of entire subsidiaries of Orion.

6.      Parmar, Zaharis, and Chivukula also fabricated the pre-Merger acquisitions of multiple Debtors (the "Sham Acquisitions") by representing that these companies, identified below, were operating businesses with *bona fide* customers and revenue when, in fact, they had no business operations, nor any employees, customers, or revenue.

7.    The Sham Acquisitions were funded with money raised in secondary rounds of equity offerings through the London Stock Exchange's Alternative Investments Market (the "AIM").

8.    Parmar, Zaharis, and Chivukula used these Sham Acquisitions to steal monies for themselves and artificially inflate CHT's revenue, earnings, and assets, resulting in an increased stock price.

9.    Based on the artificially increased stock price, Parmar, Zaharis, and Chivukula were able to secure a purchase price of $309.4 million (the "Acquisition Price") for CHT in connection with the Merger.

10.    CHT's shareholders were paid $3.36 per share – a 45% premium on the pre-Merger stock price – based on the artificially inflated price of CHT's stock.

11.    In total, Parmar and the Parmar Entities were paid no less than $55,267,485.28, presently being held in escrow as discussed below (the "Escrow Funds"), plus other cash and consideration in exchange for their CHT shares (the "Parmar Shareholder Redemption Payments").

12.    The Parmar Shareholder Redemption Payments were funded with $130 million in debt (the "Merger Financing") owed to Bank of America, N.A., as Administrative Agent, L/C Issuer and Swingline Lender ("Bank of America"), and an equity contribution of $82,502,160.25 from CC Capital Management, LLC, a Delaware private investment firm, to CHT Holdco.

13.    To secure the Merger Financing, CHT, Orion, the remaining Plaintiffs and certain non-debtor entities (i) jointly and severally guaranteed the Merger Financing, (ii) gave first priority liens in all of their property (the "Merger Liens"), and (iii) pledged 100 % of the equity interests in each of their subsidiaries.

14.    The Debtors did not receive reasonably equivalent value for the Parmar
Shareholder Redemption Payments, which were looted from the Debtors in order to fund
the Merger.

15.    In reality, CHT and other Debtors were insolvent at the time of the Merger,
or this theft orchestrated by Parmar, the Parmer Entities, Zaharis and Chivukula otherwise
rendered CHT and other Debtors insolvent after the consummation of the Merger
transaction.

16.    On March 16, 2018, (the "Petition Date"), the Debtors commenced their
Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the
United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") in the United States
Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

17.    Plaintiffs, as debtors in possession and on behalf of their bankruptcy estates,
hereby seek, among other things, turnover of the stolen Parmar Shareholder Redemption
Payments, including the Escrow Funds (discussed further below), pursuant to Sections 542
and 543 of the Bankruptcy Code and state law common law.

18.    Alternatively, Plaintiffs hereby seek to set aside and recover as fraudulent
transfers, among other things, the Escrow Funds, in addition to all the Parmar Shareholder
Redemption Payments, pursuant to Sections 544, 548, and 550 of the Bankruptcy Code and
Sections 1304 and 1305 of the Delaware Uniform Fraudulent Transfer Act ("DUFTA").

19.    Plaintiffs also seek relief against Young Conaway Stargatt & Taylor, LLP, in
its capacity as escrow agent (the "Escrow Agent"), to wit:  (i) a constructive trust for the
benefit of the Debtors over any portion of the Parmar Shareholder Redemption Payments in
its possession, custody, or control, and, specifically, the Escrow Funds, and (ii) a permanent
injunction enjoining the Escrow Agent from distributing any portion of the Shareholder

Redemption Payments in its possession, custody, or control, including, without limitation, approximately the $55 million in Escrowed Funds being held by the Escrow Agent.

## THE PARTIES

### I.    The Plaintiffs

20.    Plaintiff CHT is a Delaware corporation with a principal place of business in Jericho, New York.  CHT directly owns 100% of the interests in Orion.

21.    Plaintiff Orion is a Delaware corporation with a principal place of business in Jericho, New York.  Orion owns 100% of the interests in various operating entities, holding companies, and certain of the sham corporations created and/or acquired by Parmar.

22.    Plaintiff Integrated Physician Solutions, Inc. ("IPS") is a Delaware corporation wholly owned by Orion.  IPS operates the Debtors' physician practice management and group purchasing organization businesses.

23.    Plaintiff Medical Billing Services, Inc. ("MBS") is a Texas corporation wholly owned by Orion.  MBS operates as part of Orion's revenue cycle management ("RCM") business.

24.    Plaintiff Rand Medical Billing, Inc. ("Rand") is a California corporation wholly owned by Orion.  Rand operates as part of Orion's RCM business.

25.    Plaintiff RMI Physician Services Corporation ("RMI") is a Texas corporation wholly owned by Orion.  RMI operates as part of Orion's RCM business.

26.    Plaintiff Western Skies Practice Management, Inc. ("Western Skies") is a Colorado corporation wholly owned by Orion.  Western Skies operates as part of Orion's RCM business.

27.    Plaintiff NEMS Acquisition, LLC ("NEMS Acquisition") is a Delaware limited liability company wholly owned by Orion.  NEMS Acquisition acts as a holding company for Plaintiff Northeast Medical Solutions, LLC and Plaintiff NEMS West

Virginia, both of which are Pennsylvania limited liability companies that operate as part of Orion's RCM business.

28.     Plaintiff Physicians Practice Plus Holdings ("PPP HoldCo") is a Delaware limited liability company wholly owned by Orion.  PPP HoldCo acts as a holding company for Plaintiff Physician Practice Plus, LLC, a Delaware limited liability company that operates as part of Orion's RCM business.

29.     Plaintiff Northstar FHA, LLC ("Northstar FHA") is a Delaware limited liability company wholly owned by Orion.  Northstar FHA acts as a holding company for Plaintiff Northstar First Health, LLC ("Northstar"), a Delaware limited liability company, which in turn acts as a holding company for Plaintiff Vachette Business Services, Ltd., an Ohio limited liability company.

30.     Plaintiff Phoenix Health, LLC ("Phoenix") is a Delaware limited liability company wholly owned by Orion.  Phoenix is an entity that was the subject of one of the Sham Acquisitions.

31.     Plaintiff MDRX Medical Billing ("MDRX") is a Delaware limited liability company wholly owned by Orion.  MDRX is an entity that was the subject of one of the Sham Acquisitions.

32.     Plaintiff VEGA Medical Professionals, LLC ("Vega") is a Delaware limited liability company wholly owned by Orion.  Vega acts as a holding company for Plaintiff Allegiance Consulting Associates, LLC and Plaintiff Allegiance Billing & Consulting, LLC, both of which are New York limited liability companies.

33.     Plaintiff NYNM Acquisition, LLC ("NYNM Acquisition") is a Delaware limited liability company wholly owned by Orion.  NYNM Acquisition acts as a holding company for certain non-debtor entities that are not parties to this action.

## II.    Defendants

34.    Upon information and belief, Defendant Parmjit "Paul" Parmar (defined above as "Parmar") is a resident of the State of New Jersey.  At all relevant times herein, Parmar was CEO and Chairman of the Board of CHT.  Parmar controlled CHT through his ownership of CHT shares, his control over the Parmar Entities and other entities owning CHT shares, and his position as CEO and Chairman of the Board.

35.    Upon information and belief, Defendant Ravi Chivukula (defined above as "Chivukula") is a resident of the State of New Jersey.  At all relevant times herein, Chivukula was CFO of Orion and on the Board of CHT.

36.    Upon information and belief, Defendant Sotirios Zaharis (a/k/a Sam Zaharis) (defined above as "Zaharis") is a resident of the State of New Jersey and an Australian citizen.  At all relevant times herein, Zaharis was on the Board of CHT.

37.    Upon information and belief, Defendant Naya is a Delaware limited liability company.  At all relevant times herein, Naya was wholly owned and controlled by Parmar.

38.    Upon information and belief, Constellation Investment is a Delaware limited liability company.  At all relevant times herein, Constellation Investment was wholly owned and controlled by Parmar.

39.    Upon information and belief, Defendant First United is a Delaware limited liability company.  At all relevant times herein, First United was wholly owned and controlled by Parmar.

40.    Upon information and belief, Defendant Alpha Cepheus is a Delaware limited liability company.  At all relevant times herein, Alpha Cepheus was wholly owned and controlled by Constellation Investment and First United, which in turn were controlled by Parmar.

41.    Upon information and belief, Defendant Blue Mountain is a Delaware limited liability company.  At all relevant times herein, Blue Mountain was owned by defendant Kiyomori, another Delaware limited liability company, which was owned and controlled by Parmar.

42.    Defendant Destra Targeted Income Unit Investment Trust, on behalf of unitholders (defined above as the "Destra Trust") is a Delaware statutory trust. U.S. Bank Trust National Association is trustee for the Destra Trust, which is named a defendant herein because of its alleged interest in the Escrowed Funds.

43.    Defendant Constellation Health Group, LLC ("CH Group") is a Delaware limited liability company which is named a defendant herein because of its alleged interest in the Escrowed Funds.

44.    Defendant Constellation Health, LLC ("Constellation Health") is a Delaware limited liability company which is named a defendant herein because of its alleged interest in the Escrowed Funds.

45.    Defendant United States of America is a sovereign and named herein based on its claimed interest in the Escrowed Funds, by virtue of a certain seizure warrant obtained by the FBI in connection with, upon information and belief, a criminal investigation by the United States Department of Justice ("DOJ").

46.    Upon information and belief, Defendant Young Conaway Stargatt & Taylor, LLP (defined above as the "Escrow Agent") is a limited liability partnership with a principal place of business in Wilmington, Delaware, and also maintains a place of business in New York, New York.  The Escrow Agent is named herein because of its custody, possession and control of the Escrowed Funds.

## JURISDICTION AND VENUE

47.     This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

48.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because the claims asserted herein arise in the above-captioned Chapter 11 cases.

49.     This is a core proceeding under 28 U.S.C. § 157(b)(2).

50.     Venue is proper pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Chapter 11 cases, which are currently pending before this Court.

51.     In the event that this Bankruptcy Court or any other appropriate court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Bankruptcy Rule 7008. Plaintiffs also consent to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

### I.    Pre-Merger Background

52.     In 2012, Parmar and Southport Lane Management, LLC ("Southport") entered into a joint business venture to acquire 100% of the equity in Debtor Orion.

53.     Parmar and Southport formed CH Group, Constellation Health, Constellation Investment, and First United, to serve as holding companies for their respective interests in CHT.

54.     CHLLC's initial members were CH Group, which was controlled by Southport, and Constellation Investment and First United, which were controlled by Parmar.

55.    On or about June 17, 2013, CHLCC acquired the entire issued share capital of Orion.

56.    On or about June 9, 2014, Parmar acquired all of the interests in CHLLC.

57.    On September 3, 2014, Parmar formed CHT as the holding company for Orion and its subsidiaries.

58.    On or about December 8, 2014, CHT consummated a "go-public" transaction, after which it was publicly traded on the London Stock Exchange's Alternative Investment Market (the "AIM").

59.    As of the "go-public" transaction, CHLLC owned 68.08% of CHT's outstanding shares.

## II.    The Sham Acquisitions Inflate CHT's Value

60.    Upon information and belief, the Sham Acquisitions began in or about May 2015, when CHT raised approximately $15.8 million through a secondary offering on the AIM.

61.    The Sham Acquisitions shared common characteristics:  (1) money was raised through secondary public offerings on the AIM; (2) the acquisition target was formed shortly before the date of acquisition; and (3) the proceeds of the public offerings were used for other purposes, including but not limited to, line Parmar's own pockets and create fictitious customer receipts and as revenue for other CHT business units.

62.    On September 16, 2015, CHT announced its acquisition of Northstar for $18 million.  CHT falsely described Northstar as having 233 employees, 77 clients, and 2014 year end revenue of $7.9 million.  Northstar had no operations at the time of the alleged acquisition.

63.     On September 18, 2015, CHT announced its acquisition of Phoenix. CHT falsely described Phoenix as having 138 employees and generating revenue of $9.8 million and EBITDA of $2.2 million, with net assets of $1.1 million as of December 31, 2014. Phoenix had no operations at the time of the alleged acquisition.  In fact, Phoenix did not obtain an Employer Identification Number ("EIN") from the IRS until November 27, 2015.

64.     On December 7, 2015, MDRX was formed in Delaware and, on December 11, 2015, CHT announced a second capital raise earmarked for the acquisition of MDRX. On January 6, 2016, the Board approved the admission of 18,751,195 new shares to the AIM market, which raised approximately $45 million.  On February 10, 2016, CHT announced its acquisition of MDRX for $28 million.  MDRX claimed to have acquired its customers from Apex Healthcare Systems, a fictitious company.  MDRX was not assigned an EIN until March 11, 2016 and had no operations or employees at any time.

65.     Parmar, Zaharis, and Chivukula created fictitious revenue for non-existent customers by re-characterizing cash raised from the secondary offerings as third-party customer receipts.

66.     Parmar, Zaharis, and Chivukula altered financial statements and fabricated financial information to include fictitious entries, which created the illusion of customer deposits.

67.     The Sham Acquisitions caused CHT's revenue and earnings to be overstated in its financial statements filed with the AIM in 2015 and 2016.  CHT's stock price then increased based on these inaccurate financial statements.

### III.    The Go-Private Merger Transaction

68.    Starting in or about June 2016, CHT pursued a potential merger transaction with CC Capital Management, LLC, a private investment firm formed under the laws of the State of Delaware ("CC Capital").

69.    As part of the proposed Merger due diligence, CC Capital was given access to documents and information regarding CHT's financial condition and business operations.

70.    Parmar misrepresented CHT's revenue and EBITDA and overstated expectations following the Northstar, Phoenix and MDRX transactions.

71.    On November 25, 2016, CHT and CHT Holdco, LLC ("CHT Holdco") announced an agreement on the terms of the proposed Merger.

72.    Under the terms of the Merger, CHT Holdco would acquire CHT for $2.93 cash and $0.43 in Promissory Notes per share, representing a total value of $309.4 million.

73.    CC Capital would own a controlling interest in CHT Holdco.

74.    The remaining interest in CHT Holdco would be owned by Alpha Cepheus, an entity that, at the time, was controlled by Parmar.

75.    On January 18, 2017, CHT's shareholders approved the Merger.

76.    On January 26, 2017, CHT requested that trading of its shares on the AIM be suspended.

77.    As inducement to enter into the Merger, Parmar represented and warranted that CHT's financial statements were truthful and accurate, that there were no false entries on any of CHT's books and records, that CHT's accounts receivable were the result of bona fide transactions, and that its material contracts were valid and enforceable.    These representations and warranties were known by Parmar to be false when made.

78.     Additionally, Parmar and Alpha Cepheus, First United, and CHLLC, entities under Parmar's control, falsely represented and warranted that CHT's representations and warranties were true and correct.

79.     The Merger Financing was obtained from Bank of America to fund the Parmar Shareholder Redemption Payments.

80.     The Merger Financing was jointly and severally guaranteed by all Plaintiffs.

81.     As collateral security for their guarantees, Plaintiffs granted first priority liens on all of their property, including 100% of the equity interests in each of their subsidiaries, to Bank of America.

82.     Prior to the Merger, Parmar and certain Parmar-controlled entities owned approximately 53.5% of CHT's 92,081,632 outstanding shares.  The remaining shares were publicly held.

83.     CHT's common shares were then converted into the right to receive the Acquisition Price.

84.     Following the Merger, (i) CHT Holdco owned 100% of the equity interests in CHT; (ii) CC Holdco controlled approximately 50.7% of the economic and 55% of the voting interests in CHT; and (iii) Alpha Cepheus controlled approximately 49.3% of the economic and 45% of the voting interests in CHT.

85.     To fund all of the shareholder redemption payments, including the Parmar Shareholder Redemption Payments, (i) CC Capital conveyed the CC Capital Contribution to CHT Holdco; (ii) Plaintiffs incurred liens on all their assets to secure the Merger Financing from Bank of America; and (iii) CHT issued unsecured promissory notes to its shareholders in the amount of approximately $39.6 million.

86.     At closing on or about January 30, 2017, Bank of America wired all of the shareholder redemption payments, including Parmar Shareholder Redemption Payments to CC Holdco.

87.     On or about February 2, 2017, CC Holdco wired all of the shareholder redemption payments, including the Parmar Shareholder Redemption Payments to Capita Registrars, Ltd. (n/k/a Link Market Services Ltd.) ("Capita"), the registrar for the Merger, for distribution to CHT's shareholders.

88.     On or about February 3, 2017, Capita distributed the Parmar Shareholder Redemption Payments to the Parmar Entities according to their ownership interests.

89.     On September 14, 2017, Parmar resigned as CEO of CHT and its subsidiaries.

90.     On September 29, 2017, Parmar resigned from the Board.

## IV.     Related Litigation Predating the Merger

91.     On April 24, 2014, the Delaware Insurance Commissioner commenced litigation by filing state court rehabilitation proceedings against Freestone Insurance Company ("Freestone") in the Delaware Court of Chancery (the "Chancery Court') and, by order dated April 28, 2014, the Chancery Court placed Freestone into liquidation.  See In the Matter of the Liquidation of Freestone Insurance Company, No. 9574-VCL (the "Freestone Litigation").

92.     On December 27, 2016, Destra Trust, CH Group and Constellation Health (the "Destra Plaintiffs") commenced an action styled Destra Targeted Income Unit Investment Trust, on behalf of Unitholders, et al. v. Parmjit Singh Parmar (a.k.a. Paul Parmar), et al., Del. Ch. No. 13006-VCL (the "Destra Litigation"), currently pending before the Chancery Court, by filing a verified complaint in the Chancery Court seeking (1) a declaratory judgment as to the ownership of certain CHT shares and invalidating certain

transfers of CHT shares and any actions taken by Parmar and the other defendants in the Destra Litigation regarding the conveyance, transfer, or encumbrance of CHT's shares; (2) asserting breaches of fiduciary duties and the aid and abetting thereof; (3) asserting breaches of the CH Group and CHT operating agreements; and counts of fraudulent transfer, conversion, unjust enrichment, and civil conspiracy and fraud.

93.     By order dated January 25, 2017 (the "Chancery Court Order"), the Chancery Court directed Parmar to cause the Parmer Entities to deposit $55,267,485.28 of the Parmar Shareholder Redemption Payments in an escrow account maintained at Wilmington Savings Fund Society under the name Blue Mountain Healthcare/Young Conaway Stargatt & Taylor Escrow Savings, Account Number 465102150 ("the Escrowed Funds").

94.     The Escrowed Funds are rightfully the Debtors' property, as they constitute cash proceeds of the Merger that were obtained by Parmar as a result of the Debtors incurring the Merger Liens because of his massive fraud, breach of fiduciary duty and illegal conduct.

95.     The Insurance Commissioner of the State of Delaware, as receiver (the "Receiver") of Freestone, then proposed a settlement agreement (the "Settlement Agreement") with Parmar, the Destra Trust, and others.  If approved, the Settlement Agreement would have resulted in the transfer of $46 million of the Escrowed Funds to the Destra Plaintiffs to resolve their claims asserted against Parmar in the Destra Litigation, while simultaneously permitting Parmar to retain nearly $9 million of the Escrowed Funds for himself.

96.     On December 8, 2017, the FBI obtained a seizure warrant involving the Escrowed Funds.  As a result, the Receiver decided to abandon pursuit of the Settlement Agreement, which expired by its terms on January 26, 2018, and instead agreed that

distribution of the Escrowed Funds would be best handled through the DOJ's forfeiture procedures.

97.    At the request of the Delaware Chancery Court, CC Capital filed a motion to lift the preliminary injunction as to the Escrowed Funds and to pay the administrative expenses of the Escrow Agent, which the Chancery Court granted by order issued March 16, 2018.

98.    The Chancery Court's March 16th order lifting the preliminary injunction states, in relevant part "[t]he Escrowed Funds shall remain in the escrow account of [the Escrow Agent] until the USDOJ or the Court issuing a seizure warrant provides or causes to be provided to Wilmington Savings Fund Society ("WSFS") instructions concerning the Escrowed Funds, and [the Escrow Agent] and WSFS are authorized to comply with those instructions without further order of this Court and regardless of any opposition by any other person including any parties to these actions."

99.    Upon information and belief, no such instructions were provided before commencement of the Debtors' chapter 11 proceedings, and the Escrowed Funds remain in the Escrow Account as of the Petition Date, and are subject to the automatic stay and assets of the Debtors' estates.

**V.    The Escrowed Funds Were Stolen From and Rightfully Belong to the Debtors**

100.    In order to effectuate the Merger, Parmar, Zaharis and Chivukula knowingly concealed and falsified the true financial condition of the Debtors.  They converted assets of the Debtors in order to obtain the Merger Financing.

101.    The Escrowed Funds constitute property of the Debtors' estates that could be used to pay their legitimate creditors.

102.    As the rightful owners, the Debtors have a superior interest in and to the Escrowed Funds over all other parties hereto.

103.    As a result of the theft of the Escrowed Funds from the Debtors, Defendants have been unjustly enriched at the Debtors' expense.

## VI.    Alternatively, The Escrowed Funds Are Proceeds of Avoidable Fraudulent Transfers

104.    The Debtors did not receive reasonably equivalent value for incurring the Merger Financing and other transfers they made in connection with the Merger.

105.    Each of the Debtors' pre-Merger financial condition was significantly impacted by the Merger Financing.

106.    Parmar, Zaharis, and Chivukula knowingly concealed and falsified the true financial condition of the Debtors from their creditors, pre- and post-Merger.

107.    The Debtors were under no obligation to enter into the Merger or incur the obligations under the Merger Financing that resulted in a massive payout to its shareholders, including Parmar and the Parmar Entities.  But for the fraudulent intent of Parmar, Zaharis and Chivukula, the Debtors would not have done so.

108.    The Debtors seek to avoid and recover the Escrowed Funds and the other Palmar Shareholder Redemption Payments as actual and constructively fraudulent transfers.

### COUNT I.

### TURNOVER OF THE ESCROWED FUNDS
### (11 U.S.C. §§ 542)

109.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

110.    The Escrowed Funds are in the possession, custody or control of the Escrow Agent.

111.    The Escrowed Funds were stolen from the Debtors and rightfully constitute property of the Debtors' estates.

112.    The Escrowed Funds can be used to satisfy claims of the Debtors' legitimate creditors.

113.    The Escrowed Funds are valued at approximately $55 million, and, therefore are not of inconsequential value or benefit to the Debtors' estates.

114.    The Escrowed Funds should be turned over by the Escrow Agent to the Debtors pursuant 11 U.S.C. § 542.

## COUNT II.

### TURNOVER OF THE ESCROWED FUNDS
### (11 U.S.C. §§ 543)

115.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

116.    The Escrowed Funds are in the possession, custody or control of the Escrow Agent.

117.    By letter dated March 19, 2018, the Debtors former counsel advised the Escrow Agent of the commencement of these chapter 11 cases.

118.    The Escrowed Funds were stolen from the Debtors and rightfully constitute property of the Debtors' estates.

119.    Upon information and belief, the conditions precedent necessary to release the Escrowed Funds have not occurred, and the Escrowed Funds remain in the custody, possession and control of the Escrow Agent in the escrow account.

120.    The Escrowed Funds can be used to satisfy claims of the Debtors' legitimate creditors.

121.    The Escrowed Funds are valued at approximately $55 million, and, therefore are not of inconsequential value or benefit to the Debtors' estates.

122.    The Escrowed Funds should be turned over by the Escrow Agent to the Debtors pursuant 11 U.S.C. § 543.

## COUNT III.

## UNJUST ENRICHMENT

123.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

124.    The Defendants have received a benefit from the transfer of the Escrowed Funds at the Debtors' expense.

125.    The Escrowed Funds rightfully belong to the Debtors estates.

126.    It is against equity and good conscience to permit the Defendants to retain the Escrowed Funds.

127.    The Defendants have been unjustly enriched at the Debtors' expense as a result of the theft of the Escrowed Funds.

128.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing the Escrow Agent to immediately turnover the Escrowed Funds to the Debtors.

## COUNT IV.

## CONVERSION

129.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

130.    The Debtors are the rightful owners of the Escrowed Funds.

131.    The Defendants have unlawfully and without authorization assumed and exercised dominion and control over the Escrowed Funds to the exclusion of the Debtors, and inconsistent with the Debtors' rights as the rightful owners.

132.    The Defendants' exercise of dominion and control over the Escrowed Funds has unjustifiably denied the Debtors' the right to use, consume, exploit and profit from same.

133.    The Debtors have demanded return of the Escrowed Funds.

134.    The Defendants have refused to return the Escrowed Funds to the Debtors.

135.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing the Escrow Agent to immediately turnover the Escrowed Funds to the Debtors.

## COUNT V.

## **REPLEVIN**

136.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

137.    The Merger Financing is specifically identifiable and traceable to the Escrowed Funds.

138.    The Debtors have a superior interest in and to the Escrowed Funds as such money was stolen from the Debtors and is property of the Debtors' estates.

139.    The Defendants are wrongfully retaining custody, possession or control over the Escrowed Funds.

140.    The Debtors are unaware of any valid defenses.

141.    By reason of the foregoing, the Debtors are entitled to an order from this Court instructing the Escrow Agent to immediately turnover the Escrowed Funds to the Debtors.

## COUNT VI.

### INTENTIONAL FRAUDULENT TRANSFER
### (11 U.S.C. §§ 548(a)(1)(A) and 550)

142.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

143.    In or about January 2017, CC Holdco, on CHT's behalf, transferred the cash proceeds of the Merger to Capita.  Thereafter, Capita transferred the Escrowed Funds to Palma controlled entities, who then transferred the Escrowed Funds to the Escrow Agent, as directed by order of the Chancery Court.

144.    CHT entered into and executed the transactions in connection with the Merger with knowledge of the effect such transactions would have on the future creditors of CHT and those created by the Merger, and with the intent to hinder, delay or defraud such creditors.

145.    The Debtors did not receive reasonably equivalent value for incurring the Merger Liens that secured the funding of the Escrowed Funds.

146.    The transfer of the Escrowed Funds occurred within two years of the Petition Date.

147.    The Escrowed Funds should be avoided and recovered from the Escrow Agent pursuant to 11 U.S.C. §§ 548(a)(1)(A), and 550(a).

## COUNT VII.

### CONSTRUCTIVE FRAUDULENT TRANSFER
### (11 U.S.C. §§ 548(a)(1)(B) and 550)

148.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

149.    In or about January 2017, CC Holdco, on CHT's behalf, transferred the cash proceeds of the Merger to Capita.  Thereafter, Capita transferred the Escrowed Funds to

Palma controlled entities who transferred them to the Escrow Agent, as directed by order of the Chancery Court.

150.    The Debtors did not receive reasonably equivalent value for incurring the Merger Liens that secured the funding of the Escrowed Funds.

151.    At the time the Escrowed Funds were transferred, the Debtors were either insolvent or became insolvent as a result of the Merger transaction.  Specifically, (i) the Debtors were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (ii) the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

152.    The transfer of the Escrowed Funds occurred within two years of the Petition Date.

153.    The Escrowed Funds should be avoided and recovered from the Escrow Agent, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

## COUNT VIII.

### ACTUAL FRAUDULENT TRANSFER
### (11 U.S.C. § 544 and 6 Del. C. § 1304(a)(1))

154.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

155.    In or about January 2017, CC Holdco, on CHT's behalf, transferred the cash proceeds of the Merger to Capita.  Thereafter, Capita transferred the Escrowed Funds to Palma controlled entities who transferred the Escrowed Funds to the Escrow Agent, as directed by order of the Chancery Court.

156.     CHT approved the Merger and entered into and executed the transactions in connection therewith with knowledge of the effect such payments would have on the future creditors of CHT or those created by the Merger, and with the intent to hinder, delay or defraud such creditors.

157.     The Debtors did not receive reasonably equivalent value for incurring the Merger Liens that secured the funding of the Escrowed Funds.

158.     The transfer of the Escrowed Funds occurred within four years of the Petition Date.

159.     The Escrowed Funds should be avoided and recovered from the Escrow Agent pursuant to 11 U.S.C. § 544 and sections 1304(a)(1) of the Delaware Uniform Fraudulent Transfer Act ("DUFTA").

## COUNT IX.

### CONSTRUCTIVE FRAUDULENT TRANSFER
### (11 U.S.C. § 544 and 6 Del. C. §§ 1304(a)(2) and 1305(a))

160.     The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

161.     In or about January 2017, CC Holdco, on CHT's behalf, transferred the cash proceeds of the Merger to Capita.  Thereafter, Capita transferred the Escrowed Funds to Palma controlled entities who transferred the Escrow Funds to the Escrow Agent, as directed by order of the Chancery Court.

162.     The Debtors did not receive reasonably equivalent value for the incurring the Merger Liens that secured the funding of the Escrowed Funds.

163.     At the time the Escrowed Funds were transferred, the Debtors were either insolvent or became insolvent as a result of the Merger transaction.  Specifically, (i) the Debtors were engaged in business or a transaction, or were about to engage in business or a

transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (ii) the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

164.    The transfer of the Escrowed Funds occurred within four years of the Petition Date.

165.    The Escrowed Funds should be avoided and recovered from the Transferees pursuant to 11 U.S.C. § 544 and sections 1304(a)(2) and 1305(a) of the DUFTA.

**COUNT X.**

**CONSTRUCTIVE TRUST**
**(11 U.S.C. § 105(a))**

166.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

167.    Parmar had a fiduciary duty to the Debtors.

168.    Parmar assured the Debtors that they could receive value in connection with the Merger, and, in reliance thereon, the Debtors incurred millions of dollars in debt or otherwise paid millions of dollars, including the Escrowed Funds, to finance the Merger.

169.    The Defendants received the Escrowed Funds herein and as a result have been unfairly and unjustly enriched.

170.    The Escrowed Funds constitute a portion of fraudulently obtained proceeds of the Merger and are in the possession, custody, or control of the Escrow Agent.

171.    As a result, Plaintiffs are entitled to the imposition of a constructive trust for their benefit on the Escrowed Funds in the possession, custody, or control of Escrow Agent.

## COUNT XI.

### PERMANENT INJUNCTION PREVENTING
### DISTRIBUTION OF THE ESCROWED FUNDS
### (11 U.S.C. § 105(a))

172.    The Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

173.    Plaintiffs believe that it is imminent that the DOJ will execute its seizure warrant on the Escrowed Funds.

174.    Plaintiffs will suffer irreparable harm absent the issuance of a permanent injunction preventing the Defendants from conveying the Escrowed Funds to another person or entity and preventing the seizure of the Escrowed Funds by the DOJ.

175.    Plaintiffs have sufficiently demonstrated that they will be successful on the merits of their fraudulent transfer claims.

176.    Alternatively, Plaintiffs have set forth sufficiently serious questions going to the merits of their fraudulent transfer claims to make such claims a fair ground for litigation.

177.    The balance of the hardships tips in Plaintiffs' favor because the Defendants would suffer no harm by the issuance of the requested injunction, whereas the Debtors, their estates and their creditors will suffer great harm if the Destra Trust conveys the Escrowed Funds to another person or entity or the DOJ seizes the Escrowed Funds.

178.    Accordingly, this Court should permanently enjoin the Destra Trust from conveying the Escrowed Funds to any person or entity or from being seized by the DOJ.

## COUNT XII.

### FRAUD

179.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

180.    Parmar, Zaharis and Chivukula have combined both omissions of material fact that they had a duty to disclose and active misrepresentations of material fact in order to defraud the Debtors by, among other things, converting and/or otherwise fraudulently transferring the Debtors' assets.

181.    The Debtors materially relied on these omissions and misrepresentations.

182.    The Debtors were damaged as a result thereof.

183.    Based on the foregoing, the Debtors are entitled to recover an amount to be determined at trial, but no less than the amount of the Escrow Funds.

## COUNT XIII.

## BREACH OF FIDUCIARY DUTY

184.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

185.    At all relevant times, the Debtors were insolvent and/or in the vicinity or zone of insolvency.

186.    Parmar, Zaharis and Chivukula owed fiduciary duties to the Debtors and their creditors.

187.    Parmar, Zaharis and Chivukula breached their fiduciary duties (including, without limitation, their duty of loyalty) to the Debtors and their creditors, by among other things:

        (a)    failing to act in good faith or acting intentionally or knowingly by permitting the Debtors to (i) engage in the Sham Acquisitions, (ii) secure the Shareholder Redemption Payments and additional Merger Financing (including by the granting of the Merger Liens), which constituted theft from the Debtors, unlawful fraudulent transfers and/or improper transfers;

(b)     continuing to receive compensation and/or other benefits from the Debtors;

(c)     continuing the Debtors' business operations for the purpose of providing substantial benefit to themselves and others (at the expense of the Debtors) in the form of the theft and/or transfers described herein;

(d)     consciously and intentionally abdicating their duties to the Debtors and their creditors; and

(e)     acting only in the interest of themselves and/or the Transferees at a time when the Debtors were insolvent and/or in the vicinity or zone of insolvency.

188.    The Debtors and their creditors were harmed by Parmar, Zaharis and Chivukula's breaches of their fiduciary duties.

189.    Based on the foregoing, the Debtors are entitled to recover an amount to be determined at trial, but no less than the amount of the Escrow Funds.

## COUNT XIV.

## DECLARATORY JUDGMENT

190.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

191.    This matter constitutes an actual case in controversy between the Debtors and the Defendants.

192.    By virtue of the foregoing, the Debtors have superior rights to and interests in the Escrowed Funds over all of the Defendants.

193.    The Debtors are entitled to a judgment from this Court determining and declaring that the Debtors have a superior interest over all of the Defendants in and to the Escrowed Funds.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiffs respectfully request that judgment be entered in their favor and against the Defendants as follows:

(a)    on Count I, against all Defendants, directing immediate turnover to the Debtors of the Escrowed Funds, pursuant to 11 U.S.C. § 542;

(b)    on Count II, against all Defendants, directing immediate turnover to the Debtors of the Escrowed Funds, pursuant to 11 U.S.C. § 543;

(c)    on Count III, against all Defendants, directing immediate turnover to the Debtors of the Escrowed Funds;

(d)    on Count IV, against all Defendants, directing immediate turnover to the Debtors of the Escrowed Funds;

(e)    on Count V, against all Defendants, directing immediate turnover to the Debtors of the Escrowed Funds;

(f)    on Count VI, pursuant to 11 U.S.C. §§ 548 and 550, finding that the transfer of the Escrowed Funds was a fraudulent transfer, avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $55 million, plus interest thereon;

(g)    on Count VII, pursuant to §§ 548 and 550, finding that the transfer of the Escrowed Funds was a fraudulent transfer, avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $55 million, plus interest thereon;

(h)      on Count VIII, pursuant to §§ 545 and 550 and 6 Del. C. § 1304(a)(1), finding that the transfer of the Escrow Funds was a fraudulent transfer, avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $55 million, plus interest thereon;

(i)       on Count IX, pursuant to §§ 545 and 550 and 6 Del. C. §§ 1304(a)(2) and 1305(a), finding that the transfer of the Escrowed Funds, was a fraudulent transfer, avoiding the transfer, and entering judgment in an amount to be determined at trial, but no less than $55 million, plus interest thereon;

(j)       on Count X, against all Defendants, imposing a constructive trust over the Escrowed Funds in the possession, custody or control of the Defendants;

(k)      on Count XI, against all Defendants, permanently enjoining the Defendants from conveying the Escrowed Funds to any person or entity or from being seized by the DOJ;

(l)       on Count XII, against Parmar, Zaharis and Chivukula, in an amount to be determined at trial, but no less than $55 million, plus interest thereon;

(m)     on Count XIII, against Parmar, Zaharis and Chivukula, in an amount to be determined at trial, but no less than $55 million, plus interest thereon;

(n)      on Count XIV, determining and declaring that the Debtors have superior rights in and to the Escrowed Funds as against all Defendants;

(o)     for Plaintiffs' attorneys' fees and costs; and

(p)     for such other and further relief as the Court deems equitable, just and

proper.

Dated:   New York, New York
         April 4, 2018

                                        **HAHN & HESSEN LLP**


                                        By:     /s/ *John P. Amato*
                                                John P. Amato
                                                Mark T. Power
                                                Joseph Orbach
                                                Annie P. Kubic

                                        488 Madison Avenue
                                        New York, New York 10022
                                        Telephone: (212) 478-7200
                                        jamato@hahnhessen.com
                                        mpower@hahnhessen.com
                                        jorbach@hahnhessen.com
                                        akubic@hahnhessen.com

                                        *Proposed Special Counsel to Plaintiffs*