**WINDELS MARX LANE & MITTENDORF, LLP**
156 West 56th Street
New York, New York 10019
Charles E. Simpson, Esq.
Jeffrey C. Hoffman, Esq.
Tel: (212-237-1000
Email: csimpson@windelsmarx.com
       jhoffman@windelsmarx.com

*Attorneys for Parmjit Singh Parmar and the*
*Parmar Entities*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

| In re: | Chapter 11 Case |
|---|---|
| ORION HEALTHCORP, INC. | No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LL | No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | No. 18-71756 (AST) |
| RMI PHYSICIANS SERVICES CORPORATION | No. 18-75757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | No. 18-75758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | No. 18-75759 (AST) |
| NYNM ACQUISITION, LLC | No. 18-75760 (AST) |
| NORTHSTAR FHA, LLC | No. 18-75761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | No. 18-75762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | No. 18-75763 (AST) |
| MDRX MEDICAL BILLING, LLC | No. 18-75764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | No. 18-75765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | No. 18-75766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | No. 18-75767 (AST) |
| PHOENIX HEALTH, LLC | No. 18-71789 (AST) |
| Debtors. | (Jointly Administered) |

-------------------------------------------------------------------------x

{11563768:1}

```
-------------------------------------------------------------------------x
```
Orion Healthcorp, Inc., *et al.*,

                                Plaintiffs,

              v.

Parmjit Singh Parmar (a/k/a Paul Parmar), Sotirios               Adv. Pro No. 18-08053 (AST)
Zaharis, Ravi Chivukula, Pavan Bakshi, Naya Constellation
Health LLC, Alpha Cepheus, LLC, Constellation Health
Investment, LLC, Constellation Health Group, LLC,
Constellation Health, LLC, First United Health, LLC, Taira no
Kiyomori LLC, Blue Mountain Healthcare, LLC, CC Capital
CHT Holdco LLC, CHT Holdco LLC, PBPP Partners LLC, Axis
Medical Services, LLC, Vega Advanced Care LLC, Pulsar
Advance Care LLC, Lexington Landmark Services LLC,
MYMSMD LLC, PPSR Partners, LLC, AAKB Investments
Limited, Destra Targeted Income Unit Investment Trust, on
  behalf of unitholders, a Delaware Statutory Trust, United States
of America, Aquila Alpha LLC, 2 River Terrace Apartment 12J,
LLC, Dioskouroi Kastor Polydeuces, LLC, 21B One Riiver Park
LLC, Aquila Ashain LLC , Ranga Bhoomi LLC, Harmohan
Parmar (a/k/a Harry Parmar), Kiran Sharma, The Red Fronted
Macaw Trust, Young Conaway Stargatt & Taylor, LLP (in its
capacity as Escrow Agent), Blue Cross Blue Shield of South
Carolina, Honorable Trinidad Navarro, Insurance Commissioner
of the State of Delaware, in his capacity as Receiver, and John
Does 1 through 100 inclusive,

                            Defendants.
```
-------------------------------------------------------------------------x
-------------------------------------------------------------------------x
```
Parmjit Singh Parmar, First United Health, LLC, and
Constellation Health, LLC,

                       Cross-claim Plaintiffs,

             v.

CC Capital CHT Holdco LLC and CHT Holdco LLC,

                       Cross-claim Defendants.
```
-------------------------------------------------------------------------x
```

## ANSWER AND CROSS-CLAIM OF PARMJIT SINGH PARMAR
## AND PARMAR ENTITIES TO THE FIRST AMENDED
## ADVERSRY PROCEEDING  COMPLAINT

Parmjit Singh Parmar a/k/a Paul Parmar  ("Parmar") and the Defendants who are entities

owned or controlled by Parmar and listed on Exhibit "A" hereto as Defendants in the above-

captioned Adversary Proceeding (the "Parmar Entities" or "Defendants") , as and for their

Answer, and Cross-claim to the First Amended Adversary Proceeding Complaint (the

"Adversary Complaint"), and Cross-claim, respectfully allege as follows:

### NATURE OF THE ACTION

1.      Deny the allegations contained in paragraph 1 of the Adversary Complaint except

they admit that the Adversary Proceeding was commenced to recover funds allegedly stolen

from the Plaintiffs (sometimes referred to herein as "Plaintiffs" or "Debtors") and certain assets

allegedly purchased with the funds stolen from the Debtors.

2.      Deny the allegations contained in paragraph 2 of the Adversary Complaint except

they admit that Parmar was Chief Executive Officer and Chairman of the Board of Directors of

Constellation Healthcare Technologies, Inc. ("CHT").

3.      Deny the allegations contained in paragraph 3 of the Adversary Complaint except

they admit that Sotirios "Sam" Zaharis ("Zaharis") was the Chief Financial Officer and a

Director of CHT and Ravi Chivukula ("Chivukula") was the Secretary of CHT and a Director of

Orion HealthCorp, Inc. ("Orion").

4.      With respect to the allegations contained in paragraph 4 of the Adversary

Complaint, Parmar asserts his privilege set forth in the Fifth Amendment to the U.S. Constitution

("Fifth Amendment Privilege").  The Parmar Entities lack sufficient knowledge and/or

information upon which to form a belief as to the truth of the allegations contained in paragraph

4 of the Adversary Complaint.

5.     Deny the allegations contained in paragraph 5 of the Adversary Complaint except they admit that CHT was able to secure a transaction price of $309.4 million in connection with its "go-private" merger transaction with CHT Holdco, LLC ("CHT Holdco").

6.     Deny the allegations contained in paragraph 6 of the Adversary Complaint.

7.     Deny the allegations contained in paragraph 7 of the Adversary Complaint except they admit that Bank of America, N.A., as Administrative Agent, L/C Issuer and Swingline Lender ("Bank of America") provided $130 million in debt to CHT Holdco.

8.     Admit the allegations contained in paragraph 8 of the Adversary Complaint.

9.     Deny the allegations contained in paragraph 9 of the Adversary Complaint.

10.     Deny the allegations contained in paragraph 10 of the Adversary Complaint except they admit that on March 16, 2018 (the "Petition Date"), the above-captioned Debtors each commenced a Chapter 11 case by filing Voluntary Petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

11.     Admit that the Plaintiffs seek various forms of relief pursuant to Sections 542 and 543 of the Bankruptcy Code and State common law but otherwise deny the allegations contained in paragraph 11 of the Adversary Complaint.

12.     Admit that the Plaintiffs seek various forms of relief pursuant to Sections 544, 548 and 550 of the Bankruptcy Code and Sections 1304 and 1305 of the Delaware Uniform Fraudulent Transfer Act but otherwise deny the allegations contained in paragraph 12 of the Adversary Complaint.

## THE PARTIES

### I.    The Plaintiffs

13.    Admit the allegations contained in paragraphs 13, 15 through 22, 25 and 26 of the Adversary Complaint.

14.    Deny the allegations contained in paragraph 24 of the Adversary Complaint except they admit that Plaintiff Orion is a Delaware corporation with a principal place of business in New Jersey and which owns 100% of the interests in various operating entities and holding companies.

15.    Deny the allegations contained in paragraph 23 of the Adversary Complaint except they admit that Phoenix Health, LLC is a Delaware limited liability company owned by Orion.

16.    Deny the allegations contained in paragraph 24 of the Adversary Complaint except they admit that MDRX Medical Billing LLC is a Delaware limited liability company owned by Orion.

### II.    The Defendants

17.    Deny the allegations contained in paragraph 27 of the Adversary Complaint except they admit that Parmar resides at 18/19 Colts Gait Lane, Colts Neck, New Jersey (the "Colts Neck Property"), and was the CEO and Chairman of CHT.

18.    Deny the allegations contained in paragraph 28 of the Adversary Complaint except they admit that Chivukula is a personal associate of Parmar, and was Secretary of CHT and a Director of Orion.

19.    Deny the allegations contained in paragraph 29 of the Adversary Complaint except they lack sufficient knowledge and/or information upon which to form a belief as to Zaharis' citizenship or where Zaharis resides and admit that Zaharis was on the Board of CHT.

20.     Deny the allegations contained in paragraph 30 of the Adversary Complaint.

21.     Admit the allegations contained in paragraphs 31 through 33 of the Adversary Complaint.

22.     Deny the allegations contained in paragraphs 34 and 35 of the Adversary Complaint, except as to paragraph 34, admit Alpha Cepheus, LLC is a Delaware Limited Liability Company and was wholly owned and controlled by Constellation Investment and First United,

23.     Deny the allegations contained in paragraph 35 of the Adversary Complaint, except admit that Blue Mountain Healthcare LLC is a Delaware Limited Liability Company and was owned by Defendant, Taira No Kiyomori, another Delaware Limited Liability Company.

24.     Deny the allegations contained in paragraph 36 of the Adversary Complaint except they admit that CC Capital CHT Holdco LLC ("CC Holdco") is a Delaware limited liability company formed by Chinh Chu in anticipation of the Merger.

25.     Deny the allegations contained in paragraph 37 of the Adversary Complaint except they admit that CC Holdco is a limited liability company.

26.     Admit the allegations contained in paragraphs 38 through 42 of the Adversary Complaint.

27.     Deny the allegations contained in paragraph 43 of the Adversary Complaint except they admit that MYMSMD LLC is a New Jersey limited liability company owned by Parmar.

28.     Deny the allegations contained in paragraph 44 of the Adversary Complaint except they admit that AAKB Investments Limited is a UK company registered in Guernsey.

29.     Admit the allegations contained in paragraphs 45 and 46 of the Adversary Complaint.

30.     Deny the allegations contained in paragraph 47 of the Adversary Complaint except they admit that Constellation Health Group LLC is a Delaware limited liability company.

31.     Deny the allegations contained in paragraph 48 of the Adversary Complaint except they admit Constellation Health, LLC is a Delaware limited liability company.

32.     Deny the allegations contained in paragraph 49 of the Adversary Complaint except they admit that the United States of America is a sovereign and has claimed an interest in certain real property assets owned and controlled by Parmar and approximately $20 million of Parmar's and Parmar Entities' monies seized from escrow accounts maintained by Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog").

33.     Deny the allegations contained in paragraph 50 of the Adversary Complaint except they admit that Aquila Alpha LLC is a Delaware limited liability company formed on January 22, 2016.

34.     Deny the allegations contained in paragraph 51 of the Adversary Complaint except they admit that 2 River Terrace Apartment 12J is a New York limited liability company formed on December 23, 2016.

35.     Deny the allegations contained in paragraph 52 of the Adversary Complaint.

36.     Deny the allegations contained in paragraph 53 of the Adversary Complaint except they admit that 21B One River Park, LLC is a Delaware limited liability company formed in or around April 2017.

37.     Deny the allegations contained in paragraph 54 of the Adversary Complaint except they admit that Aquila Alshain LLC is a Delaware limited liability company and the sole member of 21B One River, LLC.

38.     Deny the allegations contained in paragraph 55 of the Adversary Complaint except they admit that Kiran Sharma is Parmar's sister, resides at 5 Muncee Ct., Holmdel, New Jersey 07733-1246 and is a trustee of The Red Fronted Macaw Trust (the "Red Trust").

39.     Deny the allegations contained in paragraph 56 of the Adversary Complaint except they admit that the Red Trust is a trust formed under the laws of the State of New York and is the sole member of Aquila Alshain.

40.     Deny the allegations contained in paragraph 57 of the Adversary Complaint except they admit Ranga Bhoomi LLC is a Delaware limited liability company.

41.     Deny the allegations contained in paragraph 58 of the Adversary Complaint except they admit that he resides at 40 Broad Street, Apt. 20 FG, New York, New York 10004.

42.     Admit the allegations contained in paragraphs 59 through 61.

43.     Deny the allegations contained in paragraph 62 of the Adversary Complaint except they admit that Does 1 through 100, inclusive, are unknown individuals and/or corporate entities.

## JURISDICTION AND VENUE

44.     Admit the allegations contained in paragraph 63 of the Adversary Complaint.

45.     Deny the allegations contained in paragraph 64 of the Adversary Complaint.

46.     Admit the allegations contained in paragraph 65 of the Adversary Complaint

47.     Deny the allegations contained in paragraph 66 of the Complaint.

48.     In the event that this Bankruptcy Court or any other appropriate court finds any part of this adversary proceeding to be "non-core", Parmar and the Parmar Entities DO NOT consent to the entry of final orders and judgments by the Bankruptcy Court.  Parmar and the Parmar Entities DO NOT consent to the entry of final orders or judgments by the Bankruptcy

Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

### I.    Pre-Merger Background

49.    Admit the allegations continued in paragraphs 68 through 75 of the Adversary Complaint.

### II.    The Sham Acquisitions Inflate CHT's Value

50.    Deny the allegations contained in paragraph 76 of the Adversary Complaint.

51.    Deny the allegations contained in paragraph 77 of the Adversary Complaint.

52.    Deny the allegations contained in paragraph 78 of the Adversary Complaint.

53.    With respect to the allegations contained in paragraph 79 of the Adversary Complaint, Parmar asserts his Fifth Amendment privilege, except the Parmar Entities admit that on September 16, 2015 CHT announced its acquisition of Northstar for $18 million, and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the remaining allegations.

54.    With respect to the allegations contained in paragraph 80 of the Adversary Complaint, Parmar asserts his Fifth Amendment privilege, except the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the remaining allegations.

55.    With respect to the allegations contained in paragraph 81 of the Adversary Complaint, Parmar asserts his Fifth Amendment privilege, except the Parmar Entities admit that on December 11, 2015, CHT announced a second capital raise and on January 6, 2016, CHT's Board approved the admission of 18,751,195 new shares to the London AIM market raising $45 million and on February 10, 2016, CHT announced its acquisition of MDRX for $28 million.

The Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the remaining allegations.

56.     Parmar and the Parmar Entities lack sufficient knowledge and/or information as to the truth of the allegations contained in paragraph 82 of the Adversary Complaint.

57.     Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 83 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 84 of the Adversary Complaint.

58.     Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 84 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 84 of the Adversary Complaint.

59.     Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 85 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 85 of the Adversary Complaint.

**III.    The Go-Private Merger Transaction**

60.     Deny the allegations contained in paragraph 86 of the Adversary Complaint, except they admit that beginning in January 2016, CHT pursued a potential merger with Sun Capital and CC Capital.

61.     Deny the allegations contained in paragraph 87 of the Adversary Complaint except they admit that the negotiations resulted in a Merger.

62.     Admit the allegations contained in paragraph 88 of the Adversary Complaint.

63.     Deny the allegations contained in paragraph 89 of the Adversary Complaint except they admit that Alpha Cepheus LLC owned 53.5% of CHT's outstanding shares, other entities owned 11.65% of CHT's outstanding shares and the balance of CHT's shares were owned by public shareholders.

64.     Admit the allegations contained in paragraph 90 of the Adversary Complaint.

65.     Deny the allegations contained in paragraph 91 of the Adversary Complaint except they admit that Zaharis and Chivukula provided CC Capital with information regarding CHT's operations and financial condition.

66.     Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 92 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 92 of the Adversary Complaint.

67.     Parmar asserts his Fifth Amendment privilege  with respect to the allegations contained in paragraph 93 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 93 of the Adversary Complaint.

68.     Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 94 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 94 of the Adversary Complaint.

69.     Admit the allegations contained in paragraph 95 of the Adversary Complaint.

70.     Denies the allegations contained in paragraph 96 of the Adversary Complaint except they admit that CHT Holdco was formed as a limited liability company.

71.     Admit the allegations contained in paragraph 97 of the Adversary Complaint.

72.    Admit the allegations contained in paragraph 98 of the Adversary Complaint.

73.    Admit the allegations contained in paragraph 99 of the Adversary Complaint.

74.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 100 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 100 of the Adversary Complaint.

75.    Admit the allegations contained in paragraph 101 of the Adversary Complaint.

76.    Deny the allegations contained in paragraph 102 of the Adversary Complaint except they admit that CHT was valued in excess of $309 million.

77.    Deny the allegations contained in paragraph 103 of the Adversary Complaint except they admit that at the closing of the Merger the Acquisition Price for each outstanding share of CHT's stock was $2.93 cash and $0.43 in promissory notes per share.

78.    Admit the allegations contained in paragraph 104, 105, 106, 107 and 108 of the Adversary Complaint.

**IV.    The Merger Proceeds, Merger Financing and Shareholder Redemption Payments**

79.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 109 of the Adversary Complaint.

80.    Lack sufficient knowledge and/or information upon which to form a belief as to the allegations contained in paragraph 110 of the Adversary Complaint.

81.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 111, 112, 113 and 114 of the Adversary Complaint.

**A.    The Destra Litigation and The YC Escrowed Funds**

82.    Admit the Allegations contained in paragraphs 115, 116, 117 and 119 of the Adversary Complaint.

83.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 118 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 118 of the Adversary Complaint.

84.    Deny the allegations contained in paragraph 120 of the Adversary Complaint except they admit that plaintiffs in the Destra Litigation did not seek to prevent the Merger.

85.    Admit the allegations contained in paragraph 121 of the Adversary Complaint.

**B.    Disbursement of the Merger Proceeds**

86.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 122, 123, 124 and 125 in the Adversary Complaint.

87.    Admit the allegations contained in paragraph 126 of the Adversary Complaint.

88.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 127 and 128 of the Adversary Complaint.

89.    Deny the allegations contained in paragraph 129 of the Adversary Complaint except they admit that Capita wired $45,959,429.43 into the RB Escrow Account.

90.    Deny the allegations contained in paragraph 130 of the Adversary Complaint.

91.    Deny the allegations contained in paragraph 131 of the Adversary Complaint.

92.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 132 of the Adversary Complaint.

93.     Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 133 and 135 of the Adversary Complaint.

## V.     Proposed Settlement of the Destra Litigation

94.     Admit the allegations contained in paragraphs 134 through 137 of the Adversary Complaint.

95.     Admit the allegations contained in paragraph 138 of the Adversary Complaint except they deny that the YC Escrowed Funds are assets of the Debtors' estates.

96.     Deny the allegations contained in paragraph 139 of the Adversary Complaint.

## VI.     Discovery of the Fraud

97.     Admit the allegations contained in paragraph 140 of the Adversary Complaint.

98.     Deny the allegations contained in paragraph 141 of the Adversary Complaint except they admit that Truc To, who had led financial due diligence efforts for Chinh Chu, was hired as CFO of CHT.

99.     Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraphs 142 and 143 of the Adversary Complaint and the Parmar Entities deny the allegations contained in paragraph 143 except they admit that a specially called meeting of CHT's Board was held on September 29, 2017.

100.     Admit the allegations contained in paragraph 144 of the Adversary Complaint.

101.     Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 145 and 146 of the Adversary Complaint except they admit that (i) Zaharis and Chivukula were placed on administrative leave and then terminated on October 13, 2017 and (ii) that Tim Dragelin was appointed as the Debtors' interim CEO and CFO.

VII.    **The Parmar Shareholder Redemption Payments
Were Stolen From and Rightfully Belong to the Debtors**

102.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 147 of the Adversary Complaint and the Parmar Entities deny the allegations contained in paragraph 147 of the Adversary Complaint.

103.    Deny the allegations contained in paragraphs 148, 149 and 150 of the Adversary Complaint.

VIII.   **Alternatively, the Parmar Shareholder Redemption Payments
Are Proceeds of the Avoidable Fraudulent Transfers**

104.    Deny the allegations contained in paragraph 151 of the Adversary Complaint.

105.    Admit the allegations contained in paragraph 152 of the Adversary Complaint.

106.    Deny the allegations contained in paragraph 153 of the Adversary Complaint.

107.    Deny the allegations contained in paragraph 154 of the Adversary Complaint except they admit that the Debtors were under no obligation to enter into the Merger or incur obligations under the Merger Financing.

108.    Deny the allegations contained in paragraph 155 of the Adversary Complaint except they admit the Debtors seek to avoid and recover the Parmar Shareholder Redemption Payments.

IX.     **Parmar, Zaharis and Chivukula Defrauded the Debtors by Secreting
Assets Stolen Before the Merger and Using the Parmar Shareholder
Redemption Payments to Purchase Real Estate Assets After the Merger**

A.      **Parmar and Zaharis Create a Fraudulent Email
Account to Help Hide Real Estate Purchases**

109.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraphs 156 and 157 and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 156 and 157.

{11563768:1}                                15

**B.** **The Colts Neck Property**

110.    Deny the Allegations contained in paragraphs 158 and 159 of the Adversary Complaint.

111.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraphs 160 through 166 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 160 through 166 of the Adversary Complaint.

112.    Deny the allegations contained in paragraphs 167 of the Adversary Complaint except they admit that Aquila Alpha was incorporated on January 22, 2016.

113.    Deny the allegations contained in paragraph 168 of the Adversary Complaint except they admit that (i) on March 2, 2016, Deutsche Bank and Aquila Alpha executed a Note Sale Agreement, pursuant to which Aquila Alpha purchased the Colts Neck Property Mortgage for $3.8 million and (ii) the Note Sale Agreement contains an arm's length transaction provision.

114.    Admit the allegations contained in paragraph 169 of the Adversary Complaint.

115.    Deny the allegations contained in paragraph 170 of the Adversary Complaint.

116.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraphs 171, 172 and 173 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 171, 172 and 173 of the Adversary Complaint.

**C.** **The River Terrace Property**

117.    Deny the allegations contained in paragraphs 174 through 177 of the Adversary Complaint.

D.    **The Broad Street Property**

118.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 178 and 179 of the Adversary Complaint.

119.    Deny the allegations contained in paragraph 180 of the Adversary Complaint except they admit that DKP was incorporated in Delaware on June 27, 2017.

120.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 181 and 182.

121.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraphs 183, 184, 185 and 186 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 183, 184, 185 and 186 of the Adversary Complaint.

E.    **The Riverside Boulevard Property**

122.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraphs 187 and 188 of the Adversary Complaint and the Parmar Entities lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 187 and 188 of the Adversary Complaint.

123.    Parmar asserts his Fifth Amendment privilege with respect to the allegations contained in paragraph 189 of the Adversary Complaint and the Parmar Entities deny the allegations contained in paragraph 189 of the Adversary Complaint.

124.    Parmar assets his Fifth Amendment privilege with respect to the allegations contained in paragraphs 190 and 191 and the Parmar Entities deny the allegations contained in paragraphs 190 and 191 of the Adversary Complaint except they admit that a trust managed by Kiran Sharma is the owner of the Riverside Boulevard Property.

125.    Admit the allegations contained in paragraph 192 of the Adversary Complaint.

126.    Parmar asserts his Fifth Amendment privilege and the Parmar Entities deny the allegations contained in paragraphs 193, 194, 195 and 196 of the Adversary Complaint except they admit that the money used to purchase the Riverside Boulevard Property came from a M&T bank account.

127.    Deny the allegations contained in paragraph 197 of the Adversary Complaint except they admit the Debtors had no obligation to fund the purchase of the Riverside Boulevard Property.

X.    **The United States' Actions Against Parmar, Zaharis, Chivukula and the Parmar Real Property**

128.    Deny the allegations contained in paragraph 198 of the Adversary Complaint except they admit that FTI Consulting Corp. commenced an investigation into the Debtors, related entities and the Merger.

129.    Deny the allegations contained in paragraph 199 of the Adversary Complaint except they admit complaints were filed by the United States government on May 16, 2018 against Parmar, Zaharis, Chivukula and the Parmar Real Property.

130.    Deny the allegations contained in paragraph 200 of the Adversary Complaint except they admit that Parmar, Zaharis and Chivukula were charged with (a) fraud and securities fraud in the SEC's complaint and (b) conspiracy to commit securities fraud and securities fraud in the DOJ complaint.

131.    Admit the allegations contained in paragraph 201 of the Adversary Complaint.

## COUNT 1

## TURNOVER

132.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 129 with the same force and effect as if fully set forth herein.

A.    **The Parmar Shareholder Redemption Payments**

133.    Admit the allegations contained in paragraph 203 of the Adversary Complaint.

134.    Deny the allegations contained in paragraphs 204 through 207 of the Adversary Complaint.

B.    **The Parmar Real Property**

135.    Admit the allegations contained in paragraph 208 of the Adversary Complaint.

136.    Deny the allegations contained in paragraphs 209, 210, 211 and 212 of the Adversary Complaint.

**COUNT II**

**TURNOVER OF THE YC ESCROWED FUNDS**

137.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 134 with the same force and effect as if fully set forth herein.

138.    Admit the allegations contained in paragraphs 214 and 215 of the Adversary Complaint.

139.    Deny the allegations contained in paragraph 216 of the Adversary Complaint.

140.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 217 of the Adversary Complaint except they admit that the YC Escrowed Funds remain in the custody, possession and control of the Escrow Agent.

141.    Deny the allegations contained in paragraphs 218 and 220 of the Adversary Complaint.

142.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 219 of the Adversary Complaint except they admit that the YC Escrowed Funds are valued at $55 million.

## COUNT III

## UNJUST ENRICHMENT

143.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 140 with the same force and effect as if fully set for herein.

**A.      The Parmar Shareholder Redemption Payments**

144.    Admit the allegations contained in paragraph 222 except they deny that it is "…at the Debtors' expense".

145.    Deny the allegations contained in paragraphs 223, 224, 225 and 226 of the Adversary Complaint.

**B.      The Parmar Real Property**

146.    Deny the allegations contained in paragraphs 227, 228, 229, 230 and 231 of the Adversary Complaint.

## COUNT IV

## CONVERSION

147.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 144 with the same force and effect as if fully set forth herein.

**A.      The Parmar Shareholder Redemption Payments**

148.    Deny the allegations contained in paragraphs 233, 234, 245, 236 and 238 of the Adversary Complaint.

149.    Admit the allegation contained in paragraph 237 of the Adversary Complaint.

**B.      The Parmar Real Property**

150.    Deny the allegations contained in paragraphs 239, 240, 241, 242 and 244 of the Adversary Complaint.

151.    Admit the allegations contained in paragraph 243 of the Adversary Complaint.

COUNT V

**REPLEVIN**

152.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 149 with the same force and effect as if fully set forth herein.

153.    Deny the allegations contained in paragraphs 246, 247, 248 and 249 of the Adversary Complaint.

COUNT VI

**INTENTIONAL FRAUDULENT TRANSFER**

154.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 151 with the same force and effect as if fully set forth herein.

**A.    The Parmar Shareholder Redemption Payments**

155.    Admit the allegations contained in paragraphs 251 and 252 of the Adversary Complaint.

156.    Deny the allegations contained in paragraphs 253, 254 and 256 of the Adversary Complaint.

157.    Admit the allegations contained in paragraph 255 of the Adversary Complaint.

**B.    The Parmar Real Property**

158.    Deny the allegations contained in paragraphs 257, 258, 259 and 261 of the Adversary Complaint.

159.    Deny the allegations contained in paragraph 260 of the Adversary Complaint except they admit that The Broad Street Property and The Riverside Boulevard Property were acquired within two (2) years of the Petition Date.

**COUNT VII**

**CONSTRUCTIVE FRAUDULENT TRANSFER**

160.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 157 with the same force and effect as if fully set forth herein.

A.    **The Parmar Shareholder Redemption Payments**

161.    Admit the allegations contained in paragraphs 263 and 264 of the Adversary Complaint.

162.    Deny the allegations contained in paragraphs 265, 266 and 268 of the Adversary Complaint.

163.    Admit the allegations contained in paragraph 267 of the Adversary Complaint.

B.    **The Parmar Real Property**

164.    Deny the allegations contained in paragraphs 269, 270 and 273 of the Adversary Complaint.

165.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 271 of the Adversary Complaint.

166.    Deny the allegations contained in paragraph 272 of the Adversary Complaint except they admit that The Broad Street Property and The Riverside Boulevard Property were acquired within two (2) years of the Petition Date.

**COUNT VIII**

**ACTUAL FRAUDULENT TRANSFER**

167.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 164 with the same force and effect as if fully set forth herein.

A.    **The Parmar Shareholder Redemption Payments**

168.    Admit the allegations contained in paragraphs 275, 276 and 279 of the Adversary Complaint.

169.    Deny the allegations contained in paragraphs 277, 278 and 280 of the Adversary Complaint.

B.    **The Parmar Real Property**

170.    Deny the allegations contained in paragraphs 281, 282, 283 and 285 of the Adversary Complaint.

171.    Admit the allegations contained in paragraph 284 of the Adversary Complaint.

## COUNT IX

## CONSTRUCTIVE FRAUDULENT TRANSFER

172.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 169 with the same force and effect as if fully set forth herein.

A.    **The Parmar Shareholder Redemption Payments**

173.    Admit the allegations contained in paragraphs 287, 288 and 291 of the Adversary Complaint.

174.    Deny the allegations contained in paragraphs 289 and 292 of the Adversary Complaint.

175.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 290 of the Adversary Complaint.

B.    **The Parmar Real Property**

176.    Deny the allegations contained in paragraphs 293, 294 and 297 of the Adversary Complaint.

177.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraph 295 of the Adversary Complaint.

178.    Deny the allegations contained in paragraph 296 of the Adversary Complaint except they admit that The Broad Street Property and The Riverside Boulevard Property were acquired within two (2) years of the Petition Date.

## COUNT X

## CONSTRUCTIVE TRUST

179.    Parmar and the Parmar Entities repeat, restate and reallege the foregoing paragraphs 1 through 176 with the same force and effect as if fully set forth herein.

180.    Admit the allegations contained in paragraph 299 of the Adversary Complaint.

181.    Deny the allegations contained in paragraph 300 of the Adversary Complaint.

**A.    The Parmar Shareholder Redemption Payments**

182.    Deny the allegations contained in paragraph 301 of the Adversary Complaint except they admit that they received, or will receive, the Parmar Shareholder Redemption Payments.

183.    Admit the allegations contained in paragraph 302 of the Adversary Complaint.

184.    Deny the allegations contained in paragraph 303 of the Adversary Complaint.

**B.    The Parmar Real Property**

185.    Deny the allegations contained in paragraphs 304, 305 and 306 of the Adversary Complaint.

## COUNT XI

## PERMANENT INJUNCTION

186.    Parmar and the Parmar Entities repeat, restate, reallege the foregoing paragraphs 1 through 183 with the same force and effect as if fully set forth herein.

A.    **The Parmar Shareholder Redemption Payments**

187.    Lack sufficient knowledge and/or information upon which to form a belief as to the truth of the allegations contained in paragraphs 308 and 309 of the Adversary Complaint.

188.    Deny the allegations contained in paragraphs 310, 311, 312, 313 and 314 of the Adversary Complaint.

B.    **The Parmar Real Property**

189.    Deny the allegations contained in paragraphs 315, 316, 317, 318, 319 and 320 of the Adversary Complaint.

**COUNT XII**

**CONSPIRACY BASED FRAUD**

190.    Parmar and the Parmar Entities repeat, restate and reallege each of the foregoing paragraphs 1 through 187 with the same force and effect as if fully set forth herein.

191.    Deny the allegations contained in paragraphs 322, 323, 324, 325 and 326 of the Adversary Complaint.

**COUNT XIII**

**BREACH OF FIDUCIARY DUTY**

192.    Parmar and the Parmar Entities repeat, restate and reallege each of the foregoing paragraphs 1 through 189 with the same force and effect as if fully set forth herein.

193.    Deny the allegations contained in paragraphs 328, 330 (a), (b), (c), (d) and (e), 331 and 332 of the Adversary Complaint.

194.    Admit the allegations contained in paragraph 329 of the Adversary Complaint.

**COUNT XIV**

**ILLEGAL DIVIDEND**

195.    Parmar and the Parmar Entities repeats, restate, reallege each of the foregoing

paragraphs 1 through 192 with the same force and effect as if fully set forth herein.

196.    Deny the allegations contained in paragraphs 334, 335 and 336 of the Adversary

Complaint.

**COUNT XV**

**DECLARATORY JUDGMENT**

197.    Parmar and the Parmar Entities repeat, restate and reallege each of the foregoing

paragraphs 1 through 194 with the same force and effect as if fully set forth herein.

198.    Deny the allegations contained in paragraph 338 of the Adversary Complaint.

A.    **The Parmar Shareholder Redemption Payments**

199.    Deny the allegations contained in paragraphs 339 and 340 of the Adversary

Complaint.

200.    Deny the allegations contained in paragraphs 341 and 342 of the Adversary

Complaint.

**CROSS-CLAIMS AGAINST
CC CAPITAL CHT HOLDCO LLC AND CHT HOLDCO LLC**

Cross-claim Plaintiffs, Paul Parmar, First United Health, LLC and constellation Health

LLC, (jointly, the "Parmar Entities") by and through their counsel, Windels Marx Lane &

Mittendorf, LLP, and Complaining of the Cross-claim Defendants, CC Capital CHT Holdco

LLC and CHT Holdco LLC, respectfully allege as follows:

**INTRODUCTION**

201.    This is an action against Cross-Claim Defendants CC Capital CHT Holdco LLC

("CC Capital") and CHT Holdco LLC ("CHT Holdco") (jointly referred to as "CC-CHT") for

their unlawful and corrupt actions as part of an ongoing scheme to unlawfully enrich themselves at the Debtors' creditors, Parmar and the Parmar Entities' expense.

202.    CC-CHT through its control of the Debtors and exerted leverage over Parmar have orchestrated a large, complex and brazen fraud with the target objective of devaluing and, ultimately, stealing valuable assets belonging to the Debtors' creditors, Parmar and the Parmar Entities - namely their ownership interests in CHT, a profitable medical billing company.  CC-CHT pursued this objective, on behalf of CC Capital and its principal, Chinh Chu ("Chu" or "Chinh Chu"), through a pattern of activity in violation of various state and federal statutes.

203.    Parmar and the Parmar Entities who are shareholders in CHT, have suffered immense damages by CC-CHT's  pattern of illegal activity from in and around January 2016 to the present.

204.    CHT was a publicly traded company on the London Stock Exchange's Alternative Investment Market ("AIM").  Beginning in January 2016, CC-CHT was utilized by its owner/principal, Chinh Chu, to express an interest in purchasing CHT for CC Capital and taking CHT off the AIM in a "go private" transaction.  The proposed transaction would have resulted in CHT becoming a privately held corporation with 50% held by CC Capital controlled entities and fifty (50%) percent being owned by Alpha Cephus, LLC; another one of the Parmar Entities.

205.    During the due diligence phase of the "go private" transaction, CC-CHT discovered problems with CHT's records, specifically that three (3) of the subsidiaries that had been acquired by CHT were allegedly empty shell corporations with little to no customers, revenue, or value (the "empty shells").  CC-CHT determined that CHT had put out false press releases touting the imaginary value of these three (3) empty shells, but had not done anything in the way of creating any <u>false </u>backup documentation to corroborate the press releases.

206.    Despite reviewing significant evidence that could have easily been used to determine that these three (3) subsidiaries were empty shells, CC-CHT and, Chinh Chu made a conscious decision to ignore this data and to pretend that they had not discovered these inconsistencies.

207.    The reason CC-CHT chose to ignore data that would ordinarily delay or derail a "go private" transaction is because CC-CHT and Chinh Chu determined that, even excluding the inflated revenue data from those empty shells, the sale price of CHT was still a bargain and that this information would be useful for CC-CHT and Chinh Chu to later use as leverage against Parmar and the Parmar Entities.

208.    Unfortunately for CC-CHT and Chinh Chu, a reporter from the Financial Times easily uncovered the truth behind the empty shells and began asking questions, months before the "go private" closing.  CC-CHT and Chinh Chu responded by denying that there was anything wrong and hired a public relations firm to respond and try to prevent reporters from revealing the truth of the empty shells.

209.    Predictably, as soon as the "go private" transaction was completed, CHT, now in the control of Chinh Chu, began looking for a pretext to begin a forensic accounting investigation, so that they could falsely claim that they were unaware of and only discovered the empty shells after the "go private" closing and use this information as leverage to steal Parmar's and the Parmar Entities' interests in CHT. In furtherance of their aforestated endeavor, CC-CHT and the Debtors hired the forensic accounting firm of FTI Consulting Corp., currently the Debtors' consultant in this Chapter 11 case, to create a report to outline how the empty shells were fraudulent, while falsely making it appear as though these conclusions were only discovered after the "go private" closing.

210.    First, CC-CHT, through the efforts of Chinh Chu and Chinh Chu's subordinates, primarily, Truc To, John Altorelli, Esq., Douglas Newton and others,  attempted to steal Parmar's and the Parmar Entities' shares by extorting Parmar.  Mr. Chu demanded that Parmar pay him $10 million and turn over all of the Parmar Entities' interests in CHT in exchange for Chu's and CC-CHT's silence about the empty shells. When Parmar refused this attempted extortion, Mr. Chu and his subordinates threatened Parmar with bodily harm by the "Chinese Mafia" and then attempted to institute a frivolous arbitration proceeding against Parmar and the Parmar Entities and to take their shares.

211.    CC-CHT and the Debtors, at Chinh Chu's behest,  then instituted a fraudulent Chapter 11 Bankruptcy case, utilizing conflicted professionals and falsely claiming that CHT had little to no value. The target objective of this Chapter 11 case was to sell CHT to another entity, secretly controlled by CC-CHT and Chinh Chu, with all proceeds of the sale through the "waterfall" priority going to other creditors, such as Bank of America, and thereby enabling CC-CHT and Chinh Chu to take all of Parmar's and the Parmar Entities' shares without providing them any compensation.

212.    When the Debtors filed their Chapter 11 petitions, they already had in place an outstanding offer from GSS Infotech Inc. ("GSS") to purchase CHT that would have satisfied all of the claims of secured creditors, unsecured creditors, and current and past shareholders claims (the "GSS Offer"). The GSS Offer, which was a series of offers, had been made months before the Chapter 11 filing, was proposed to the Debtors on several CC-CHT occasions and to several individuals, as the Debtors and CC-CHT desperately sought to avoid this Offer, which would have derailed  CC-CHT's and Chinh Chu's corrupt plan to steal the Parmar Entities' equity for CC Capital. The Debtors and CC-CHT then persuaded the Bankruptcy Court to accept an offer to

purchase certain of CHT's assets by a straw purchaser for less than 10% of the GSS Offer, while falsely and fraudulently claiming that this was the "highest and best offer" that they had received.

213.    In a stunning escalation and ethical breach, CC-CHT, Chinh Chu and the Debtors worked behind the scenes with the U.S. Department of Justice ("DOJ") and the U.S. Attorney's Office for the District of New Jersey ("USAO-NJ") to investigate Parmar and the Parmar Entities, feeding them false information and alleging fraud in the "go private" transaction. These actions first bore fruit, as the DOJ seized all the funds that had been placed in escrow as part of the "go private" transaction, much of which was to be paid to the Parmar Entities.  Later, CC-CHT, Chinh Chu and the Debtors corruptly persuaded the USAO-NJ to file criminal charges and to arrest Parmar during the same week that the GSS offer was being presented to the Bankruptcy Court. Defendants accomplished this corrupt design by knowingly providing materially false information to DOJ and the USAO-NJ.

214.    The USAO-NJ arrested Parmar one (1) week before the hearing in the Bankruptcy Court where the GSS Offer was presented in opposition to CC Capital's straw purchaser's offer. When it appeared that Parmar might be granted bail, CC-CHT and Chinh Chu attempted to tip the scales by providing an "anonymous tip" consisting of fabricated allegations that Parmar had moved money overseas in preparation for fleeing the country.

215.    As a direct result of CC-CHT's and the Chinh Chu's pattern of illegal activity, Parmar and the Parmar Entities have suffered immense damages through the seizure of funds that were to be paid to the Parmar Entities in the "go private" transaction, and the intentional devaluation of their interest in CHT. These damages will be compounded, should CC-CHT, Chinh Chu and the Debtors succeed in their fraudulent and corrupt use of the Bankruptcy Court to steal all of the Parmar and Parmar Entities' interests in CHT without providing any compensation.

## JURISDICTION AND VENUE

216.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§157 and 1334 because the claims asserted herein arise in the above-captioned Chapter 11 cases.

217.    This is a core proceeding under 28 U.S.C. 157(b)(2).

218.    Venue is proper pursuant to 28 U.S.C. §§1409(a) and 1391(b)(2) because this proceeding is related to the Chapter 11 cases currently pending before this Court.

## THE PARTIES

219.    Cross-Claim Plaintiff, First United Health, LLC is a limited liability company, organized under the laws of the State of New York, with its primary offices located within the State of New York.

220.    Cross-Claim Plaintiff, Constellation Health LLC, is a limited liability company, organized under the laws of the State of Delaware.  With respect to Parmar, paragraph 17 is incorporated herein by reference.

221.    Cross-Claim Defendant, CC Capital CHT Holdco LLC, is a limited liability company, organized under the laws of the State of Delaware.

222.    Cross-Claim Defendant, CHT Holdco LLC, is a limited liability company, organized under the laws of the State of Delaware.

## FACTUAL BACKGROUND

223.    At all times relevant to this Cross-Complaint, unless otherwise indicated.

### The Enterprise

224.    All Cross-claim  Defendants, as well as others known and unknown, are members, partners, and associates[1] of CC Capital and CHT Holdco.

---

[1] For the purpose of this complaint, "associates" refers to all individuals associated with the CC Capital, officially or unofficially, and is not limited to individuals employed with the official title of associate.

225.    CC Capital is an organized group based in New York City, that operated in New York and elsewhere and constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

226.    CC Capital was founded in or about 2016, when Chinh Chu left Blackstone to begin his own private investment firm.

### Methods and Means of the Enterprise

227.    The principle purpose of CC Capital was to generate money for its members, partners and associates. This purpose was implemented by members, partners, and associates of CC Capital.

228.    On information and belief, before launching CC Capital, Chinh Chu spent 25 years working at Blackstone, focusing on building its Private Equity business. Fashioning himself as a "master deal maker," Mr. Chu closed some significant deals on his way to becoming a billionaire.

229.    One of CC Capital's and Chinh Chu's most significant assets is former KPMG partner, Truc To. A fellow Vietnamese immigrant, Truc To was Chu's go-to person at KPMG to perform due diligence for his acquisitions.  Later, Truc To's loyalty to CC Capital and Chinh Chu became evident from his actions following his appointment by CC Capital and Chinh Chu as CFO of the Debtors.

### Background of CHT

230.    In 2012, Parmar, the Parmar Entities, and other investors acquired Orion, a medical billing, collections, and practice management service company. Orion was later merged into CHT. Parmar served as CEO of CHT.

231.    Parmar's vision for CHT was to provide physician back office services, including billing and collections. While this industry is traditionally populated by smaller "mom and pop"

service companies, Parmar saw an opportunity to create a much larger operation that could provide far better service at a much lower price. He developed CHT into a sophisticated platform to provide these services.

232.    Although CHT's platform was the best and most efficient in the industry, CHT struggled to gain new physician customers because of the difficulty in convincing independent practicing physicians to leave their existing service providers. Parmar decided that the best way to grow CHT's business was by implementing a strategy of acquiring smaller service providers. The value of these acquisitions to CHT is primarily in their customer lists and relationships, as these medical practices would then be serviced by the main CHT platform.

233.    As CHT grew through these acquisitions, CHT went public on the London AIM to help raise money to fund the acquisitions.

### CC Capital Seeks to Aquire CHT

234.    Parmar and Chinh Chu first met through mutual friends, in September, 2015 on Chu's yacht.  At the time, Parmar was considering taking CHT off the AIM through a "go private" transaction. However, Chinh Chu stated that he would not be interested in CHT as it was "too small" for him.

235.    In January, 2016, Chu began to show interest in bidding for CHT. He reviewed public data for 6-8 weeks and gave a verbal offer of £1.77/share, which he shortly followed up with a term sheet.

236.    CHT's Board of Directors hired Stifel Bank to advise it on the going private process and Stifel Bank advised that Chinh Chu's bid was very low, but it was the start of a process and they recommended bringing in additional players to bid.

237.    Parmar and Chinh Chu met for breakfast to discuss Chu's bid and Chu considered raising his bid to £1.92, but wanted Parmar to personally contribute $10 million towards the

purchase. When this was presented to the Board of CHT, the Board advised that if Parmar

intended to contribute to the bid, he would be recused from all bid evaluation discussions, as he

would be part of the buying group. Parmar agreed to this recusal.

238.    Soon thereafter, Chinh Chu submitted a formal bid of £ 1 .91 /share.

239.    Upon receiving this bid, the Board formed an Independent Committee to evaluate

all bids.  Mark Feuer ("Feuer") was elected chairman of the Independent Committee and

Kirkland & Ellis, LLP was hired as attorneys and advisors to the Independent Committee. Duff

& Phelps Corp. ("D&P") was hired to perform an independent evaluation in order to write a

fairness opinion, as required by 17 CFR §229.1014.

240.    Immediately, Chinh Chu began to manipulate the process by instructing Parmar

on how to prepare the paperwork for D&P to review. He instructed Parmar to provide a watered

down model with no acquisitions, no projected growth, and an increase in anticipated future

costs. He explicitly told Parmar that D&P would price all of these things and Chinh Chu wanted

to ensure that D&P's valuation of CHT was as low as possible.

241.    Later, Chinh Chu became upset when he discovered that someone had put a draft

financial model for CHT on the dropbox server that showed five (5%) percent growth for CHT

and Chu began lecturing Parmar, berating him as to why he didn't want to help CC Capital get

the deal done.

242.    Parmar informed Douglas Newton, a Chinh Chu associate, that he did not want to

proceed with the deal.

243.    At approximately the same time, representatives from D&P informed Parmar that

they were shocked that he was supporting a bid as low as Chu's. D&P then informed the

Independent Committee that Chu's offer was off by more than sixty (60%) percent from the

lowest level ($400 million to $650 million) that they would consider before issuing a fairness opinion.

### CC Captial Revives the Deal

244.    Disappointed by this turn of events, Chinh Chu dispatched Newton to visit Parmar at his home and convince him to revive the transaction with CC Capital. Newton informed Parmar that Chinh Chu was offering to let Parmar use his yacht and insisted that for the next several days, Parmar use the yacht as an office during the day to work on reviving the bid and have parties at night.

245.    Parmar traveled to Chinh Chu's yacht, along with Sam Zaharis, where he met Newton and Pavan Bakshi ("Bakshi"). Newton and Bakshi spent all day in an attempt to convince Parmar to revive the CC Capital transaction. In an attempt to push Newton off, Parmar said that he wanted time to resolve the CHT issues and finish a few more acquisitions before CHT would be ready to sell. Parmar estimated that the additional acquisitions would take approximately 18-24 months to complete. Newton responded that Chinh Chu did not want to drop the deal and that they would be happy to work out any of CHT's issues with Parmar once they became partners.

246.    The following day, Chu invited Parmar to his office to look at another deal he was working on. During this visit, Chu took Parmar aside to explain why his low offer would still be very profitable to Parmar personally. Chu promised Parmar the following:

    a.    CC Capital would commit up to $400 million in additional financing for CHT without any dilution to shareholders.

    b.    CC Capital would provide CHT with access to a large number of new clients.

    c.    Chinh Chu would make Parmar a partner in CC Capital.

    d.  Chinh Chu would make Parmar a partner in a new $10 billion fund that

       Chu was forming called Northstar.

  247.  In exchange for the above, Chinh Chu wanted Parmar to assist CC Capital in

pushing the deal through at the then current bid price. Parmar responded by informing Chinh

Chu of the objections that D&P had already raised to the fairness of the bid. Parmar further

informed Chinh Chu that Kirkland & Ellis and D&P had advised the Independent Committee

that they believed that they could find new bidders willing to pay more than double Chu's offer.

  248.  In an effort to influence the Independent Committee, Chinh Chu began to review

the possibility of acquiring an unrelated company that was owned by Mark Feuer, the Chairman

of the Independent Committee. Chinh Chu and Feuer then engaged in extensive negotiations for

this potential acquisition.

  249.  At approximately the same time, Parmar received a phone call from Newton

asking Parmar to consider increasing the compensation for the Independent Committee members.

Parmar responded that the Committee members were already being highly compensated at

approximately $100,000 each for their participation in six (6) meetings. Newton then explained

that he had been speaking with John Johnston, one of the Committee members, about the

transaction and that this Committee member had expressed to Newton his desire for additional

compensation.

  250.  Shortly thereafter, Parmar again met with Chinh Chu, who explained to Parmar

that he did not believe that the deal could be worked out, so long as D&P and Kirkland were still

involved. Chu explained that he would revise the CC Capital bid by a few cents as a final bid and

then withdraw it. Chu directed Parmar to then dissolve the Independent Committee and terminate

the advisors.

251.    Chinh Chu then directed Parmar to give him a copy of the D&P report. Unaware that this was prohibited, Parmar emailed a copy of the D&P report to an analyst at CC Capital.

252.    Upon learning that the D&P report had been emailed, and therefore was able to be tracked, Chinh Chu became enraged at Parmar, yelling that Parmar's action alone had derailed the deal, as CC Capital could be subject to a class action lawsuit for being privy to the valuation methodology and analysis prior to winning the bid.

253.    As previously stated, Chinh Chu withdrew his final offer. As CHT officially had no bids to evaluate, Parmar followed Chinh Chu's instructions, dissolved the Independent Committee and terminated D&P and Kirkland.

254.    With the first Independent Committee dissolved, Chinh Chu then set about ensuring that the new Independent Committee would bend to his will. He had Bakshi introduce Parmar to representatives from SunTrust Bank and McGuire Woods as potential advisors for the next Independent Committee. Bakshi assured Parmar that Sun Trust would issue a fairness opinion in accordance with Chinh Chu's desires.

255.    Bakshi brought an executive from SunTrust to meet Parmar at his home and review the D&P report. After review, the SunTrust executive said that he saw no issues with presenting a new report with a valuation in the range that Chinh Chu desired.

256.    The fact that the entire credit agreement and commitment from BofA was negotiated directly with Chu, and BofA commitment letters were included in CC Capital's bids as early as July, 2016, well before the due diligence process had made any significant progress. In fact, BofA had absolutely no communications with Parmar or anyone else at CHT until April 2017, well after the due diligence had been completed and the deal had closed. Additionally, the terms that BofA provided on the CHT deal were extraordinary and unheard of. Most significantly, no audit of CHT was required prior to closing.

## Problems in the Due Diligence Process

257.    At a certain point in the due diligence process, Truc To sent CHT a request for all collection data on all doctors. CHT then provided complete and accurate data to Truc To, without any fabrications.

258.    Predictably, Truc To returned with a series of follow up questions and additional data requests. Astonishingly, Truc To was looking for more data to do a more indepth analysis of all the legitimate subsidiaries, but made no requests for any data from MDRX, Phoenix or Northstar, the alleged fraudulent entities.

259.    This was not an oversight by True To, as simple arithmetic would have revealed that the data provided was thirty (30%) percent short of the inflated collections claims. It is not reasonable to believe that an experienced expert such as True To and his well-paid team from KPMG would have missed over $800 million in collections.  Chinh Chu and his associates at CC Capital had undoubtedly discovered the empty shells, but for strategic reasons, were keeping quiet about their discovery and never confronted CHT or Parmar about it.

260.    On or about August, 2016, CHT received a series of questions from a reporter at the Financial Times asking about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX, the empty shells.

261.    Without ever explicitly acknowledging what he believed to be true about the empty shells, Chinh Chu directed Parmar to retain the services of a public relations firm who could coordinate with the public relations firm that CC Capital had hired to try to kill the Financial Times story and let the deal proceed to closing.

262.    In coordinated statements to the Financial Times, both CC Capital and CHT did their best to convince the reporters that everything was OK with the deal. Chu told the reporters that he was "comfortable" with proceeding, having spent $7 million and three (3) months' work

on due diligence alone. While these statements delayed Financial Times from reporting the obvious flaws in CHT, ultimately it did not stop the public disclosure of these issues just prior to the closing.

### CC Capital Pushes the Deal Through

263.    In or about July 2016, Chu submitted a new offer to purchase CHT, along with a commitment letter from BofA and a draft merger agreement.

264.    In response, CHT organized a Board meeting to discuss the following three (3) issues:

a.    CC Capital's new offer, which was a few pennies higher than the previous offer, but still less than half of the lowest price D&P reported as fair.

b.    CHT had repaid its outstanding loan.  The repayment of this loan should have increased the value of CHT by $23 million above the valuations calculated by D&P.

c.    CHT was in the process of acquiring Allegiance Billing & Consulting, LLC and Allegiance Consulting Associates, LLC ("ABC/ACA Acquisitions") using internal cash. This acquisition would significantly increase the revenue to CHT, and therefore also increase the value of CHT approximately $30 million above the D&P valuations.

265.    The impact of the repayment of the loan and the acquisitions would have increased the minimum fair price of CHT from D&P's estimate of $500 million to $553 million. However, CC Capital's offer was in the $275 million range. This disparity caused significant debate among the CHT Board.

266.    Mark Feuer, having been conflicted by Chinh Chu's attempt to purchase his company, advocated for the CC Capital deal and argued that the D&P estimates were never

officially presented to the Board and therefore were not binding. Other Board members responded that, notwithstanding the lack of official presentment, they had heard the D&P numbers and felt duty bound not to accept any offer below the D&P estimate. Although D&P had been terminated, the Board refused to entertain any lower offer, unless they were presented with a new, formal fairness report, prepared by a consultant with equal competency and reputation to D&P.

267.    Mark Feuer's advocacy on Chinh Chu's behalf resulted in him being accused of being conflicted by the other Board members. Although Feuer denied any conflict, he resigned from the Board.

268.    Bakshi took this opportunity to recommend SunTrust and McGuire Woods as advisors to the new Independent Committee. The Board agreed and formed a new Independent Committee with SunTrust and McGuire Woods as advisors.

269.    The Board then appointed John Johnston as the chairman to the Committee, the same Committee member who had previously discussed increasing the Board's compensation with Newton. Johnston was almost removed from the Committee for this reason, but the Board ultimately decided to leave him in that position with instructions not to have any more discussions with CC Capital about his compensation.

270.    Four (4) days after SunTrust was retained, SunTrust executive Tarun Mehta called Parmar seeking an urgent face-to-face meeting. When they meet later that day, Mehta explained that SunTrust would be unable to provide a fairness report in the range that Chinh Chu desired and that their initial calculations show that their estimate will actually be approximately thirty (30%) percent higher than D&P on the lower end of the range and fifteen (15%) percent higher on the higher of the range.  Sun Trust saw a $650 million minimum valuation of CHT to obtain fairness.  Mehta stated that SunTrust's position was complicated by the fact that Johnston had put

on the record what the D&P estimates were and the fact that this estimate did not account for the repaid loan or the ABC/ACA Acquisitions.

271.    Mehta explained to Parmar that he would rather resign than submit a fairness report that would upset Chinh Chu.

272.    Parmar asked Mehta to delay announcing Sun Trust's resignation so that he could speak with Chinh Chu and figure out how to deal with this new development. Mehta responded that it would be impossible for SunTrust to continue without having to disclose at least preliminary findings. Parmar asked Mehta to stop all meetings with the Independent Committee and to give him two (2) days to discuss the matter with Chinh Chu, which Mehta agreed to.

273.    Parmar then consulted with Chu, who suggested that Parmar demand an immediate Board vote on Chinh Chu's bid. Parmar did as Chu suggested but, predictably, the Board rejected CC Capital's offer, reiterating their belief that accepting such a low offer would violate their fiduciary duties.

274.    Undeterred, Chinh Chu made several further attempts to push the CC Capital deal through. CC Capital first offered the shareholders 7-year promissory notes for an additional $40 million, which would effectively raise the purchase price to $315 million, still forty-five (45%) percent below the D&P valuation and substantially below D&P's fairness mark.  Next, upon Parmar's return from a trip to Portugal, Chinh Chu tried to influence Parmar not to pursue any potential investors he had met in Portugal. When Parmar, after speaking with Bashri, tried to present one of Chu's new offers to the Board, the Board unanimously rejected it and all Board members offered to resign.

275.    The potential resignations, and the significant delays that would result, sent Chinh Chu into overdrive, trying to find any way to get the CC Capital deal closed. He advised Parmar that, at that point, he would not accept the possibility of the deal falling through.

276.    After Chu offered a second slight increase of 2 cents per share, McGuire Woods informed Chu that they would not allow any more votes unless CC Capital agreed to give them indemnity. Chu revised the CC Capital offer to include a full release and indemnity for McGuire Woods and all of the Board members from CC Capital. The Board indicated that if Chu revised the CC Capital offer further to include additional compensation for the Board members, they would accept the CC Capital offer. Chu made these changes and the Board voted to accept the offer for CC Capital to purchase CHT.

277.    The CC Capital deal was approved by the Board on November 24, 2016, with CHT Holdco, purchasing CHT at a price of $2.93/share in cash, plus $0.43/share in promissory notes, for a total of approximately $309.4 million for the entire company. CHT Holdco was, and still is, owned by CC Capital. The deal was financed by up to $145 million from B of A, with the remainder being paid in part as cash by CC Capital, in part as rollover equity by Parmar Entities and in part by CHT through the issuance of seven (7) years promissory notes.

278.    The agreement provided for a brief "go shop" period for CHT. While a "go shop" period ordinarily allows a public company to seek out better offers before going private, here, Chinh Chu set the terms of the "go shop" period to ensure that no other buyer could outbid CC Capital. A breakup fee of $20 million was set, which was to be paid to CC Capital if CHT accepted any other offer and CC Capital was given the right to counter any competing bids. This put CC Capital in a significantly advantageous position for any bidding, as any other bidder would have to beat CC Capital by over $20 million. (For example, if another party bid $400 million, CC Capital's counter would only need to exceed $380 million.)  Finally, an extraordinarily short time period of 30-days was set, insufficient for any other bidders to complete any of the due diligence required to submit a competent bid.

279.    Surprisingly, even under these conditions, CHT received much higher offers from two (2) credible bidders. Chinh Chu responded by sending a letter to the Board to "remind" them that the definition of a superior bid required proof that all funds for the purchase had been placed in escrow and an agreement to a January 30, 2017 closing date. Chu's definition was false, as CC Capital's bid did not meet these criteria, but was sent in an effort to influence the Board to reject those superior bids without forcing CC Capital to raise their bid to counter.

280.    Chu's efforts to influence the bidding process was fruitful, as CC Capital's accepted bid is the one that was ultimately closed on.

## Last Minute Delays

281.    On December 27, 2016, a shareholder derivative lawsuit was filed in Delaware Chancery Court by Destra Targeted Unit Investment Trust ("Destra"), one of the major shareholders of CHT, alleging fraud and unlawful dilution of their interest in CHT.

282.    With such a lawsuit being filed a month prior to the "go private" scheduled closing date, ordinarily the closing would have been delayed and an audit conducted. Parmar went to Chinh Chu and asked for the closing to be delayed, so that he could try to resolve these issues, but Chinh Chu refused. No audit was ever conducted and the closing date remained in place.

283.    The Chancellor presiding over the Destra litigation ordered that, in the event the CC Capital deal closed, $56.25 million of the "go private" proceeds were required to be placed into escrow to protect Destra's interests.

284.    As a result of the Chancellor's order, Parmar sought to stop the CC Capital deal from going forward and asked Chinh Chu to delay the closing for four (4) months, so that he could resolve the outstanding issues. Again, Chu refused and told Parmar that he wanted to bring in another attorney to negotiate with Destra. The attorney that Chu wanted to bring in was

Altorelli who he referred to as his "clean up guy." Although Altorelli attempted to negotiate with Destra, no progress was made.

285.    As a result of the allegations raised in the Destra lawsuit, reporters from the Financial Times intensified their inquiries to CC Capital and CHT about the empty shells.

286.    With his inability to quickly resolve the Destra matter, along with the intensifying inquiries from Financial Times, Parmar reiterated his request to Chu to delay the closing for four (4) months. Although he really wanted to cancel the deal altogether, Parmar thought that a delay would look better than an outright cancellation.

287.    However, Chu was unwilling to accept anything other than the closing of the deal, but agreed to a very short delay, as long as the closing would go forward within the next 3-4 days. A simple announcement was put out on January 26, 2017.

288.    Despite the best efforts of Chinh Chu and the public relations firms hired by CC Capital and CHT, the Financial Times published an article on January 26, 2017, the same day that the delay was announced, entitled "The Curious Case of Constellation Health and Blackstone's Former Top Deal Maker." This article exposed the empty shells, detailing how they had been incorporated shortly before acquisition, that press releases touted their significant revenue over time periods before they were even incorporated, and the complete lack of any internet footprint prior to the acquisition announcement. The article noted that "the cat's cradle of corporate entities and generalized opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike." However, the article notes Chinh Chu's history with Blackstone and closes by saying "[i]f anyone is/was in a position to kick Parmar's proverbial tyres, it was Chu. We must assume he knows what he's doing."

289.    Late that same night, Parmar received a call from Newton stating that Chinh Chu is "freaking out" about the bad press and needs to close the deal immediately. Parmar responded

that this is a mistake and is not fair, but Newton was immoveable. Parmar believed CC Capital had a fiduciary duty to either cancel or substantially delay the closing; at a minimum, Parmar believed a new consultant audit report would be required by the Banks.

290.    Shortly thereafter, Parmar received a call from Chu, where Chu told Parmar that he was going to give Parmar an additional $3.3 million in fees, a similar amount in fees to CC Capital and $6 million in cash from CHT to pay the expenses of the "go private" transaction. Parmar inquired of Chinh Chu whether the aforesaid payments required Board approval, whereupon Chinch Chu replied that he had done this 100s of time and knew what he was doing. Chu stated that he had figured out a way to pay Parmar to fix the problem, but the deal needed to close immediately.

291.    Parmar later learned that Chinh Chu altered the equity investments and added a wire out for $3.3 million to Parmar in the closing documents. Chu also added several inflated fees to the closing documents, including $575,000 to Altorelli, who admitted that he performed no work on the transaction, and an incredible $3.6 million to CC Capital's other attorneys, without providing any invoices to show that these fees were actually related to the CHT deal.

## PRAYER FOR RELIEF

**WHEREFORE,** by reason of the foregoing, Defendants and Cross-claim Plaintiffs request that Judgment be entered in their favor and against Plaintiffs and Cross-claim Defendants as follows:

A.    On the First Amended Adversary Proceeding Complaint as follows:

(1)    An Order dismissing the First Amended Adversary Proceeding Complaint in all respects;

(2)    On Counts I, III, IV, VI, VII, VIII, IX, X, XII and XV, an Order directing that the Parmar Shareholder Redemption Payments be turned over to the respective Parmar Entity to which they are owed;

(3)    On Counts I, III, IV, VI, VII, VIII, IX, XI and XII, an Order declaring that the Colts Neck Property, the River Terrace Property, the Broad Street Property and the Riverside Boulevard Property belong to the Parmar Entity or Entities in whose name title is recorded and that their acquisitions do not result from illegal activities; and,

(4)    On Count II, an Order directing that the $55 million subject to this Court's Order of Attachment be released from the Order of Attachment and returned to Parmar and the Parmar Entities to whom payment was due under the "Go Private" Merger Agreement.

B.    On the Cross-claim, Judgment entered against the Cross-claim Defendants, jointly and severally, in an amount to be determined after trial but believed to be not less than One Hundred Million ($100,000,000.00) Dollars, plus interest thereon;

C.    For Defendants' and Cross-claim Plaintiffs' attorneys' fees and costs; and,


**INTENTIONALLY LEFT BLANK**

D.      For such other and further relief as to which the Court deems equitable, just and

proper.


Dated:  July 6, 2018
        New York, New York


                              Respectfully submitted,


                              /s/ Charles E. Simpson


                              Windels Marx Lane & Mittendorf, LLP
                              By: Charles E. Simpson, Esq.
                                  Jeffrey C. Hoffman, Esq.
                              *Attorneys for the Defendants and*
                              *Cross-claim Plaintiffs*
                              156 West 56th Street
                              New York, New York 10019
                              (212) 237-1000
                              (212) 262-1215 Facsimile
                              csimpson@windelsmarx.com
                              jhoffman@windelsmarx.com

## CERTIFICATE OF SERVICE

MARIA VITALE-RULLO, hereby certifies that:

1.     I am employed by Windels Marx Lane & Mittendorf, LLP, located at 156 West

56th Street, New York, New York 10019.  I am over the age of eighteen (18) years and I am not a

party to the above-captioned proceeding.

2.     On July 9, 2018, I caused to be served the *Answer and Cross-claim to First*

*Amended Adversary Proceeding Complaint,* by causing true and correct copies to be delivered

*via electronic mail* to the following parties:

John Amato, Esq.
jamato@hahnhessen.com

Joseph Orbach, Esq.
jorbach@hahnhessen.com

and caused to be served by Regular Mail on the following parties:

John Amato, Esq.
Joseph Orbach, Esq.
Hahn & Hessen
488 Madison Avenue
New York, NY 10022

at the address designated by said persons or entities for that purpose.

/s/ Maria Vitale-Rullo
Maria Vitale-Rullo