UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
------------------------------------------------X
U.S. SECURITIES AND EXCHANGE
COMMISSION,

             Plaintiffs,             **Docket No.: 18-CV-9284-MCA-MAH**

   -against-                    **DECLARATION IN SUPPORT**
                                   **OF MOTION**
PAUL PARMAR, et al.

             Defendants.
------------------------------------------------X
**STATE OF NEW JERSEY**   )
                            ) **SS.:**
**COUNTY OF HUDSON**   )

     **TIMOTHY C. PARLATORE**, a lawyer admitted to practice before this

Court, declares the following allegations under the penalties of perjury:

     1.    I represent the Defendant, Paul Parmar and submit this Affirmation in

Support of Defendant's Motion to Dismiss.

     2.    This Affirmation is based on information and belief, the source of that

information, and the basis for that belief being an examination of the various papers

filed as part of this proceeding, related proceedings, publicly available information,

and my independent investigation of this matter.

## PRELIMINARY STATEMENT

     3.    This case involves claims by the U.S. Securities and Exchange

Commission ("SEC") of securities fraud by the Defendant, Paul Parmar and the co-

defendants, against Investor-1, a private investment firm based in New York City. The factual allegations in the complaint focus on the events leading up to Investor-1's acquisition of a controlling interest in Constellation Healthcare Technologies, Inc. ("CHT"), through a "go-private transaction" to convert CHT from a publicly traded company to a private entity. At the time, CHT was being publicly traded on the London Stock Exchange's Alternative Investment Market ("AIM").

4.    As discussed more fully in the associated Memorandum of Law, Defendant argues that the allegations of fraud pleaded in the complaint fail to meet the pleading standards of plausibility, especially once the Court considers the additional documents that Plaintiff incorporated by reference, but declined to quote specifically in the complaint. Defendant also argues that the overwhelming evidence establishes that the fraud was perpetrated by at least two individuals, who were not named as defendants – Chinh Chu and Truc To. The purpose of this Declaration is to provide the Court with the necessary facts and supporting documents relevant to these two issues.

## STATEMENT OF FACTS

### Background of CHT

5.    As outlined in the complaint, in June 2013 Parmar and other investors acquired Orion Healthcorp, Inc. ("Orion"), a medical billing, collections and practice

management service company.  Orion was later merged into CHT.  Parmar served as CEO of CHT.

6.      Parmar's vision for CHT was to provide physician back office services, including billing and collections.  While this industry is traditionally populated by smaller "mom and pop" service companies, Parmar saw an opportunity to create a much larger corporation that could provide much better service at a lower price.  He developed CHT into a sophisticated platform to provide these services.

7.      Although CHT's platform was the best and most efficient in the industry, CHT struggled to gain new physician customers because of the difficulty in persuading independent practicing physicians to leave their existing service providers.  Parmar decided that the best way to grow CHT's business was by implementing a strategy of acquiring smaller service providers.  The value of these acquisitions to CHT is mainly in their customer lists and relationships, as CHT would service these medical practices on their main platform.

8.      As CHT grew through these acquisitions, CHT went public on the AIM to help raise money to fund the acquisitions.  At that time, Orion held eight subsidiary companies and continued with an aggressive acquisition and growth strategy.  Most of the shares were held by various entities, which Parmar managed and controlled.

9.      When Investor-1 wanted to acquire CHT, it had grown to 14 operational subsidiaries, along with several holding companies and Special Purpose Acquisition Companies ("SPAC").   Of these, two SPACs, MDRX Medical Billing, LLC, ("MDRX"), and Phoenix Health, LLC ("Phoenix"), had been formed to acquire new subsidiaries using raise ups on the AIM exchange.   Unfortunately, while these two raise ups were successful, the acquisitions were not, and the SPACs remained empty shells.[1]

## Investor-1 Seeks to Acquire CHT

10.      Chinh Chu is the senior managing director and founder of CC Capital[2]. Before launching CC Capital, Chinh Chu spent 25 years working at Blackstone, focusing on building its Private Equity business.  Fashioning himself as a "master deal maker," Chinh Chu closed some significant deals on his way to becoming a billionaire and purchased an apartment that takes up two floors of Trump World Tower and a large yacht.

---

[1] Plaintiff has alleged that Defendants provided false information, in the form of press releases and financial statements, showing that these empty shells were actual acquisitions.  For the limited purpose of this motion, these allegations are presumed to be true.

[2] The complaint is unclear on what entity Investor-1 is, but it appears that Investor-1 may be an investor that Chinh Chu and CC Capital brought to the CHT deal or, may even be CC Capital itself.  Because of this ambiguity, the terms CC Capital and Investor-1 are being used interchangeably here.

4

11.    Parmar and Chinh Chu first met in September 2015 on Chinh Chu's yacht. They were introduced through mutual friends. At the time, Parmar was considering taking CHT off the AIM through a going private transaction. In February 2016, Parmar and Chinh Chu began discussing having CC Capital bid on CHT. Chu first reviewed public data of CHT and, on April 5, 2016, Defendant Parmar emailed Chu the audited financials from 2013, 2014, and 2015, as well as a consolidated spreadsheet.[3]

12.    After reviewing these disclosures, Parmar and Chu met for breakfast to discuss the proposed transaction. Chu was considering submitting a bid of £1.92/share, but wanted Parmar personally to contribute $10 million cash, in addition to the equity of CHT owned by entities controlled or managed by Parmar, towards the purchase.

### The First Independent Committee

Soon thereafter, Investor-1 submitted a formal bid of £1.91/share. When Investor-1's bid was presented to the board of CHT, the board advised that if Parmar intended to contribute to the bid, he would be recused from all bid evaluation discussions, as he is part of the buying group. Parmar agreed to this recusal. From approximately April 2016 going forward, Parmar was removed from the decision-

---

[3] A copy of these emails and attachments are annexed hereto at Exhibits "A" and "B."

making process on CHT's side of the negotiations and the board formed an independent committee to evaluate all bids. CHT hired Duff & Phelps Corp. ("D&P") to perform an independent evaluation to write a fairness opinion, as required by 17 CFR §229.1014.

13.    At Chinh Chu's direction, Investor-1 hired KPMG to perform the due diligence on the acquisition of CHT. Chinh Chu directed the hiring of then-KPMG partner Truc To to head the due diligence efforts. A fellow Vietnamese immigrant, Truc To was Chinh Chu's go-to person at KPMG to perform due diligence for his acquisitions. Based in Atlanta, Georgia, whenever Truc To travelled to New York to perform work for Chinh Chu, he would stay as a guest in Chinh Chu's home, where Chinh Chu would lavish him with VIP treatment.

14.    On August 17, 2016, D&P submitted their initial report, entitled "Discussion Materials Prepared for the Special Committee of the Board of Directors.[4] This report contains several errors or omissions which effectively resulted in an undervaluation of CHT:

   a.  On Page 5, the analysis of the "Total Enterprise Value" lists $28.3 million of debt in the form of loans, but these loans had already been repaid. At Chinh Chu's direction, these loans were repaid on July 11, 2016, to avoid a potential audit by the lender,

---

[4] A copy of this report is annexed hereto at Exhibit "C."

but left on the valuation report as debts resulting in a diminution of the enterprise value. On information and belief, this error may have been influenced by Chinh Chu, as he wrote in an email to Parmar "Let's chat when you are free. I have an idea regarding the loan."[5] This email was sent on July 14, 2016, three days after the loans were paid off.

b.  On page 7, in a chart entitled "Historical and Projected Financial Performance," D&P outlined the annual revenues, growth and EBITDA for CHT from 2012 to the present, with projections through 2021. Although CHT had shown significant growth from 2013 through 2016, the projections for future growth were set extraordinarily low, at 1.2% projected annual growth, rather than the 35-50% ordinarily expected from a growth company.

c.  The 2017 projected revenue was an artificially low $140.4 million.

d.  CHT was acquiring Allegiance Consulting Associates, LLC ("ACA") and Allegiance Billing & Consulting, LLC ("ABC") using internal cash. This acquisition, which closed in September 2016, expanded the

_____

[5] A copy of this email is annexed hereto at Exhibit "D."

revenue of CHT, and thus also increased the value of CHT, but was omitted from the D&P report.

e. CHT was acquiring NYNM, which also would have expanded the projected revenue to CHT, but was also not included. Ultimately, this acquisition was delayed until after the closing of the go-private at Chinh Chu's direction.

15.    The D&P report showed that the value of CHT was far greater than Investor-1 was willing to pay:

a. On page 12, D&P provided their valuation ranges using several different valuation methods on a chart, annotating Investor-1's bid with a red line, well below any calculated valuation range.    Investor-1's bid of £2.11/share was over 25% less than the lowest end of the valuation range using the discounted cash flow method of £2.83.[6]

b. Because Investor-1's offer was so far below any price on which D&P could issue a fairness opinion, they suggested many alternative buyers on pages 21-27.

---

[6] Although these numbers were unacceptable at the time, the offer would have become even less palatable as time went on, because of the decreasing exchange rate of British Pounds to Dollars.

16.    On August 23, 2016, the Special Committee held a telephone conference to discuss the D&P report. Parmar was present briefly in the beginning to present his views, but was then excused from the deliberations, as he was a member of the buyers group. The committee discussed the matter with D&P and "that the Proposal was not fair based on the standalone value of the Corporation as reflected in management's forecasts and that Mr. Feuer should reiterate to the buyer group that the Proposal remains too low and that the Committee would not approve a transaction at the price of the current Proposal."[7]

17.    Later, Parmar met with Chu, to explain that the deal could not go forward unless the price increased substantially. Chu explained that he will withdraw Investor-1's bid, at which point, Parmar would dissolve the independent committee and terminate the advisors, only to form a new committee with new advisors upon the submission of a later bid.

18.    Shortly thereafter, Investor-1 withdrew its offer. As CHT officially had no bids to evaluate, Parmar followed Chinh Chu's instructions and dissolved the independent committee and terminated D&P[8] and Kirkland & Ellis their counsel.

---

[7] A copy of the meeting minutes is annexed hereto at Exhibit "E."
[8] A copy of the email from Committee Chair Mark Feuer to terminate Duff & Phelps is annexed hereto at Exhibit "F."

On September 12, 2016, he emailed Chinh Chu, saying that he "wanted to inform you both and [Investor-1] that Special Committee was disbanded."[9]

19.    The next day, September 13, 2016, at Chinh Chu's direction, Parmar forwarded a copy of the D&P report by emailing it to Andrew Barnett, an analyst at Investor-1.[10]

### The Second Independent Committee

20.    With the first independent committee dissolved, Chinh Chu directed Parmar to representatives from SunTrust Robinson Humphrey ("SunTrust"), to produce a valuation that he said would allow the deal to go forward with a fairness opinion reflecting the discounted price. Chinh Chu arranged for Parmar to be introduced to Tarun Mehta ("Mehta"), an executive from SunTrust, to meet Parmar at his home and review the D&P report. After review, Mehta said that he saw no issues with presenting a new report with a valuation in the range that Chu desired.

21.    On September 14, 2016, Parmar emailed Mehta to inform him that CHT had received a bid from Investor-1 and to inquire whether SunTrust was interested in being hired as the independent advisor and providing a fairness opinion. Parmar was sure to identify Investor-1 as being run by Chinh Chu. Mehta responded within 20 minutes that SunTrust was interested, and, in his response, he revealed that he

---

[9] A copy of this email is annexed hereto at Exhibit "G."
[10] A copy of this email is annexed hereto at Exhibit "H."

knew much more about the proposed deal than Parmar had disclosed in his introductory email, by noting that Parmar was an "interested party" and so SunTrust must deal directly with the Special Committee.[11] CHT retained SunTrust the next day, September 15, 2016.

22.    Shortly after retaining SunTrust, Mehta called Parmar to explain that SunTrust will be unable to provide a fairness report in the low range that Chinh Chu desired because Mehta knew what the D&P estimates were and the fact that this estimate did not account for either the repaid loan or the ABC/ACA acquisitions

23.    SunTrust resigned on September 26, 2016.[12]

24.    To push the deal through without a fairness opinion, Chu revised the offer to include a full release and indemnity for the Special Committee and all of its board members.    This indemnity, part of the merger agreement documents, indemnified the members of the Special Committee if they were sued by shareholders for breaching their fiduciary duties.

25.    The Special Committee approved the deal on November 24, 2016, with CHT Holdco, LLC purchasing CHT at a price of $2.93/share in cash, plus $0.43/share in promissory notes, for about $309.4 million for the entire company. The deal was to be financed up to $145 million by Bank of America Merrill Lynch,

---

[11] A copy of this email exchange is annexed hereto at Exhibit "I."
[12] A copy of this email is annexed hereto at Exhibit "J."

with the remainder being paid in cash by Investor-1 and equity from several CHT shareholder entities controlled by Parmar.

## The Due Diligence Process

26.    Simultaneous with all the above described transactions, Truc To of KPMG was conducting due diligence on the deal.  Through his due diligence, there were several documents produced which show that Chinh Chu and Truc To had actual knowledge that the empty shells had no assets, revenue or employees.

27.    On July 21, 2016, Chinh Chu and the team at CC Capital and McKinsey were given a demonstration and access to PARCS, CHT's proprietary internal database management software system used to bridge different processes and accurately track all data, collections and fees.[13]  All the data in PARCS is accurate and was available to Chinh Chu and Truc To throughout the due diligence process.[14]

28.    On or about mid-August 2017, Truc To sent CHT a request for detailed collections data.  Truc To then sent another request for all data on two randomly selected months, December 2015 and June 2016, to perform an in depth audit.  On August 25, 2017, Melodie Kraljev, head of operations for Orion, sent Truc To the

---

[13] Before this meeting, Arvind Walia sent Doug Newton the meeting information and information slides that would be presented.  A copy of this email and the attached slides is annexed hereto at Exhibit "K."

[14] A copy of the McKinsey report is annexed hereto at Exhibit "L."

requested data from the selected months.[15]  As the empty shells had no collections data, none was provided.

29.   The total collections from these spreadsheets was $177,702,244.31 for December 2015 and $134,498,514.52 for June 2016.  As CHT's contracts with the various medical offices provided for 2-7.5% of these collections, with a companywide average of about 5%, this results in monthly revenues to CHT of $8,885,112.22 for December 2015[16] and $6,724,925.73 for June 2016.

30.   After CHT provided complete and accurate data to Truc To and KPMG, they had actual knowledge that the annual revenue of CHT was less than $100 million.[17]

31.   After this, Truc To and his team asked many follow up questions to verify the data, but never asked about the lack of any data from MDRX and Phoenix.

32.   Several other indications Truc To and Chinh Chu knew that the empty shells were indeed empty:

---

[15] A copy of this email is annexed hereto at Exhibit "M."  The attachments are not being filed, as a pdf file would be 17,850 pages.  As Plaintiff already has this file, as part of their investigation, they will not dispute the characterizations of this spreadsheet.  If necessary, Defendant can provide a copy of the spreadsheet to the Court by email.

[16] In the medical billing industry, collections are always higher later in the year, as patients go to the doctors more readily after meeting their deductible.

This number is not inconsistent with the 2017 projected revenue in the Duff & Phelps report, as these numbers were based on the anticipated acquisitions of NYNM and NACO.

a. CHT provided payroll records on every subsidiary except the empty shells.

b. CHT provided lease documents and other information on the physical offices of every subsidiary except the empty shells.[18]

c. CHT provided tax returns and other tax filings on every subsidiary except the empty shells.

33.    On August 5, 2016, Chinh Chu met with Arvind Walia, CEO of Orion, and Melodie Kraljev to discuss the operations of CHT and all subsidiaries. During this meeting, Arvind Walia informed Chinh Chu that, as CEO, he has no knowledge of Phoenix or MDRX, as these subsidiaries of Orion had never been put under his control.

34.    Despite many requests, Chinh Chu never permitted Parmar to review the final KPMG report.

**Bank of America Financing**

35.    Separately, Chinh Chu interfaced directly with Bank of America ("BofA") to obtain financing for the deal. BofA sent commitment letters, as early as August 9, 2016 committing to provide up to $120 million principle financing and

---

[18] This point should have been even more glaring to the highly experienced and highly paid team from KPMG, as a simple google search for the address listed for MDRX, 166 High Street, Akron Ohio does not even exist. The closest address, 166 S. High Street, is Akron's City Hall, where the mayor's office is.

another $15 million revolving credit facility.[19]    These commitment letters were issued before KPMG had made any significant progress on the due diligence and without BofA conducting any due diligence of its own. BofA never communicated with Parmar, or any other member of CHT.  This lack of communication is especially curious, considering that the commitment letters made clear that BofA intended for CHT to be the borrower, not Invester-1.

36.    In the five months following this initial commitment letter, BofA never requested an audit, made no effort to conduct any due diligence, and had no communications with Parmar or anyone else at CHT.

37.    On information and belief, this extraordinary lack of inquiry, and BofA's willingness to lend such a significant sum of money to an entity with which they never communicated was because of a secret deal that Chinh Chu had negotiated with BofA.

38.    On November 16, 2016, Doug Newton ("Newton"), Senior Managing Director at CC Capital, sent an email, saying "Head of Lev Fin at BoA requested a call with Chinh this evening – we are unsure re: what, but our thought is to get from Chinh another face to face commitment of support of our deal / diligence – will keep you posted."  In this email, Newton may have revealed that BofA was not doing any audit or due diligence on the CHT deal because they were relying solely on the verbal

---

[19] A copy of this letter is annexed hereto at Exhibit "N."

assurances of Chinh Chu.  On information and belief, Chinh Chu knew, consciously avoided or was reckless in not knowing, that these assurances were false, based on Chinh Chu and Truc To's actual knowledge of the true financial condition of CHT.

### Go Shop Period

39.    Early in the process, the special committee began to express concerns over the fairness opinion process and, protecting themselves from potential claims that they were violating their fiduciary duty by accepting Investor-1's unreasonably low offer.  The committee wanted to add a "go-shop" period to the transaction, to ensure that they were getting the best offer on the market.

40.    Chinh Chu agreed to the go shop provision, but immediately set about controlling the terms to ensure that no legitimate competing bids could be presented. He emailed the Committee on July 19, 2016, saying:

> We understand and agree with the point that you made regarding the Board's fiduciary responsibility.  Regarding this point, we would be amenable to a 4 week "Go-Shop" period post the execution of the Purchase Agreement (terms of such Go-Shop to be contained in the signed transaction) -- enables the company to entertain other potential offers for Constellation.  As you may appreciate, we would not be amenable to the company initiating a market check prior to us executing a transaction – if the Company pursues a market check, we will stop our work and withdraw our offer at that time.  The rationale is that a Go Shop enables the Board to exercise its fiduciary duty and a market check will be very disruptive to the Company as the company barely has the bandwidth to handle our diligence.
>
> Deals are based on momentum and we do not want to put

the deal at risk with lengthy delays. We are incurring millions of dollars of expense as part of our due diligence process and welcome expeditious progress in reaching a conclusion to our process.[20]

41.    After the Duff & Phelps report revealed the inadequacy of Investor-1's offer, the Special Committee, advised by attorneys at Kirkland & Ellis, wanted to perform a market check. Chinh Chu countered with a "modified market check." He first sent his proposal to Parmar on August 23, 2016,[21] before refining it to send to the Special Committee on August 25, 2016.[22]

42.    On September 6, 2016, Chinh Chu pushed for an answer to his proposed "modified market check" and attorneys from Kirkland & Ellis confirmed that it had been rejected by the Special Committee.[23]

43.    Attorneys from Kirkland & Ellis, counsel to the Special Committee, objected to Chinh Chu's extraordinary demands and explained that it would not be a legitimate go shop, as the rules had been set up to dissuade anyone from submitting a legitimate bid. This is why Kirkland & Ellis was terminated along with Duff & Phelps.

44.    While a "go shop" period ordinarily allows a public company to seek out better offers before going private, here, Chu then set the "go shop" period to

---

[20] A copy of this email is annexed hereto at Exhibit "O."
[21] A copy of this email is annexed hereto at Exhibit "P."
[22] A copy of this email is annexed hereto at Exhibit "Q."
[23] A copy of this email is annexed hereto at Exhibit "R."

ensure that no other buyer could outbid him. A breakup fee of $20 million was set, to be paid to Investor-1, if CHT accepted any other offer and Investor-1 was given the right to counter any competing bids. This put Investor-1 in a protected position, as any other bidder would have to beat Investor-1 by over $20 million. For example, if another party bid $400 million, Investor-1's counter would only need to exceed $380 million. Finally, an extraordinarily short period of 30-days was set, insufficient for any other bidders to complete any of the research required to submit a competent bid.

45.    Even under these conditions, CHT received much higher offers from two credible bidders in two weeks. On December 24, 2016, CHT received an offer from Flexpoint Ford, at a total enterprise value of $365 million.[24]

46.    Although this offer was only communicated to CHT's Special Committee, not Investor-1 or Parmar, within hours Chinh Chu sent a message through a mutual contact, Tomer Vardi to Defendant Parmar that Chinh Chu was aware of the offer and its terms and that he didn't think it was "too big of a concern." This was news to Parmar, as he had not heard about the Flexpoint Ford offer and apparently Chinh Chu could get information on competing bids before even Parmar could.

---

[24] A copy of this offer is annexed hereto at Exhibit "S."

47.    To prevent the board from accepting these higher and better offers, Chinh Chu sent a letter to the board to instruct them that he interpreted Flexpoint Ford's bid as not being superior, falsely claiming that Flexpoint Ford "does not have "committed" financing."[25]   In reality, Flexpoint Ford is a far larger private equity firm than CC Capital and required no financing to close the proposed CHT deal and thus was "not subject to a financing contingency," as the Merger Agreement required.

48.    Chinh Chu's efforts succeeded, as his originally accepted bid is the one ultimately closed on.

### Financial Times Inquiry

49.    On or about August, 2016, CHT received a series of questions from a reporter at the Financial Times asking about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX, the empty shells.   Chinh Chu directed Parmar to retain the services of a public relations firm who could coordinate with the public relations firm that CC Capital had hired to try to kill the Financial Times story and let the deal go on to closing.

50.    In coordinated statements to Financial Times, both CC Capital and CHT tried to convince the reporters that everything was ok with the deal.   Chu told the reporters that he was "comfortable" with proceedings, having spent $7 million

---

[25] A copy of this letter is annexed hereto at Exhibit "T."

and three months' work on due diligence alone.  While these statements delayed Financial Times from reporting the obvious flaws in CHT, ultimately it did not stop the public disclosure of these issues just before the closing.

51.    Despite the best efforts of Chu and the public relations firms hired by CC Capital and CHT, the Financial Times published an article on January 26, 2017, entitled "The Curious Case of Constellation Health and Blackstone's Former Top Deal Maker."[26]  This article discussed the empty shells, but noted that "the cat's cradle of corporate entities and generalised opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike." Yet the article notes Chu's history with Blackstone and closes by saying "[i]f anyone is/was in a position to kick Parmar's proverbial tyres, it was Chu. We must assume he knows what he's doing."

52.    While such an article would normally cause a deal like this to be delayed to perform additional due diligence, the bank requested none and Chinh Chu had the opposite reaction, demanding immediately to close the deal.

## CHT Deal Closes

53.    On January 30, 2017, after requests from Parmar to delay the closing to fix outstanding issues, the CHT deal closed, resulting Investor-1 gaining 51% interest in CHT and entities controlled by Parmar retaining 49%.

---

[26] A copy of this article is annexed hereto at Exhibit "U."

54.    At closing, the final funds flow document[27] showed a very different flow of funds than was anticipated in the prior documents, and very different from what the go-shop bidders thought they were bidding against:

a.    The cash contributed by Investor-1 was lowered to $82,502,160.25 from the $88,687,476.20 originally anticipated.    Presumably, the $6,185,315.95 difference between what Investor-1 (and the SEC) thought was contributed was pocketed by Chinh Chu.

b.    Of the $212,502,160.25 cash contributed at closing by Investor-1 and BofA, $14,519,935.90 was used for various deal related fees, many of which are of questionable legitimacy.    For example:

    i.    $2,555,023.91 to Winston & Strawn, LLP, a law firm that represented Investor-1, several times larger than reasonable for a deal of this size and complexity.    On information and belief, Chinh Chu used this deal to pay off unrelated invoices to Winston & Strawn, LLP.

    ii.    $575,000 to John Altorelli ("Altorelli"), Chinh Chu's personal attorney and "clean-up guy," who later admitted that he performed no services as part of the deal.

---

[27] A copy of this spreadsheet is annexed hereto at Exhibit "V."

55.    Investor-1 could purchase a controlling interest in CHT for well below the actual value of the company and Chinh Chu and Truc To were fully aware of the irregularities in CHT's bookkeeping and value, but actively concealed their knowledge from the banks and the investors at Investor-1.   On information and belief, although Chinh Chu is the founder and managing director of Investor-1, he did not use any of his own money for this transaction, instead getting the money from his investors and clients of Investor-1.  He also saddled CHT with an enormous amount of bank debt, although CHT received no consideration for that debt.

### After Closing[28]

56.    Beginning the day after the closing, Parmar gets the cold shoulder from Chinh Chu and the other members of Investor-1, as they did not respond to Parmar's emails.  Unknown to Parmar at the time, Chinh Chu had immediately begun to grill other members of CHT, including Tomer Vardi, asking if they are aware of any problems with CHT's books or if they are aware of any fraud.  On information and belief, Chinh Chu was already fully aware of the empty shells, but needed a pretext to pretend that he only discovered them after closing and force Parmar out.

57.    That same day, Chinh Chu announced that CHT would be hiring Truc To, the KPMG partner in charge of the due diligence process, as CFO of CHT.  When

---

[28] The remainder of the Statement of Facts is relevant only to the branch of Defendant's motion under Rule 12(b)(7), as it contains facts outside the pleadings and does not rely on documents incorporated into the pleadings by reference.

CHT hired Truc To in March, 2017, his compensation package was significantly larger than any CFO at a comparably sized company to CHT and significantly larger than Parmar's compensation as CEO.[29] On information and belief, Truc To received this job as a result of a secret agreement between Truc To and Chu to manipulate the due diligence process to fit with Chu's larger fraudulent scheme.

### Chinh Chu Forces Parmar Out of CHT

58.    In July, 2017, Parmar was traveling to Los Angeles for meetings related to a potential acquisition when he was summoned to return to New York by Chinh Chu.  Upon his return, he met with Chinh Chu, who tersely informed Parmar that he "accepts" Parmar's resignation.  Chinh Chu went on to cut Parmar off from all lines of communication.   Chinh Chu, Truc To and Altorelli began conducting CHT meetings while excluding Parmar.  When Parmar asked why he was being excluded, even though he had not yet resigned or been terminated, Chu responded that he wanted to be more involved in operations going forward.  At the next board meeting, Chu announced that Parmar had resigned and that he had accepted Parmar's resignation.

59.    While Chinh Chu and Parmar continued to try to negotiate a severance agreement until Parmar's ultimate resignation in September, he was effectively

---

[29] A copy of the email outlining Truc To's compensation is annexed hereto at Exhibit "W."

sidelined immediately, while Chinh Chu hired forensic accountants to "discover" information that he and Truc To already knew.

### Fraudulent Bankruptcy

60.    On Friday, March 16, 2018, Chinh Chu caused CHT and most of its subsidiaries to file Chapter 11 petitions for bankruptcy in the Eastern District of New York. The petitions themselves contained many irregularities, including:

a. The Petitions were filed in the Eastern District of New York, which has minimal, if any jurisdiction over CHT and its subsidiaries.

b. The petitions listed Winston & Strawn, LLP as the largest unsecured creditor at $3,000,000. Winston & Strawn never provided any services to CHT, was paid a grossly inflated $2,555,023.91 at the closing of the going private transaction for its representation of Investor-1, and never submitted any invoices to CHT for work allegedly performed.

c. Failure to list several companies controlled by Parmar as creditors of CHT, as they were owed $96 million, under consulting agreements. Had CHT prepared a truthful petition, Parmar would have been appointed chair of the unsecured creditors committee. Instead, Chinh Chu placed Winston & Strawn in this position.

d. The financial statements later submitted showed that CHT and its subsidiaries are turning a significant profit and are more than capable of paying the BofA loan payments.

61.    With the bankruptcy in place, Chinh Chu then put into motion an elaborate plan to steal all the assets of CHT through the orchestration of two auctions. Both auctions were set up the same way:

1. Chinh Chu brought in a straw purchaser to make an extremely low opening bid and act as the "stalking horse." Although the stalking horses seemed independent, they are funded and controlled by Chinh Chu.

2. CHT's bankruptcy attorneys, at Chinh Chu's direction, set out bidding procedures designed to protect the stalking horse bid and prevent any legitimate bidders from entering the auction.

3. Chinh Chu's stalking horse would win the auction and thus purchase all of CHT's assets out of the bankruptcy court at a fraction of their actual value and debt free.

62.    On May 10, 2018, CHT, now controlled by Chinh Chu, presented the Bankruptcy Court with proposed bidding procedures and timeline for the first sale of a portion of CHT's assets. CHT's attorneys informed the Bankruptcy Court that this opening bid of $10 million was based on a non-binding letter of intent that Medical Transcription Billing, Corp ("MTBC") had issued on April 10, 2018.

25

63.    MTBC is a publicly traded company that has operated at a net loss every single year, with total losses of over $26 million since 2014 and would have been unable legitimately to offer a $10 million bid on CHT's assets.[30]

64.    On April 4, 2018, just six days before issuing their letter of intent, MTBC announced a $10.5 million public offering of non-convertible preferred stock.[31]  Two days later, on April 6, 2018, MTBC announced that it had closed this $10.5 million public offering, with CEO Stephen Snyder saying:

> This upsized raise puts us in an excellent position to execute the Company's growth initiatives. As of today, we have approximately $13 million of cash, an untapped $5 million line of credit with Silicon Valley Bank, as well as positive cash flow from operations.[32]

65.    On information and belief, this public offering was orchestrated and purchased by Chinh Chu[33], so that he could set up MTBC as the stalking horse.

66.    On May 17, 2018 TG Capital, LLC, an entity associated with Arvind Walia, CEO of Orion, submitted a competing bid for $11,000,000, but MTBC

---

[30] MTBC was a perfect vehicle for Chinh Chu to steal these assets out of the bankruptcy proceeding, as it is engaged in the same business, but has struggled financially for years.  On December 20, 2013, MTBC filed their S-1 registration statement to take the company public on NASDAQ, with the expectation of raising $35 million.  It took over seven months to go public, on July 22, 2014, with a raise of only $5 million.  The company has posted losses every year since then.

[31] A copy of MTBC's press release is annexed hereto at Exhibit "X."

[32] A copy of MTBC's press release is annexed hereto at Exhibit "Y."

[33] It is unknown by Defendant whether Chinh Chu personally invested in MTBC, or through CC Capital or even Investor-1.

countered to win the auction, buying assets that produce $50-60 million annually, debt free, for $12.6 million.

67.    When Chinh Chu invested in MTBC, it was trading at $3.43/share. Within three months of his investment, MTBC's stock price rose to $5.25/share, with projections that it will go to "$6.37 and $8.16" by the end of the year, but will probably go much higher, once the true revenue of the CHT assets is reported on MTBC's next quarterly earnings statement. Chinh Chu's insider trading will likely net him several million dollars profit.

68.    On July 5, 2018, CHT moved in the bankruptcy court to sell the remaining assets of CHT.[34]  This time, Chinh Chu selected HealthTek Solutions, LLC ("HealthTek") as his straw purchaser stalking horse with an initial bid of $16.5 million.  HealthTek was incorporated on June 19, 2018[35] by TG Capital, LLC, the bidder associated with Arvind Walia, with Arvind Walia as a 10% shareholder.  In this motion, CHT explained that when TG Capital submitted a competing bid of in the first auction, it was for $23 million to purchase all the CHT assets, including those reserved for the second auction.  After some negotiations, TG Capital bifurcated its bid to $10.5 million on the first auction and $16.5 million on the second.

_____

[34] A copy of this motion is annexed hereto at Exhibit "Z."
[35] The entity status from the Delaware Department of State is annexed hereto at Exhibit "AA."

69.    The value of TG Capital/Healthtek's bid is curious, as Altorelli met with Parmar on night of March 16, 2018, as the bankruptcy petitions were being filed and explained that Chinh Chu had attempted to give $26 million to another person to act as a straw purchaser and make a $26 million bid on the CHT assets. Unfortunately for Chinh Chu, this straw purchaser hadn't followed the plan and offered less than $10 million, which was rejected and forced CHT to proceed with the bankruptcy, or as Altorelli called it "phase 2." Altorelli told Parmar words to the effect of now that the bankruptcy had been filed, they were in "phase 2," where "the whole thing can officially go for less than $30 million now."

70.    On information and belief, TG Capital/Healthtek's bids were orchestrated and funded by Chinh Chu.

71.    As there were no competing bidders, Healthtek purchased CHT's remaining assets for $16.5 million. These were new assets, as CHT had purchased them for $60-95 million, paid over 3 years, depending on revenue[36], in February 2017. This asset was acquired by CHT immediately after the going private transaction had closed and Chinh Chu was running CHT.

---

[36] It is unclear whether HealthTek agreed to continue these payments, as part of the sale or not.

## Obstruction of Justice

72.    To sideline Parmar, Chinh Chu provided a false narrative about the above outlined facts to investigators from both the SEC and Department of Justice ("DOJ") to have Parmar arrested and charged by DOJ and for the SEC to file this matter.  In addition to providing a false narrative, Chinh Chu took other actions to undermine Parmar's ability to defend himself.

73.    After forcing him out of CHT, Chinh Chu could access the login information for Parmar's personal email accounts under the domain name constellationhealthgroup.com, registered to Parmar personally the year before CHT was even incorporated and was not a CHT asset.

74.    On October 12, 2017, counsel for Parmar sent an email demanding that Chinh Chu cease and desist illegally accessing and using Parmar's emails.  This was sent to Chinh Chu's attorney Altorelli, Investor-1's attorneys at Troutman Sanders, and the head of the FTI forensic accounting team that Chinh Chu had hired.[37] Altorelli responded that he had "asked that the domain remain in a "frozen" state until an appropriate determination can be made as to the history, ownership, custody and the like. If we can't unravel it, then we may need to seek judicial assistance."

75.    On information and belief, Altorelli's response was a lie, as Chinh Chu and his legal and forensic accounting teams continued to use Parmar's private

---

[37] A copy of this email is annexed hereto at Exhibit "BB."

emails, including them as exhibits to various forensic reports and court filings. Moreover, they knowingly turned over these stolen emails to investigators from the SEC and DOJ. Many of these emails, particularly those relied on by DOJ, were privileged communications that Parmar had with his attorneys.[38]

76.    On September 28, 2017, Chinh Chu met with Parmar and told Parmar that he should pay Chinh Chu $10 million within 48 hours and Chinh Chu would prevent the matter from proceeding with the FBI and DOJ. Parmar did not submit to this extortionate demand.

77.    On information and belief, shortly after this attempted extortion, Chinh Chu did go to the FBI and DOJ to provide them with false allegations and a deeply flawed forensic accounting report to support his false charges.

78.    On May 16, 2018, Parmar was arrested and charged by the DOJ based on the false statements made by Chinh Chu to the DOJ.

## CONCLUSION

79.    For all these reasons, and in the associated Memorandum of Law, Defendant Paul Parmar respectfully requests that this Court issue an Order dismissing this case as to Paul Parmar, as the documents relied on by Plaintiff and

---

[38] Although not a part of this motion, Defendant intends to file another motion shortly to address the prejudice from SEC and DOJ investigators having access to, and using, emails which contain attorney-client privileged communications and were illegally obtained in violation of both state and federal criminal statutes. See 18 U.S.C. §2701, NY PL §§156.05, 156.10, 156.35.

incorporated by reference into the complaint establish that Plaintiff has failed to state a plausible cause of action for fraud.   Moreover, the evidence strongly shows that Chinh Chu, Truc To, and others, were the ones who transmitted any fraudulent statement to induce Investor-1 to invest in CHT.   Defendant Parmar had submitted all the actual true data to Chinh Chu and Truc To; they knew, consciously avoided or were reckless in not knowing, that the statements they made to Investor-1 were false.

Dated August 15, 2018
      Hoboken, New Jersey

Respectfully submitted,

Timothy C. Parlatore, Esq.
*Attorney for the Defendant, Paul Parmar*
221 River Street, 9th Floor
Hoboken, New Jersey 10006
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com