Mark T. Power
John P. Amato
Joseph Orbach
Brigitte R. Rose
**THOMPSON COBURN LLP**
488 Madison Avenue, Suite 1400
New York, New York 10022
Telephone:  (212) 478-7200
E-mail:   mpower@thompsoncoburn.com
          jamato@thompsoncoburn.com
          jorbach@thompsoncoburn.com
          brose@ thompsoncoburn.com

*Counsel to the Liquidating Trustee*

Matthew R. Brooks
J. Timothy Mast (admitted *pro hac vice*)
Bianca DiBella (admitted *pro hac vice*)
**TROUTMAN PEPPER LLP**
875 Third Avenue
New York, New York 10022
Telephone: (212) 704-6000
Email:   matthew.brooks@troutman.com
         tim.mast@troutman.com
         bianca.dibella@troutman.com

*Counsel to CC Capital CHT Holdco LLC and CHT Holdco LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Orion HealthCorp, Inc., *et al.*, | : | Case No. 18-71748-67 (AST) |
| | : | Case No. 18-71789 (AST) |
| Debtors. | : | Case No. 18-74545 (AST) |
| | : | |
| -------------------------------------------------------------------------- x | | (Jointly Administered) |
| Howard M. Ehrenberg in his capacity as Liquidating: | | |
| Trustee of Orion Healthcorp, Inc., *et al.*, CHT Holdco,: | | |
| LLC, and CC Capital CHT Holdco LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | Adv. Pro. No. 18-08053 (AST) |
| | : | |
| Parmjit Singh Parmar a/k/a Paul Parmar, *et al.*, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------------------- x

**PLAINTIFFS' POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs Howard M. Ehrenberg, in his capacity as Liquidating Trustee ("Liquidating Trustee") of Orion Healthcorp, Inc. ("Orion"), Constellation Healthcare Technologies, Inc. ("CHT") and certain of their affiliated debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, "Debtors"), CHT Holdco, LLC ("CHT Holdco") and CC Capital CHT Holdco, LLC ("CC Holdco" and collectively with CHT Holdco, "CC Capital" and together with the Liquidating Trustee, "Plaintiffs"), by their respective undersigned counsel, respectfully submit the following post-trial proposed findings of fact and conclusions of law following the trial held on December 2 and 3, 2025 in the above-captioned adversary proceeding.[1]

## PROPOSED FINDINGS OF FACT

Transcripts of the trial held on December 2 and 3, 2025 ("Tr.") are submitted with the Declaration of Brigitte R. Rose dated December 17, 2025.

Plaintiffs incorporate herein the facts set forth in Plaintiffs' Exhibits 1-91 admitted at trial (Tr.: 15:3-4; 145:1), including the:

(i)    Amended Declaration of Direct Testimony of Frank A. Lazzara, CPA, CFF, CFE [P. Ex. 87] and exhibits thereto [P. Exs. 1-54.a] ("Lazzara Dec.") [ECF. No. 677];

(ii)   Declaration of Direct Testimony of the Liquidating Trustee [P. Ex. 89] and exhibits thereto [P. Exs. 68-85] (the "Trustee Dec.") [ECF. No. 667];

(iii)  Trial Affidavit of Richard DiBlasi [P. Ex. 88] and exhibit thereto [P. Ex. 86] ("DiBlasi Aff.") [ECF. No. 668];

---

[1]  References to docket numbers ("ECF No. __") refer to the docket of the Adversary Proceeding unless noted otherwise. Capitalized terms undefined herein have the same meaning as ascribed to them in the Second Amended Adversary Proceeding filed January 14, 2021 ("Second Amended Complaint"). Trustee Dec., P. Ex. 70 [ECF No. 303].

(iv)    Exhibits [P. Exs. 55-67.e] submitted with the Amended Declaration of Brigitte R. Rose dated November 14, 2024 (the "Rose Dec.") [ECF. No. 678]; and

(v)    Declaration of Direct Testimony of Kiran Sharma dated November 10, 2025 ("Sharma Dec.") [P. Ex. 90] [ECF No. 682].

Plaintiffs also refer to the Parties Joint Statement of Stipulated Facts filed December 2, 2025 ("Stipulated Facts"). ECF No. 694.

## I.    Bankruptcy and Adversary Proceeding Background

1.    On March 16, 2018 (the "Petition Date"), the Debtors (other than New York Network Management, L.L.C.) commenced their Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"). *See In re Orion HealthCorp, Inc., et al.*, Case No. 18-71748 (Jointly Administered); Stipulated Facts ¶ 1.

2.    On April 4, 2018, this adversary proceeding was commenced by filing an Adversary Proceeding Complaint asserting numerous claims against various persons and entities, including Parmar and his co-conspirators. ECF No. 1; Stipulated Facts ¶ 2.

3.    On June 4, 2018, Plaintiffs filed a First Amended Adversary Proceeding Complaint, adding additional claims and parties, including against certain entities owned and/or controlled by Parmar, which the Debtors allege received a financial benefit as a result of the Merger and/or were used to defraud the Debtors and others. ECF No. 24; Stipulated Facts ¶ 3.

4.    On February 26, 2019, the Liquidating Trustee was appointed pursuant to the Court's order confirming the Debtors' Third Amended Joint Plan of Liquidation (the "Confirmation Order" or "Plan") [Case No. 18-71748, Doc. No. 701], which, among other

- 3 -

things, (a) established the Liquidating Trust, (b) approved the Liquidating Trust Agreement, (c) approved the Debtors' transfer to the Liquidating Trust of all their right, title, and interest in and to, among other things, the instant adversary proceeding, (d) appointed the Liquidating Trustee as successor to the Debtors, and (e) assigned the individual claims of the Secured Lenders to the Liquidating Trustee. Trustee Dec., P. Ex. 68; Stipulated Facts ¶ 4.

5.      On January 14, 2021, the Liquidating Trustee and CC Capital filed the Second Amended Complaint. Trustee Dec., P. Ex. 70; Stipulated Facts ¶ 5.

6.      On January 2, 2024, Parmar filed an Answer to the Second Amended Adversary Proceeding Complaint. Trustee Dec., P. Ex. 71; Stipulated Facts ¶ 6.

7.      On January 2, 2024, the Parmar Entities[2] filed an Answer to the Second Amended Adversary Proceeding Complaint with Counterclaims against CC Capital. Trustee Dec., P. Ex. 72; Stipulated Facts ¶ 7.

8.      On February 29, 2024, CC Capital filed a motion to dismiss the Parmar Entities' counterclaims. ECF Nos. 548-550; Stipulated Facts ¶ 8.

9.      By Decision and Order entered December 6, 2024, the Court granted CC Capital's motion to dismiss the Parmar Entities' counterclaims. ECF No. 623; Stipulated Facts ¶ 9.

---

[2] Parmar Entities as used herein refers to: Constellation Health LLC, First United Health, LLC, Axis Medical Services LLC, Vega Advanced Care LLC, Pulsar Advance Care LLC, Lexington Landmark Services LLC, PPSR Partners, LLC, 21B One River Park LLC, Aquila Alshain LLC, Ranga Bhoomi LLC, and The Red Fronted Macaw Trust.

Plaintiffs are discontinuing all claims against Constellation Health Investment LLC, 2 River Terrace Apartment 12J, LLC, Naya Constellation Health LLC, and Taira no Kiyomori, LLC. Plaintiffs have also discontinued all claims as to defendant Kiran Sharma pursuant to the Stipulation of Dismissal filed November 12, 2025. ECF No. 676.

**II.     Parmar's Ownership and/or Control of CHT and the Parmar Entities**

10.     Parmar was, at all relevant times, the Chief Executive Officer of CHT and President of CHT's Board of Directors. P. Ex. 60 at 18:1-4.

11.     Parmar was, at all relevant times, an owner, manager, officer and/or director of Constellation Health LLC ("CHLLC"). Trustee Dec., P. Ex. 77; Lazzara Dec., P. Exs. 40, 46 at pp. 8, 68-76; Rose Dec., P. Ex. 64 at 20:22-23; 45:5.

12.     Parmar was, at all relevant times, an owner, manager, officer and/or director of First United Health, LLC ("First United"). Trustee Dec., P. Ex. 77; Rose Dec., P. Ex. 64 at 20:22-23; 45:5; Stipulated Facts ¶ 12.

13.     Parmar was, at all relevant times, an owner, manager, officer and/or director of Axis Medical Services LLC ("Axis"). Trustee Dec., P. Ex. 77.

14.     Parmar was, at all relevant times, an owner, manager, officer and/or director of Vega Advanced Care LLC ("Vega"). Trustee Dec., P. Ex. 77.

15.     Parmar was, at all relevant times, an owner, manager, officer and/or director of Pulsar Advance Care LLC ("Pulsar"). Trustee Dec., P. Ex. 77.

16.     Parmar was, at all relevant times, an owner, manager, officer and/or director of Lexington Landmark Services LLC ("Lexington"). Trustee Dec., P. Ex. 77.

17.     Parmar was, at all relevant times, an owner, manager, officer and/or director of PPSR Partners, LLC ("PPSR). Trustee Dec., P. Ex. 77.

18.     Parmar was, at all relevant times, an owner, manager, officer and/or director 21B One River Park LLC ("21B One River"). Trustee Dec., P. Ex. 77.

19.     Parmar was, at all relevant times, an owner, manager, officer and/or director of Aquila Alshain LLC ("Aquila Alshain"). Trustee Dec., P. Ex. 77.

20.      Parmar was, at all relevant times, an owner, manager, officer and/or director of Ranga Bhoomi LLC ("Ranga Bhoomi"). Trustee Dec., P. Ex. 77.

21.      Parmar was, at all relevant times, the grantor of The Red Fronted Macaw Trust (the "Red Trust"). Lazzara Dec., P. Ex. 51; Trustee Dec., P. Ex. 77.

### III.    The Fraudulent Scheme

22.      The Debtors, CC Capital and the Debtors' Secured Lenders alleged in this adversary proceeding that they were the victims of a large, complex, and brazen fraudulent financial scheme that was subject to a complex and deliberate concealment effort perpetrated by their former management culminating in the Merger. Lazzara Dec., ¶ 7; Stipulated Facts ¶ 22.

23.      Parmar and the other Board Member Defendants (*i.e.,* Zaharis and Chivikula) are alleged to have fabricated the pre-Merger Sham Acquisitions of multiple Debtors, which are largely or entirely fictitious, and falsified and altered financial documents and bank statements, created fictitious customers and invoices, and fabricated the operations of entire subsidiaries of Orion in order to artificially inflate CHT's stock price and induce CC Capital to enter into the Merger and the Debtors' Secured Lenders to provide financing for the Merger. Lazzara Dec., ¶ 7; Stipulated Facts ¶ 23.

#### i.      CHT's RCM Business

24.      CHT touted itself as a "healthcare services organization providing outsourced business services to physicians" through three segments: Revenue Cycle Management ("RCM"), Practice Management and Group Purchasing Organization. Lazzara Dec., Ex. 46 at p. 97.

25.    CHT's RCM business was focused on providing physicians and hospitals "medical billing and collections, practice management, and other related services" and was represented as comprising 65.3% and 52.1% of CHT's total revenue for the years ended 2015 and 2014, respectively, and thus, was CHT's largest revenue generating segment. *Id.*

26.    CHT's practice management segment was focused on providing primary care and subspeciality pediatric practices "accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services" among other things. *Id.* The practice management segment was represented as comprising 24.7% and 35.0% of CHT's total revenues for 2015 and 2014, respectively. *Id.*, at p. 98.

27.    CHT's group purchasing organization segment provided for "eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies" and, in return, received an administrative fee from such companies. *Id.*

### ii.    The Sham Acquisitions

28.    In CHT's financial statements for 2015 and 2016, including those filed with the AIM, revenue and EBITDA (*i.e.,* earnings before interest, taxes, depreciation, and amortization) were significantly overstated, causing CHT's stock price to artificially increase. Lazzara Dec., ¶ 8.

29.    The inflated results were made possible through the use of certain CHT subsidiaries, specifically, MDRX Medical Billing, LLC ("MDRX"), Phoenix Health, LLC ("Phoenix"), and NorthStar FHA, LLC ("NorthStar"), which were represented to be

operating businesses with their own employees, customers and revenue but were, in fact, fictitious. Lazzara Dec., ¶ 9.

30. MDRX, Phoenix and Northstar had no business operations, employees, customers, or revenue. Lazzara Dec., ¶ 9.

31. MDRX, Phoenix and Northstar were, at all times, shell entities. Lazzara Dec., ¶ 9.

32. Each of CHT's announced acquisitions of NorthStar, Phoenix, and MDRX were fictitious transactions. Lazzara Dec., ¶ 10.

33. CHT's announced acquisition transactions for NorthStar, Phoenix, and MDRX shared common characteristics: money was raised through secondary public offerings on the AIM, the acquisition "target" was formed shortly before the date of the announced acquisition, and, while CHT's financial records indicate that the proceeds of the secondary offerings were used to fund these acquisitions, the proceeds were used for other purposes. Lazzara Dec., ¶ 10.

34. In May 2015, CHT raised approximately $15.8 million through a secondary offering on the AIM. Lazzara Dec., ¶ 11; Stipulated Facts ¶ 30.

35. The equity raise was intended for the acquisition of NorthStar for $18 million, which was described in a September 16, 2015 press release announcing the acquisition as an RCM business having 233 employees, 77 clients, and revenue of $7.9 million in 2014. Lazzara Dec., ¶ 11, P. Ex. 1.

36. The press release for Northstar contained a quote from Parmar, stating "NorthStar has an impressive senior leadership team, client coverage and technology suite which fits neatly into our long term vision for our Company." Lazzara Dec., P. Ex. 1.

37.     NorthStar was incorporated in Delaware on June 12, 2015. Lazzara Dec., ¶ 11, P. Ex. 2.

38.     On September 18, 2015, CHT issued a press release announcing its acquisition of Phoenix, which was described as an RCM business having 138 employees and generating revenue of $9.8 million and EBITDA of $2.2 million, with net assets of $1.1 million as of December 31, 2014. Lazzara Dec., ¶ 12, P. Ex. 3.

39.     The press release quoted Parmar as stating that Phoenix was "CHT's fourth acquisition overall" and would be "accretive to shareholders and further cement [CHT's] consolidated position of being one of the largest healthcare services companies in the US." Lazzara Dec., P. Ex. 3.

40.     Phoenix was incorporated in Delaware on September 14, 2015. Lazzara Dec., ¶ 12, P. Ex. 4.

41.     On December 11, 2015, CHT issued a shareholder circular detailing the terms of CHT's acquisition of MDRX. Lazzara Dec., P. Ex. 5.

42.     In January 2016, CHT raised approximately $37 million in a secondary offering, which was earmarked for the acquisition of MDRX. Lazzara Dec., ¶ 13, P. Ex. 5.

43.     A press release dated February 10, 2016 announced CHT's "completed" acquisition of MDRX "on the same terms as detailed in the shareholder circular of 11 December 2015" for $28 million "on a cash free, debt free basis." Lazzara Dec., P. Ex. 5.

44.     The press release stated that MDRX was primarily in the "billing practice management and healthcare consulting space" with "a nationwide presence and brings approximately 3,500 more Physicians onto the Constellation platform." Lazzara Dec., ¶ 13, P. Ex. 5.

- 9 -

45.    Parmar was quoted in the MDRX press release, stating "[t]he closing of the MDRX transaction will further increase CHT's revenue and significant cost savings will be borne by MDRX being part of the CHT platform.  MDRX will be our fourth acquisition since our IPO." Lazzara Dec., P. Ex. 5.

46.    The stock purchase agreement between CHT and MDRX is dated December 7, 2015. Lazzara Dec., ¶ 13, P. Ex. 6.

47.    MDRX was incorporated in Delaware on December 7, 2015. Lazzara Dec., ¶ 13, P. Ex. 7.

48.    In total, CHT fraudulently raised approximately $52.8 million through secondary offerings on the AIM under the guise of closing on the acquisitions of these Sham Entities. Lazzara Dec., ¶ 14.

### iii.    The M&T Bank Off-Balance Sheet Cash Accounts

49.    CHT maintained two bank accounts at Manufacturer's Trust Bank ("M&T Bank"): a checking account ending in x5647 (the "M&T Checking Account") and a money market account ending in x8132 (the "M&T Money Market Account"). Lazzara Dec., ¶ 15.

50.    Neither the M&T Checking Account nor the M&T Money Market Account are reflected on the balance sheet or general ledger of CHT or any of CHT's subsidiaries. Lazzara Dec., ¶ 15.

51.    The $36.9 million of proceeds from the MDRX equity raise were deposited into the M&T Checking Account on January 8, 2016 and, on the same day, the balance was transferred to the M&T Money Market Account. Lazzara Dec., ¶ 16, P. Exs. 8, 9.

52.    While CHT's accounting records reflect a decrease to Cash and a corresponding increase to the Investment in Affiliates account (representing the purported

acquisition of MDRX), there is no such expenditure evidenced in the actual M&T Bank statement. Instead, the M&T Money Market Account statement indicates that the $36.9 million was transferred to various recipients over the next six months. Lazzara Dec., ¶ 17. [3]

53.     None of the transfers correlate with the general ledger entry or provide evidence that these funds were used for the alleged acquisition of MDRX. Lazzara Dec., ¶ 17.

54.     The proceeds of the May 2015 offering, in which CHT raised approximately $15.8 million through a secondary offering on the AIM, were deposited into the M&T Checking Account in June 2015. Lazzara Dec., ¶ 18, P. Ex. 10.

55.     Ten days later, the balance was transferred to the M&T Money Market Account. Lazzara Dec., ¶ 18, P. Ex. 11.

56.     Journal entries within the general ledger reflect payments of $8.5 million and $7.5 million on September 30, 2015, purportedly for the acquisitions of NorthStar and Phoenix, respectively. Lazzara Dec., ¶ 19.

57.     However, the activity in the M&T bank statements shows that the $15.8 million equity raise proceeds were gradually depleted over the next six months through multiple transactions, with funds disbursed to various third parties for unknown purposes, none of which appear to be related to acquisitions. Lazzara Dec., ¶ 19.

58.     None of the disbursement transactions align with the general ledger entries recorded to Cash as payments for the NorthStar and Phoenix acquisitions. Lazzara Dec., ¶ 19.

---

[3] A portion of the proceeds from the equity raises of the Sham Entities was used to purchase the 2 River Terrace Property, and on March 1, 2021, in a related adversary proceeding, this Court entered judgment against defendant 2 River Terrace Apartment 12J, LLC, avoiding and recovering the River Terrace Property as a constructive fraudulent conveyance. *See Howard M. Ehrenberg in his Capacity as Liquidating Trustee of Orion Healthcorp, Inc., et. al. v. Elena Sartison*, Adv. Proc. No. 20-08051 (AST) at ECF No. 64.

59.     The acquisitions of MDRX, Northstar and Phoenix were fictitious. Lazzara Dec., ¶¶ 8-19, P. Exs. 1-11.

60.     Parmar and the other Board Member Defendants fabricated the acquisitions of MDRX, Northstar and Phoenix. Lazzara Dec., ¶¶ 8-19, P. Exs. 1-11.

### iv.     Fictitious Orion Customers, Revenue and Collections

61.     CHT's publicly filed financial statements for the six-month period ending June 30, 2016 reported net revenues of $56,990,373. Lazzara Dec., Ex. 46 at p. 87.

62.     Of the $56.9 million in reported revenues, $31 million was fictitious revenue reported for MDRX, Orion, and Phoenix. Lazzara Dec., ¶ 20.

63.     In connection with due diligence for the Merger, Parmar and his co-conspirators presented the façade that the revenue was legitimate by transferring cash raised from the secondary offerings from the off-balance sheet M&T Bank Account to an Orion operating account at JP Morgan Chase (the "Orion Bank Account") in order to create the appearance of collected cash from non-existent customers. Lazzara Dec., ¶ 22.

64.     Parmar and his co-conspirators then recorded these as customer receipts in CHT's accounting system in satisfaction of customer billings (i.e., revenue). Lazzara Dec., ¶ 22.

65.     While the equity raise deposits into the M&T Money Market Account were accurately reflected in CHT's accounting data in the Cash Account, the subsequent transfer of these funds to the M&T Checking Account and, ultimately, to the Orion Bank Account were mischaracterized as customer receipts rather than being accurately recorded as internal transfers in CHT's accounting records. Lazzara Dec., ¶ 22.

66.     Parmar and his co-conspirators also carried out this fictitious revenue scheme by altering Orion Bank Account statements to include fictitious entries (i.e., unsupported by any cash transfer) to create the illusion of customer deposits. Lazzara Dec., ¶ 23, P. Exs. 12-16.

67.     Specifically, descriptions of deposits into the Orion Bank Account were altered so that the initiator of the deposit appeared to be a customer, rather than CHT itself. Lazzara Dec., ¶ 24, P. Exs. 12-16.

68.     On February 20, 2016, Chivukula emailed Parmar "Attached are the bank statements in excel and pdf. I am not able to get the barcode for Nov and December in the right format in word." Lazzara Dec., ¶ 24, P. Ex. 14.

69.     The bank statements attached to Chivukula's February 20, 2016 e-mail were fabricated. Lazzara Dec., ¶ 24, P. Exs. 14-16.

### v.     Misrepresentations in Connection With Go-Private Merger

70.     Under the terms of an agreement and plan of merger dated November 24, 2016 (the "Merger Agreement") between CC Capital and CHT, CHT Holdco, CHT Mergersub, Inc., and Orion, CHT Holdco acquired CHT at a price of $2.93 in cash and $0.43 in promissory notes per share, representing a total value of $309.4 million (the "Acquisition Price"). Lazzara Dec., ¶ 70, P. Ex. 39; Stipulated Facts ¶ 133.

71.     Pursuant to the Merger Agreement, as a condition and inducement to the Merger, Parmar and the other Board Member Defendants made numerous representations and warranties concerning CHT's financial state. Lazzara Dec., P. Ex. 39 at § 4.

72.     Specifically, CHT represented and warranted that: (i) CHT's financial statements "are based in all material respects on true and accurate transactions which have a

valid business purpose, and do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the Financial Statements or information therein not misleading" (Lazzara Dec., P. Ex. 39 at § 4.5(b));   (ii) CHT's books and records "are materially complete and correct and have been maintained in accordance with sound business practice" (*id.*, at § 4.15); and (iii) all accounts receivable "are valid and genuine" and "have arisen from bona fide transactions in the ordinary course of business." Lazzara Dec., P. Ex. 39 at § 4.21(a).

73.     Pursuant to a certain Subscription Agreement dated November 24, 2016 (the "Subscription Agreement"), Parmar, CHLLC and First United, among other things, agreed to indemnify CC Holdco and others for any "Adverse Consequences" as defined therein, and to require CHLLC and First United to execute and deliver certain Pledge and Security Agreements, and further represented and warranted that CHT's representations and warranties in the Merger Agreement, including those set forth above, were true and correct. Lazzara Dec., ¶ 71, P. Ex. 40.

74.     As a condition of closing, the Subscription Agreement, among other things required each of the representations and warranties made by Parmar, CHLLC and First United in the Transaction Documents to be true and correct in all material respects. Lazzara Dec., P. Ex. 40.

75.     The representations made by Parmar, CHLLC and First United and others regarding the Debtors' finances were materially inaccurate and falsified and significantly overstated the Debtors' actual financial position. Lazzara Dec., ¶ 72.

76.     Specifically, in connection with due diligence for the Merger, Parmar provided to CC Capital and the Secured Lenders fabricated and fictitious financial information that

reported the false revenue associated with Orion and the Sham Entities. Lazzara Dec., ¶ 69; Rose Dec., P. Ex. 60.

77.    Parmar also provided in due diligence the altered bank statements for Orion indicating the receipt of fictitious Orion customer revenue, fabricated bank statements for MDRX, fictitious financial statements for periods prior to the Sham Entities' existence, and lists of fake "customers" of the Sham Entities. Lazzara Dec., ¶ 69; Rose Dec., P. Ex. 60.

78.    Parmar provided to CC Capital and the Secured Lenders inaccurate and false financial statements for CHT for 2015 and 2016, with revenue and EBITDA inflated in significant amounts. Lazzara Dec., ¶ 69; Rose Dec., P. Ex. 60.

79.    Parmar presented the same fabricated financial information to CHT's Board of Directors prior to the Merger, reporting net revenue for the six months ended June 30, 2016 of approximately $57.0 million, income from operations of approximately $14.5 million, and the resulting EBITDA of approximately $21.1 million. Lazzara Dec., ¶ 73.

80.    However, due to the financial activities related to the fictitious entities and fictitious customers, revenue was overstated in the approximate amount of $30.9 million and EBITDA in the approximate amount of $20.4 million, which equates to approximately 54% and 97% of the total revenue and EBITDA reported, respectively. Lazzara Dec., ¶ 74.

81.    As of January 30, 2017, the date of closing of the Merger, CHT's actual business operations and financial condition were much smaller and less valuable than had been represented to CC Capital and the Secured Lenders during the negotiation of the transaction. Lazzara Dec., ¶ 74.

82.    The Debtors reported approximately $109 million of overstated goodwill and intangibles within their total assets of $165 million at December 31, 2016, just thirty days prior to the Merger closing date. Lazzara Dec., ¶ 75.

83.    Additionally, the Debtors' balance sheet reported significantly overstated retained earnings at approximately $9 million, a figure that was inflated by at least approximately $31 million of fabricated revenue, as determined to have existed through just the first six months of 2016. Lazzara Dec., ¶ 75.

84.    Finally, the significant liabilities arising from the capital raises through secondary offerings on the AIM for the fraudulent Sham transactions were not reflected on the Debtors' financial statements at the time. Lazzara Dec., ¶ 14.

85.    Because of the manipulation of the Debtors' revenue and earnings, the Debtors' value was far less than $309.4 million at the time of the Merger. Lazzara Dec., ¶ 76.

86.    On the date of the Merger, the Debtors' balance sheets were a fiction of solvency, and the Debtors were insolvent prior to consummation of the Merger. Lazzara Dec., ¶ 77.

87.    In a related adversary proceeding (Adv. Proc. No. 20-08052-ast), this Court determined as a matter of law that the Debtors were insolvent at the time of the fraudulent transfer at issue therein on May 25, 2017, only four months after the Merger closing. Rose Dec., P. Ex. 67 at 8:8-14, 14:18, 19:19-21.

88.    CHT's actual value at the time of the Merger was negative ($27,802,194), when adjusting CHT's audited sheet at December 31, 2016, the closest financial statement reporting date to the January 30, 2017 take-private Merger transaction, for (i) the known inflationary effects resulting from recording the "acquisitions" of the Sham

Entities, and (ii) the additional liabilities resulting from the publicly misrepresented secondary equity raises used to raise monies to allegedly acquire the Sham Entities. *See* Lazzara Dec. ¶¶ 89-91.

89.     Even considering adjusting for the taxable revenues and expenses attributable to the Sham Entities and the additional revenue for certain fabricated Orion corporate customers, CHT was operating on severe losses for the years immediately prior to and following the Merger sale, as reflected in the Debtors' Amended US Federal Income Tax Returns for the years ending December 31, 2015 through December 31, 2017. Lazzara Dec., ¶ 61; P. Exs. 35.a., 35.b., 35.c.; Tr., 74:13-75:5.

90.     Parmar's defalcation created contingent liabilities that only deepened CHT's insolvency. Lazzara Dec., ¶ 58; Tr., 74:13-75:5.

91.     In light of the false pretenses under which the $36.9 million for MDRX was raised, CHT (and the rest of the Debtors) incurred a contingent liability to the investors who subscribed to the secondary equity raise, as well as to those pre-existing shareholders who were diluted by the January 2016 secondary equity raise, of no less than $36.9 million (not even taking into account the incurrence of legal and administrative expenses that would be necessary to defend such action). Lazzara Dec., ¶ 58.

92.     While the shareholders that were the fortuitous beneficiaries of the take-private transaction did, in fact, receive a buy-out in excess of the true value of their equity holdings, (i) the contingent liability merely shifted to CC Capital and Bank of America, N.A. ("Bank of America"), who funded the Merger transaction  (Lazzara Dec., ¶ 58);[4] and (ii) the

---

[4] Pursuant to Section 4.1(c) of the Confirmation Order, Bank of America (and other Secured Lenders) assigned their interest in the claims asserted in this adversary proceeding to the Liquidating Trustee for prosecution. Trustee Dec., P. Ex. 68.

shareholders faced claw back of the Merger Proceeds that they received in related adversary proceedings, and the promissory note they received was extinguished under the Confirmation Order. Trustee Dec., P. Ex. 68 at ¶ 27.

93.     Specifically, on March 29, 2018, the Debtors commenced an adversary proceeding against approximately 80 individuals and entities who received, in the aggregate, over $80 million in Merger Proceeds. *See Ehrenberg v. Richard Ian Griffiths, et al.*, Adv. Proc. No. 18-08048 at ECF Nos. 1, 295 (Second Amended Complaint).

94.     Between this adversary proceeding and adversary proceeding no. 18-08048, claims were brought against nearly every identified individual or entity who received Merger Proceeds to recover the funds as actual and constructive fraudulent transfers. *See* Trustee Dec., P. Ex. 70 [ECF No. 303]; Adv. Proc. No. 18-0848 at ECF No. 295.

95.     Most of the named defendants in 18-8048 either (i) settled with the Liquidating Trustee or (ii) the Liquidating Trustee obtained a default judgment against such defendants. *See* Adv. Proc. No. 18-0848 at ECF No. 538 (Status Report detailing defendants who settled and defaulted).

96.     The December 30, 2016 audited financials, which included revenue for the Sham Entities and were prepared by Debtors' accountants in May 2017, reflect that the fraud had not yet been discovered at that point, nearly four months after the Merger. Lazzara Dec., Ex. 54.a.

IV.     **Merger Financing and Disbursement of the Merger Proceeds**

97.     To finance the Merger, Orion obtained a senior credit facility (the "Merger Financing") in the amount of $130,000,000.00 from Bank of America. Lazzara Dec., ¶ 78, P. Ex. 41; Trustee Dec., ¶¶ 15-16; DiBlasi Aff. ¶ 4-5, P. Ex. 86.

98.     In return, each of the Debtors jointly and severally guaranteed the Merger Financing: CHT and the other Debtors gave first priority liens in all of their property and pledged 100% of the equity interests in each of their subsidiaries to secure the Merger Financing. Lazzara Dec., ¶ 78.

99.     In connection with the Merger, CC Capital and its related investors contributed approximately $82,502,260.25 million of cash into a CC Holdco Bank account maintained by JPMorgan Chase (the "CC Holdco Bank Account"), which was used for the sole and exclusive purpose of disbursing the funds used as purchase proceeds for the Merger. DiBlasi Aff. ¶ 4, P. Ex. 86; Lazzara Dec., ¶ 79, P. Ex. 42; Trustee Dec., ¶¶ 15-16.

100.    At closing on January 30, 2017, Bank of America wired the $130 million of the Merger Proceeds to the CC Holdco Bank Account. Lazzara Dec., ¶ 80, P. Ex. 42; Trustee Dec., ¶¶ 15-16.

101.    As a result of the deposits by CC Holdco and its investors and the Debtors, originating from Bank of America, as of January 30, 2017, the CC Holdco Bank Account held the full $212,502,260.25 of Merger Proceeds. Lazzara Dec., ¶ 80; DiBlasi Aff. ¶ 6, P. Ex. 86; Trustee Dec., ¶¶ 15-16.

102.    Both CC Capital and Bank of America, and the other lenders, relied on Parmar, CHLLC and First United's material and fraudulent misrepresentations in providing the Merger Proceeds. DiBlasi Aff., ¶ 4; Trustee Dec., P. Ex. 82 at ¶ 4.

103.    On or about January 30, 2017, $177,154,981.43 in Merger Proceeds was transferred from the CC Holdco Bank Account to an account maintained by Capita Registrars Limited ("Capita"), the exchange agent for the Merger. Lazzara Dec., ¶ 81; Trustee Dec., ¶ 17.

104.    On or about January 30, 2017, Capita disbursed the Merger Proceeds to CHT shareholders. Lazzara Dec., ¶ 82.

105.    The payment to shareholders upon closing of the Merger was $2.93 in cash and $0.43 in promissory notes per share. Lazzara Dec., Ex. 46, p. 17.

106.    As set forth in the Proxy Statement, the "Parmar Controlled Entities" owned (legally or beneficially) 49,302,598 Common Shares of CHT (which constituted 53.54% of the shares outstanding). Lazzara Dec., Ex. 46 at p. 8.

107.    The "Parmar Controlled Entit[ies]" were defined in the Proxy Statement as "entities managed, whether directly or indirectly, by Paul Parmar and Sotirios ("Sam") Zaharis") namely PBPP Partners LLC, MYMSMD LLC, PPSR Partners LLC, Blue Mountain Healthcare LLC," CHT Holdco, LLC, CHT MergerSub, Inc., First United, CHLLC, and Alpha Cepheus. Lazzara Dec., ¶ 70, P. Ex. 46 at pp. 8, 68-76.

108.    Of the 49,302,598 Common Shares held by Parmar Controlled Entities, under the terms of the Merger, such entities sold 24,446,961 Common Shares (which amounts to approximately 50% of their shareholding in CHT), equating to approximately $71.6 million in Merger Proceeds.  The balance of such Common Shares (being 24,855,637 Common Shares) were rolled into a 49.3% economic interest in CHT following the closing. Lazzara Dec., Ex. 45 at pp. 31-32.

109.    Prior to the Merger, defendants Axis Medical Services LLC ("Axis"), Lexington Landmark Services LLC ("Lexington), Pulsar Advance Care LLC ("Pulsar"), and Vega Advanced Care LLC ("Vega") (collectively, and together with PPSR Partners LLC ("PPSR"), the "Proceeds Recipient Defendants") were CHT shareholders. Specifically, Axis held 2,991,808 shares (2.91%); Lexington held 524,441 shares (0.57%); Pulsar held 1,569,506

shares (1.7%); and Vega held 2,967,033 shares (3.22%), constituting 8.4% of CHT's outstanding shares. Lazzara Dec., P. Ex. 46, p. 58.

110.    Other than PPSR, the Proceeds Recipient Defendants were represented in the Proxy Statement as third-party shareholders, unrelated to Parmar. Lazzara Dec., ¶ 86, P. Ex. 46 at p. 58.

111.    However, those Proceeds Recipient Defendants were each incorporated in Delaware by Parmar's attorneys at Robinson Brog on the same date, November 17, 2016, only two months before the Merger closed.  Rose Dec., P. Ex. 67.d.

112.    Vega, Axis and certain of the other Proceeds Recipient Defendants were formed by Parmar in connection with the Sham Entities and used to hold CHT shares for Parmar's ultimate benefit.  Lazzara Dec., ¶ 104, P. Ex. 54.

113.    In an e-mail from Zaharis to Parmar that same date, Zaharis stated that certain of the Proceeds Recipient Defendants were to receive the "cash receipt" share allocated to the sham entities, Northstar and Phoenix, as well as other entities, in connection with the closing of the Merger. Lazzara Dec., Ex. 54.

114.    Robinson Brog served as escrow agent for certain Parmar Entities in connection with the receipt and distribution of Merger Proceeds. Lazzara Dec., ¶ 84.

115.    On or about January 30, 2017, Capita wired $45,959,429.43 into an attorney escrow account (the "RB Escrow Account") maintained by Robinson Brog, representing Merger Proceeds due to be paid to, among other defendants, Lexington, Vega, Axis, PPSR and Pulsar. Lazzara Dec., ¶ 85, P. Ex. 43.

116.    From the RB Escrow Account, each of the Proceeds Recipient Defendants were allocated a portion of the Merger Proceeds in exchange for the CHT shares that they

held in the following amounts: (i) Axis received $8,765,997.44; (ii) Lexington received $2,051,000.00; (iii) Pulsar received $4,598,652.58; (iv) Vega received $8,693,406.69; and (v) PPSR received $700,123.50. Lazzara Dec., ¶ 86, P. Ex. 43.

117.   Accordingly, while Parmar disclosed an ownership interest in the Parmar Controlled Entities' shares, totalling approximately $71.6 million which would be paid out as part of the Merger (primarily on account of shares Blue Mountain ultimately held at closing), Parmar received an additional $45 million through the payments in the RB Escrow Account to the Proceeds Recipient Defendants, which was not disclosed to the public shareholders. Lazzara Dec., Ex. 43.

## V.   Purchase of the Riverside Property

118.   Parmar also used Merger Proceeds to purchase 50 Riverside Boulevard, Apartment 21B, New York, New York ("Riverside Property"). Lazzara Dec., ¶ 88.

119.   On February 8, 2017, Parmar received an email from a real estate broker informing him that his $14,800,000 cash offer to purchase Riverside Property was accepted. Lazzara Dec., ¶ 94, P. Ex. 45.

120.   That same day, Parmar emailed Zaharis asking him to coordinate the creation of LLCs to acquire the Riverside Property. Lazzara Dec., ¶ 95, P. Ex. 45.

121.   In order to hide the fact that Parmar was buying a $15 million apartment (paid for in cash from the Merger Proceeds), Parmar and Zaharis (a) created an elaborate web of numerous entities, including defendants the Red Trust, Aquila Alshain, and 21B One River (collectively, and together with Ranga Bhoomi LLC ("Ranga Bhoomi"), the "Riverside Property Defendants"), through which Parmar purchased the Riverside Property, and (b) took affirmative steps to ensure that the real estate brokers on the transaction did not disclose to

others that Parmar was the buyer and did not include either Parmar or Zaharis on any emails with other individuals involved in the transaction.  Lazzara Dec., ¶ 96.

122.    21B One River and Aquila Alshain were each incorporated in Delaware in February 2017, while negotiations were ongoing. Rose Dec., P. Ex. 67.d.

123.    On February 9, 2017, an e-mail represented to be from the Vardi Yahoo Account advised an attorney from K&F that the Riverside Property was being purchased for "one of [Vardi's] portfolio investors, Red Fronted Macaw trust," of which the "Manager/trustee is Kiran Sharma." Lazzara Dec., ¶ 97, P. Ex. 47.

124.    On April 5, 2017, the Vardi Yahoo Account e-mailed unsigned copies of operating agreements for Aquila Alshain and 21B One River to Zaharis and requested that they be signed by Kiran Sharma and her husband, Salil Sharma, in preparation for the purchase of the Riverside Property.  Lazzara Dec., ¶ 98, P. Ex. 48.

125.    The e-mails from the Vardi Yahoo Account attached to the Lazzara Dec. at P. Exs. 47 and 48 were prepared by Parmar and/or Zaharis and sent *via* the Vardi Yahoo Account. Lazzara Dec., ¶ 29.

126.    The purchase of the Riverside Property was finalized on April 7, 2017 for a total price of $15,074,100.00. Lazzara Dec., ¶ 99, P. Exs. 49, 50.

127.    The $15 million in funds used to purchase the Riverside Property was funded solely with Merger Proceeds, although title to the property was placed in the name of 21B One River, which is beneficially owned by the Red Trust. Lazzara Dec., ¶ 19.

128.    Sharma was the trustee of the Red Trust at the time of the purchase of the Riverside Property and her children were designated as beneficiaries of the trust. Lazzara

Dec., ¶ 101; P. Ex. 51; Trustee Dec., P. Ex. 74 at Answer to No. 1; P. Ex. 79 at 59:14-18; Sharma Dec., ¶ 2.

129.    The Red Trust was, at all relevant times, the sole member of Aquila Alshain which, in turn, was the sole member of 21B One River, the entity that holds title to the Riverside Property. Lazzara Dec., ¶ 101, P. Exs. 52, 53.

130.    The Red Trust, Aquila Alshain and 21B One River are entities owned and controlled by Parmar. Lazzara Dec., ¶ 102; Trustee Dec., P. Exs. 77, 79; Rose Dec., P. Ex. 63.

131.    Both Aquila Alshain and 21B One River Park share the same business address, 3400 Highway 35 South, Hazlet, New Jersey, which was Parmar's business address at the time. Lazzara Dec., ¶ 102, P. Exs. 52, 53; Trustee Dec., P. Ex. 79 at 48-50, 75-109; Tr.: 141:12-18.

132.    Parmar's purchase of the Riverside Property was accomplished by diverting CHT funds through the Parmar-controlled entities Axis, Vega and Ranga Bhoomi. Lazzara Dec., ¶ 103, P. Ex. 43; Rose Dec., P. Ex. 67.e.

133.    Two wire transfers were made from the RB Escrow Account on February 10, 2017 to Ranga Bhoomi's M&T bank account (ending xxxxxx1472) in the amount of $8,765,997.44 and $7,234,002.56, which were funds originating from the $16 million portion of the Merger Proceeds paid to Axis and Vega. Lazzara Dec., ¶ 103, P. Ex. 43; Rose Dec., P. Ex. 67.e.

134.    From Ranga Bhoomi's M&T bank account, the funds were transferred to K&F, the attorneys representing 21B One River in the sale as follows:  the initial deposit of $3,705,000 on February 23, 2017 [Rose Dec., P. Ex. 67.e] and the balance of $11,100,000.00 on March 20, 2017 [P. Ex. 91].

135. CHT did not receive any value of any kind for funding 21B One River's $15 million purchase of the Riverside Property. Lazzara Dec., ¶ 105.

136. CHT did not owe any debt to 21B One River, Aquila Alshain or the Red Trust. Lazzara Dec., ¶ 105.

137. CHT did not have any business dealings with 21B One River, Aquila Alshain or the Red Trust. Lazzara Dec., ¶ 105.

138. Neither 21B One River, Aquila Alshain or the Red Trust deposited any monies into CHT's M&T Bank Account or Money Market Account. Lazzara Dec., ¶ 105.

139. No antecedent debt was satisfied as a result of the diversion of $15 million from CHT for the transfer of the Riverside Property to 21B One River. Lazzara Dec., ¶ 106.

140. 21B One River had no communications with CHT prior to the sale of the Riverside Property. Lazzara Dec., ¶ 106.

141. While, on paper, Aquila Alshain and 21B One River Park were purportedly managed and owned by Salil Sharma and/or Kiran Sharma (Lazara Dec., P. Exs. 51-53), both Mr. and Mrs. Sharma disclaimed any knowledge as to those entities or involvement in purchasing the Riverside Property and testified that their signatures that appeared on operating agreements and sale documents were forged. Trustee Dec., P. Ex. 79 at pp. 74-75, 88, Rose Dec., P. Ex. 63 at pp. 204-209, 211-212, 214; Sharma Dec., ¶ 2.

142. Similarly, while Mrs. Sharma has admitted that she was the Trustee of the Red Trust at the time the Riverside Property was purchased (Lazzara Dec., ¶ 101; P. Ex. 51; Trustee Dec., P. Ex. 74 at Answer to No. 1; P. Ex. 79 at 59:14-18), she testified that Parmar simply requested that she sign the Trust Agreement, but that she never took any action in her capacity as Trustee. Trustee Dec., P. Ex. 79 at 50:16-24, 52:1-12, 69:7-10; Sharma Dec., ¶ 2.

143.    Parmar agreed as part of his Plea Agreement to forfeit the Riverside Property, admitting that it has "the requisite nexus to the" conspiracy to commit securities fraud charge and was property that "constitutes or is derived from proceeds which Parmar obtained, directly or indirectly, as a result of the conspiracy." Rose Dec., P. Ex. 59 at p. 4 and Attachment 1.

## VI.    Default Judgment Against Aquila Alpha

144.    On October 29, 2021, this Court entered an order and default judgment (the "Default Judgment") against defendant Aquila Alpha LLC ("Aquila Alpha"), avoiding and returning to the Liquidating Trustee a $23.7 million mortgage on Parmar's Colts Neck property home (the "Colts Neck Mortgage") as an actual and constructive fraudulent transfer under 11 U.S.C. ("Bankruptcy Code") §§ 544, 548(a)(1)(A), 548(a)(1)(B) and 550, and Delaware Code §§ 1304(a)(1), (a)(2) and 1305(a). ECF No. 351.[5]

145.    Following supplemental briefing and an evidentiary hearing, by Decision and Order entered March 31, 2022, this Court denied Aquila Alpha's motion to vacate the Default Judgment (the "Vacate Order'). ECF No. 394.

146.    This Court found, *inter alia*, that Aquila Alpha had not raised a meritorious defense to the fraudulent transfer claims:

> Aquila asserts that the 2016 transfer of the Colts Neck Mortgage by Deutsche Bank to Aquila, funded by $3.8 million paid by CHT, was supported by adequate consideration. Aquila alleges that it provided consideration for the 2016 transfer because Mr. Petrozza—not by Aquila— made a $4 million equity investment made in 2013 in Constellation Health Investment LLC ("CHI"). This assertion is problematic in numerous respects. First, any equity investment was made in CHI an entirely different entity than the CHT entity that paid for the transfer of the Colts Neck Mortgage. Second, Aquila introduced no documentary evidence

---

[5]    On March 30, 2022, the Court entered an Amended Judgment Pursuant to Federal Rule Civ. P. 60(b) against Aquila Alpha to amend certain timing provisions in the Default Judgment, but otherwise the Default Judgment remains in full force and effect. ECF No. 393.

of this purported investment. Third, it would have been Mr. Petrozza who would have provided value, not the Aquila entity which did not even exist in 2013. Mr. Petrozza's purported equity investment in CHI, a different entity than CHT, would not establish the antecedent debt required to establish value under the constructive fraud provision of Bankruptcy Code § 548.

Aquila further alleges, again without any documentary evidence, that Mr. Parmar agreed to secure Mr. Petrozza's investment in the CHI entity. Again, even if true, Mr. Parmar's purported promise to secure Mr. Petrozza's equity investment in CHI does not establish a debt owed by CHT to Aquila or value for the transfer of the Colts Neck Mortgage to Aquila funded by CHT.

ECF No. 394 at pp. 18-19.

147. Aquila Alpha appealed to the District Court of the Eastern District of New York (*see* Docket No. 22-cv-2148), which affirmed the Vacate Order by Memorandum and Order entered February 22, 2023. ECF No. 459.

148. Aquila Alpha then subsequently appealed (*see* Docket No. 23-311-bk), and in a decision entered March 12, 2024, the Second Circuit affirmed the District Court's affirmance of the Court's Vacate Order.  Rose Dec., P. Ex. 55.

149. During the time that the Default Judgment was entered and contested, Parmar was a party to this proceeding and had long appeared through counsel, having first appeared by Answer filed July 10, 2018. ECF No. 51.  Parmar actively defended this proceeding both before and after the time that the Default Judgment was entered and contested. ECF Nos. 63, 264, 76, 93, 116, 226, 526; Trustee Dec., P. Exs. 71, 77.

150. Despite his active involvement in this proceeding, at no point in this Court or before any appellate court did Parmar object to or contest the Default Judgment or move to vacate the Default Judgment.

151. Parmar formed and controlled Aquila Alpha to acquire the Colts Neck Property Mortgage, including utilizing the Vardi Yahoo Account to negotiate undetected with

Deutsche Bank and opening a bank account in Aquila Alpha's name. Lazzara Dec., ¶¶ 27-40, 63-67, P. Exs. 20-32, 36-38.

152.    Further, John Petrozza testified that Parmar formed, funded and controlled Aquila Alpha, whose purpose was solely to foreclose and purchase Parmar's Colts Neck residence. Rose Dec., P. Ex. 56 at 103:21-104:14, 108:8-10, 115:7-11.

153.    Parmar also agreed as part of his Plea Agreement to forfeit a bank account in the name of Aquila Alpha, admitting that it has "the requisite nexus to the" conspiracy to commit securities fraud charge and was property that "constitutes or is derived from proceeds which Parmar obtained, directly or indirectly, as a result of the conspiracy." Rose Dec., P. Ex. 59 at p. 4 and Attachment 1.

154.    In the Liquidating Trustee's foreclosure action in New Jersey, Judge Acquaviva found this persuasive evidence of a relationship between Parmar and Aquila Alpha, stating:

> [Parmar] has said here he is different from Aquila Alpha, but in the federal guilty plea, he agrees to turn over Aquila Alpha funds as restitution.  Against, this is like the scarecrow in 'The Wizard of Oz' and pointing both ways.  Mr. Parmar has taken a variety of inconsistent positions when this litigation is viewed in pari materia with the federal litigation where there is overlap.

Rose Dec., P. Ex. 57, 13:6-13.

## VII.    **Parmar's Criminal Guilty Plea**

155.    By indictment filed December 13, 2018 (the "Indictment"), Parmar, the other Board Member Defendants and Bakhshi were criminally indicted for conspiracy to commit securities fraud, securities fraud, and wire fraud in connection with the Sham Acquisitions and go-private Merger. Rose Dec., P. Ex. 58; *see United States of America v. Parmar*, No. 2:18-cr-00735-MCA, D. N.J. (the "Criminal Proceeding").

156.    Count One of the Indictment for conspiracy to commit securities fraud specifically alleged that Parmar (i) was the Chief Executive Officer of CHT from its inception through in or about September 2017, (ii) was a member of CHT's Board of Directors, and (iii) until in or around January 2017, individually and through various entities he owned and controlled, owned the majority of CHT's shares. Rose Dec., P. Ex. 58.

157.    The Indictment further alleged that, as part of the conspiracy, "defendants orchestrated an elaborate scheme to defraud [CC Capital] and others out of hundreds of millions of dollars in connection with the Go-Private Transaction," including, *inter alia*, orchestrating the Sham Acquisitions, falsifying and fabricating financial records, falsely inflating CHT's revenue and value, which caused "[CC Capital] and others to invest over $300 million for purposes of financing the Go-Private Transaction, far in excess of [CHT's] actual value." Rose Dec., P. Ex. 58.

158.    Pursuant to a plea agreement dated May 6, 2025 (the "Plea Agreement"), Parmar pled guilty to Count One of the Indictment for conspiracy to commit securities fraud contrary to 15 U.S.C. § 78j(b) and 78ff, in violation of 18 U.S.C. § 371, 17 C.F.R. § 240.10b-5. Rose Dec., P. Ex. 59.

159.    In connection therewith, Parmar stipulated to the following facts:

From in or around May 2015 through on or about September 2017, in the District of New Jersey and elsewhere, Parmar knowingly and willfully combined, conspired, confederated, and agreed with others to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not: misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud

and deceit upon one or persons, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

Rose Dec., P. Ex. 59 at Schedule A.

160.    Additionally, as part of the Plea Agreement Parmar forfeited (i) his interest in the Riverside Property; (ii) his interest in the contents of TD Bank Account number XXXX3418 held in the name of Aquila Alpha; and (iii) the contents of a Wells Fargo Account number XXXX4994 held in the name of Aquila Alpha, and specifically admitted that the Riverside Property and Aquila Alpha bank accounts had "the requisite nexus to the offense charged in Count one of the Indictment" and was property that "constitutes or is derived from proceeds which Parmar obtained, directly or indirectly, as a result of the conspiracy." Rose Dec., P. Ex. 59 at p. 4 and Attachment 1.  Parmar further agreed to "take all necessary steps to pass clear title" to such property. *Id*.

161.    On May 7, 2025, Parmar's plea allocution (the "Plea Allocution") was held. Rose Dec., P. Ex. 60.

162.    During the Plea Allocation, Parmar admitted to the following facts:

a.    "in or around May of 2015 through in or around September 2017, in the District of New Jersey and elsewhere, [Parmar did] conspire and agree with others to use manipulative and deceptive devices and contrivances in connection with the purchases and sales of securities of [CHT]" (Rose Dec., P. Ex. 60 at 17:12–19);

b.    During the relevant time period, Parmar was CEO of CHT and a member of CHT's Board of Directors (*id*., at 18:1–4);

c.    In furtherance of the conspiracy, Parmar "agree[d] with others to falsely manipulate the value of [CHT] and its operating companies and subsidiaries through various fraudulent means" and to "falsely portray the growth of [CHT] in order to generate an inaccurate picture of [CHT's] revenue streams" (*id*., at 18:5–14);

d.    In furtherance of the conspiracy, on or about July 22, 2016, Chivukula sent to CC Capital "a spreadsheet of financial information containing

- 30 -

various material misrepresentations and omissions regarding [CHT]," and Parmar made other material misrepresentations and omissions to others (*id.*, at 18:15–19:1);

e. Parmar engaged in this conduct in connection with the purchase or sale of CHT's securities (*id.*, at 19:2–4);

f. Parmar engaged in this conduct "willfully, knowingly, and with the intent to defraud" (*id.*, at 19:5–7); and

g. As a result of Parmar and his co-conspirators' actions, investors in CHT were defrauded (*id.*, at 19:8–10).

163. On May 7, 2025, Parmar submitted an Application for Permission to Enter Plea of Guilty. Rose Dec., P. Ex. 61.

164. The United States District Court for the District of New Jersey formally accepted Parmar's guilty plea to Count One of the Indictment and approved the terms and substance of the corresponding Plea Agreement. *See generally U.S. v. Parmar*, No. 2:18-cr-00735 (D.N.J. Dec. 13, 2018).

165. Parmar's criminal sentencing hearing is currently scheduled for February 4, 2025. ECF No. 713.

## VIII. The New Jersey Foreclosure Action

166. On September 30, 2022, the Liquidating Trustee commenced an action to foreclose the Colts Neck Property Mortgage in the Superior Court of New Jersey, Monmouth County. *See Howard M. Ehrenberg, in his capacity as Liquidating Trustee v. Parmar, et al.,* Docket No. SWC-F-10487-22 (the "Foreclosure Action").

167. In the Foreclosure Action, Parmar challenged the Default Judgment on the grounds that the Liquidating Trustee purportedly made misrepresentations to this Court concerning the source of the funds used to purchase the Colts Neck Property Mortgage and CHT's insolvency in obtaining the Default Judgment, and further that the transfer of the Colts

Neck Property Mortgage satisfied a debt owed. *Compare* Parmar Dec., ¶¶ 617-624 *with* Lazzara Dec., P. Ex. 35 and Rose Dec., P. Ex. 67.c.

168.    These issues were extensively briefed before the state court, including with an expert report and supplemental briefing, and Parmar's challenges were necessarily rejected when the Court granted summary judgment in favor of the Liquidating Trustee to foreclose the Colts Neck Property Mortgage on July 24, 2025 (the "Summary Judgment Order"). Lazzara Dec., P. Ex. 35; Rose Dec., P. Exs. 57, 67.c.

169.    The New Jersey court specifically noted:

> There's no dispute that Mr. Parmar defaulted under the mortgage by not paying taxes or insurance.  Period. Full stop.  The only question is standing.  And even then, the only question is whether the trustee committed fraud on the bankruptcy court through Parmar's punitive collateral estoppel argument, but that avenue is now closed by Parmar's unclean hands.

> ***

> Given the ample record here, and the inconsistencies and untruths, and the unclean hands, there is not a fact finder in this state, in this country, possibly on earth, who could conclude that any other than that plaintiff has standing and is entitled to move forward with this proceeding.  To allow Parmar to defend this matter and collaterally attack Judge Trust's decision, by the United States Court of Appeals for the [S]econd court [sic], would be to allow an admitted fraudster to further prolong the admitted fraud, such as nothing short of perverse.

Rose Dec., P. Ex. 57 at 13:15-22, 15:9-21.

170.    Judge Acquaviva granted summary judgment in large part based upon Parmar's guilty plea, finding that Parmar admitted in the guilty plea that (i) the MDRX transaction-—which funded the purchase of the Colts Neck Property Mortgage to Aquila Alpha— was a sham; and (ii) the Colts Neck Property Mortgage was transferred from Deutsche Bank to Aquila Alpha after the MDRX fraud occurred. Rose Dec., P. Ex. 57 at 10:2-8, 12:16-25.

171.     Judge Acquaviva also noted the interconnectedness of Parmar's guilty plea with the Foreclosure Action and Parmar's pattern of asserting inconsistent positions whenever it suits him, stating:

> Here, the guilty plea read in conjunction with the documents here not only demonstrate that the two proceedings are intertwined with the common transaction being this mortgage, but also demonstrate a clear pattern and practice of Parmar saying whatever is necessary in a given case to work towards his advantage.
>
> Plaintiff, in their brief, I think aptly said that Mr. Parmar has engaged in, "a persistent course of action that relates to the same set of facts, with each untruth being asserted whenever defendant sought a favorable outcome in the various forums in which he appeared."

Rose Dec., P. Ex. 57 at 14:18-15:5.

172.     Judge Acquaviva also found that Parmar's guilty plea and agreement to surrender Aquila Alpha's property as restitution for his crime was inconsistent with his position in the Foreclosure Action that he is not Aquila Alpha. Rose Dec., P. Ex. 57 at 13:6-13.

173.     At bottom, Judge Acquaviva determined that Parmar was barred from collaterally attacking the Default Judgment against Aquila Alpha in light of Parmar's own unclean hands. Rose Dec., P. Ex. 57 at 13:18-22.

## IX.     Damages Suffered by Plaintiffs

174.     On July 23, 2020, this Court issued findings of fact and conclusions of law related to damages suffered by CC Capital and certain lenders, following the evidentiary hearing held on the Liquidating Trustee's original motion and renewed motion for an order approving the settlement agreement by and among the Liquidating Trustee, Destra Parties, CC Capital and the United States of America. Trustee Dec., P. Ex. 69.

175. As part of its findings of fact and conclusions of law, this Court found that, to finance the Merger, (i) CC Capital contributed approximately $82.5 million of cash (as equity) to CHT Holdco, (ii) CHT obtained $130 million in financing from Bank of America, and (iii) CHT issued unsecured promissory notes to its shareholders in the amount of approximately $39.6 million. *Id.*, p. 11.

176. Moreover, this Court also found that, as part of the overall Merger transaction, Orion entered into a certain credit agreement, by and among Orion, as Borrower, certain subsidiaries of Orion, including CHT, as guarantors (the "Guarantors" and together with Orion, the "Loan Parties"), Bank of America, and certain lender parties. *Id*. p. 12.

177. This Court found that, as security for the payment of Orion's obligations under the credit agreement, CHT and the other Guarantors jointly and severally guaranteed the obligations thereunder. Additionally, pursuant to a certain security agreement, dated January 30, 2017, the Loan Parties pledged as collateral first priority liens in all of their property and pursuant to a certain pledge agreement, dated January 30, 2017, the Loan Parties pledged as collateral 100% of the equity interests in each of their subsidiaries. *Id*.

178. In addition, pursuant to the Confirmation Order, the Secured Lenders (as defined therein) were granted an allowed secured claim in the amount of $50,000,000 against each of the Debtors and a deficiency claim in the amount of $108,287,223.39 relating to amounts owed under the Prepetition Credit Agreement. Trustee Dec., P. Ex. 68 (Confirmation Order at ¶¶ 1-2).

179. In connection with the Criminal Proceeding, the United States agreed, pursuant to the settlement agreement with the Liquidating Trustee and others, that the

proceeds of any forfeited assets shall be available, as appropriate, for remission, pursuant to 28 C.F.R. Part 9. ECF No. 289-1 ¶¶ 2(c)-(e).

180.    The Liquidating Trustee agreed, on behalf of CC Capital and Bank of America, to file a petition for remission with the United States pursuant to 28 C.F.R. 9.8(a) as victims and claim in the aggregate amount the Merger Proceeds (less any amounts previously paid on such claim). ECF No. 289-1 ¶¶ 2(e).

181.    As part of the remission process in the Criminal Proceeding, CC Capital submitted a declaration of victim losses (the "CC Capital Victim Loss Declaration"), stating, in relevant part, that as a result of Parmar's fraud and in connection with the closing of the Merger, CC Capital and its related investors deposited and disbursed a total of $82,502,260.25 as purchase proceeds for the Go-Private Transaction. Rose Dec., P. Ex. 62 at p. 2; DiBlasi Aff., ¶ 4.[6]

182.    The CC Capital Victim Loss Declaration further stated that CC Capital has received distributions from the Liquidating Trustee totaling $16,065,418.58. Rose Dec., P. Ex. 62 at p. 3; DiBlasi Aff., ¶ 8.

183.    Bank of America, on behalf of itself and the other lenders, also submitted a declaration of victim losses (the "Lenders Victim Loss Declaration") in the Criminal Proceeding, stating that, as a result of the material and fraudulent misrepresentations

---

[6]    As part of the parties' settlement agreement, CC Capital agreed to turn over to the Liquidating Trustee any proceeds of any victims' claims paid to or received by CC Capital in the Criminal Proceeding. Trustee Dec., P. Ex. 80 § 4.2.

admitted by Parmar in the Indictment and Plea Agreement, Bank of America and the other lenders suffered losses in the total amount of $159,272,474.78. Trustee Dec., P. Ex. 82.[7]

184.    The Lenders Victim Loss Declaration further stated that, following distributions from the Liquidating Trustee totaling $71,387,059.91, the amounts outstanding to Bank of America and the other lenders totaled $86,900,163.48. *See id.*

185.    On October 16, 2025, the Liquidating Trustee submitted the latest quarterly report demonstrating a total amount of $130,263,735.00 paid out from all creditor claims (including claims of third parties) since the Plan's March 1, 2019 effective date. Trustee Dec., P. Ex. 85.

## X.    Additional Background and Related Proceedings

### i.    Discovery

186.    On March 11, 2024, Plaintiffs served upon defendant Sharma a First Set of Interrogatories. Trustee Dec., P. Ex. 73.

187.    On May 29, 2024, Sharma served a Response to Plaintiffs' First Set of Interrogatories, admitting that she was the trustee of the Red Trust until 2019. Trustee Dec., P. Ex. 74, at Answer to No. 1.

188.    On November 27, 2024, Plaintiffs served their First Set of Interrogatories Directed to Defendants Parmar and the Parmar Entities (the "Parmar Interrogatories") and First Request for the Production of Documents to Parmar and the Parmar Entities ("Parmar Document Demands"). Trustee Dec., P. Exs. 76, 77.

---

[7] The $159 million in losses suffered by Bank of America and the lenders included $130 million for the Merger Financing and $30 million provided for CHT's acquisition of New York Network Management, LLC ("NYNM") after the Merger. Trustee Dec., P. Ex. 82 ¶ 2.

189. On February 3, 2025, Parmar and the Parmar Entities served Responses and Objections to the Parmar Interrogatories (the "Parmar Interrogatory Response"). Trustee Dec., P. Ex. 77.

190. Parmar signed the Parmar Interrogatory Response on behalf of himself, individually, and as manager of the Parmar Entities. Trustee Dec., P. Ex. 77.

191. In the Parmar Interrogatories, Plaintiffs requested, *inter alia*, identification of "all members, partners, officers, managers and/or beneficial owners" for the Parmar Entities "from the date of formation (including their respective predecessors) through the present." Trustee Dec., P. Ex. 75.

192. In the Parmar Interrogatory Response, Parmar admitted that he was "prior manager with 100% control of all Parmar [E]ntities" during the time of the Sham Acquisitions and Merger, was "removed as the manager of all Parmar entities in 2018 or 2019," and "was reinstated as manager thereafter," and did not know "who the members, managers, and/or beneficial owners are" and did "not have possession, custody or control of documents with this information." Trustee Dec., P. Ex. 77, at Answer to Nos. 4, 6, 7.

193. In the Parmar Document Demands, Plaintiffs requested, among other things, the Parmar Entities' books and records, including organizational documents, tax returns, and documents to identify their members. Trustee Dec., P. Ex. 76.

194. No such documents were ever produced.

195. On April 4, 2025, Plaintiffs issued a Notice of Deposition to Parmar and Notices of Depositions under Fed. Rule 30(b)(6) to each of the Parmar Entities. Rose Dec., P. Ex. 66.

196.    On April 4, 2025, Plaintiffs conducted the deposition of defendant Sharma. Trustee Dec., P. Ex. 79.

197.    By letter to the Court dated April 17, 2025, counsel for Parmar and the Parmar Entities requested a conference, seeking a stay of discovery pending the outcome of the criminal trial, and noting that, with respect to the Rule 30(b)(6) notices to the Parmar Entities, "the only person with the requisite knowledge is Mr. Parmar." ECF No. 633.

### ii.    Relevant Rulings in this Proceeding

198.    Default judgments were entered in this Court against defendants Alpha Cepheus, LLC, Blue Mountain Healthcare, LLC and PBPP Partners LLC [ECF No. 424], and Sotirios Zaharis and Ravi Chivukula [ECF No. 538].

199.    On October 4, 2022, this Court entered orders expunging the filed claims of First United and CHLLC. Case No. 18-71748, ECF Nos. 1057, 1058.

### a.    Robinson Brog Escrow

200.    On November 10, 2022, the Court entered a Stipulation and Order Directing the Turnover of Funds held by Robinson Brog (the "Robinson Brog Escrow Order"), pursuant to which Robinson Brog (as defined therein) turned over to the Liquidating Trustee the proceeds of an escrow account it was holding (the "Robinson Brog Escrow") in the approximate balance of $692,597.15. Trustee Dec., P. Ex. 83 [ECF No. 435].

201.    As provided in the Robinson Brog Escrow Order, the Liquidating Trustee (as successor to the Debtors) and Parmar claimed an interest in the Robinson Brog Escrow. Trustee Dec., P. Ex. 83 [ECF No. 435].

### b.    JP Morgan Escrow

202.    On May 1, 2023, the Court entered an Order Directing Turnover (the "JPM Escrow Turnover Order") of a certain escrow account in the approximate balance of $600,000 (the "JPM Escrow") previously held by JPMorgan Chase in the name of CHLLC. Trustee Dec., P. Ex. 84 [ECF No. 488].

203.    The JPM Escrow Turnover Order provided that the Liquidating Trustee was to hold the contents of the JPM Escrow pending further order of the Court. Trustee Dec., P. Ex. 84 [ECF No. 488].

204.    As set forth in the motion upon which the JPM Escrow Turnover Order was granted, pursuant to the escrow agreement giving rise to the JPM Escrow, CHLLC and Orion Disbursing Agent, LLC (a non-debtor, non-Defendant) were the only entities with an interest in the JPM Escrow. ECF No. 488.

### c.    Summary Judgment Ruling

205.    On October 21, 2025, following a conference, this Court granted in part and denied in part Plaintiffs' motion for summary judgment, granting summary judgment (i) in favor of CC Capital against Parmar on claims for conspiracy-based fraud, common law fraud, aiding and abetting fraud, fraudulent inducement, securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq*.) (the "Exchange Act")  and Delaware law (Counts XI, XV, XVI, XVII, XVIII and XIX); and (ii) in favor of the Liquidating Trustee against Parmar on the claim for conspiracy based fraud (Count XI).  Rose Dec., P. Ex. 65.

206.    The Court found that, as part of his guilty plea, Parmar admitted to all elements necessary to establish his liability under such claims, specifically admitting that:

> [I]n connection with the sale of CHT securities, [Parmar] willfully, knowingly, and with intent to defraud made material misrepresentations and omissions to

others, including providing to CC Capital financial statements – financial information containing material misrepresentations and omissions, and also admitted that he did so in furtherance of a conspiracy, and that he and his co-conspirator's actions were intended to defraud CHT and its investors.

Rose Dec., P. Ex. 65, p. 15:22-16:8.

207. This Court denied summary judgment as to the Parmar Entities and reserved for the trial the determination of damages. *See id*.

### d. Evidentiary Objections and Rulings

208. As part of their pretrial submissions in this proceeding, Plaintiffs filed: (i) motions to strike and evidentiary objections to the declarations of Paul Parmar, John Petrozza and Tomer Vardi [ECF Nos. 679-681]; (ii) an omnibus motion to strike certain evidence and arguments and for an adverse inference [ECF No. 686]; and (iii) objections to certain of Defendants' trial exhibits [ECF No. 685 at Ex. 3].[8]

209. Defendants did not file separate objections to any of Plaintiffs' evidence, and the only evidentiary objection raised by Defendants was with respect to certain portions of Mr. Lazzara's testimony and exhibits as improper expert opinion, raised in the context of Defendants' motion to continue the trial, which was denied by the Court. ECF Nos. 689, 690-693; Tr: 30:18-31:17.

210. The Court granted Plaintiffs' evidentiary objections to the extent of ruling as follows:

  (i)   Striking the declaration of Tomer Vardi due to his failure to appear for cross-examination at trial [Tr. 86:14-19];

  (ii)  Striking numerous paragraphs in the declaration of Paul Parmar [Defendants' Exhibit CC], and admitting into evidence the portion of the declaration that remained and Defendants' exhibits A through BB [Tr. 89:23-92:25];

---

8  Defendants thereafter removed John Petrozza as a trial witness in the parties' amended Joint Pretrial Memorandum. ECF No. 684.

(iii)    Precluding Defendants from challenging the Default Judgment against Aquila Alpha; however, ruling that Plaintiffs are required to establish an "adequate nexus" to bind Parmar to the Default Judgment for res judicata and collateral estoppel purposes [Tr. 87:3-17];

(iv)    Precluding Defendants from controverting Parmar's guilty plea or any claim on which the Court previously granted summary judgment, including precluding any challenge to CC Capital's reasonable or justifiable reliance [Tr: 87:18-88:19];

(v)    Precluding Defendants from controverting the post-bankruptcy value of the estate obtained in the bankruptcy sale, but holding that such sale did not determine the Debtors' value at the time of the Merger and that evidence related to the latter was admissible [Tr: 88:20-89:8];

(vi)    Precluding Defendants from challenging the allowed claims of CC Capital in the amount of $82.5 million and the Secured Lenders in the amount of the $50 million secured claim and $108,287,223.39 deficiency unsecured claim [Tr. 89:9-22]; and

(vii)    Precluding any evidence that was demanded in discovery and not produced [Tr. 89:19-22].

## PROPOSED CONCLUSIONS OF LAW

### I.    Jurisdiction

211.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the Eastern District of New York standing orders of reference dated August 28, 1986 and December 5, 2012.

212.    This adversary proceeding arises in and relates to the above-referenced Chapter 11 proceedings pending before this Court.

213.    This adversary proceedings contains both core and non-core claims, which this Court has jurisdiction to determine pursuant to 28 U.S.C. § 157(b)(2) and (c)(1).

214.    Plaintiffs consent to entry of final orders and judgment by this Court.

II.    **The Parmar Entities' Liability**

    A.    **Piercing the Corporate Veil Against the Parmar Entities (Count XXXVII)**

215.    As the Parmar Entities are the alter egos of Parmar, reverse veil piercing should be applied to hold the Parmar Entities liable to the full extent as Parmar.

    i.    **Applicable Law**

216.    Because the Parmar Entities were incorporated in Delaware, Delaware law governs the reverse veil piercing claim. *In re Extended Stay, Inc.,* No. 09-13764-JLG, 2020 WL 10762310, at *35 (Bankr. S.D.N.Y. Aug. 8, 2020) ("Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed . . .").

217.    Delaware law recognizes a reverse veil piercing theory of liability: "At its most basic level, reverse veil-piercing involves the imposition of liability on a business organization for the liabilities of its owners" and "like traditional veil piercing, reverse veil-piercing is permitted against a company where "the owner is utilizing the corporate form to perpetuate a fraud or injustice." *Manichaean Cap., LLC v. Exela Techs.*, *Inc.*, 251 A.3d 694, 710 (Del. Ch. 2021).

218.    When analyzing a reverse veil-piercing claim, courts consider the same factors reviewed in analyzing a traditional veil-piercing claim to determine whether the owner dominated and controlled the entities (*see id.* at 715), namely:

> whether the corporation was solvent; whether dividends were paid, corporate records kept, *officers and directors functioned properly*, and other corporate formalities were observed; whether the dominant shareholder *siphoned corporate funds*; and whether, in general, the corporation simply functioned as a *facade* for the dominant shareholder.

219.    For reverse piercing, the following additional factors should be considered:

(1) the degree to which allowing a reverse pierce would impair the legitimate expectations of any adversely affected shareholders who are not responsible for the conduct of the insider that gave rise to the reverse pierce claim, and the degree to which allowing a reverse pierce would establish a precedent troubling to shareholders generally; (2) the degree to which the corporate entity whose disregard is sought has exercised dominion and control over the insider who is subject to the claim by the party seeking a reverse pierce; (3) the degree to which the injury alleged by the person seeking a reverse pierce is related to the corporate entity's dominion and control of the insider, or to that person's reasonable reliance upon a lack of separate entity status between the insider and the corporate entity; (4) the degree to which the public convenience, as articulated by [the Delaware General Corporation Law and Delaware's common law], would be served by allowing a reverse pierce; (5) the extent and severity of the wrongful conduct, if any, engaged in by the corporate entity whose disregard is sought by the insider; (6) the possibility that the person seeking the reverse pierce is himself guilty of wrongful conduct sufficient to bar him from obtaining equitable relief; (7) the extent to which the reverse pierce will harm innocent third-party creditors of the entity the plaintiff seeks to reach; and (8) the extent to which other claims or remedies are practically available to the creditor at law or in equity to recover the debt.

*Manichaean Cap., LLC*, 251 A.3d at 715.

220.   "Reverse veil piercing is particularly appropriate when an LLC has a single member, because this circumstance alleviates any concern regarding the effect of veil piercing on other members who may have an interest in the assets of an LLC." *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 387 (4th Cir. 2018) (applying Delaware law to a reverse veil piercing analysis and determining the district court correctly held reverse piercing of an LLC was warranted to render an LLC a co-judgment debtor). "Therefore, when an entity and its sole member are alter egos, the rationale supporting reverse veil piercing is especially strong." *Id*. ("Delaware has a powerful interest of its own in preventing the entities that it charters from being used as vehicles for fraud. Delaware's legitimacy as a chartering jurisdiction depends on it.").

**ii.    All the Evidence Establishes that the Parmar Entities are Alter Egos of Parmar**

221.    All factors for reverse piercing the corporate veil weigh in favor of doing so for each of the Parmar Entities, as the only evidence demonstrates that the Parmar Entities were created by Parmar as vehicles to further the fraudulent scheme against CC Capital, including to receive Merger Proceeds and property purchased with Merger Proceeds and avoid collection from Parmar's creditors.

222.    First, Defendants have not produced any documents or information demonstrating that anyone other than Parmar is connected to the Parmar Entities. I n discovery, Plaintiffs demanded that the Parmar Entities identify all members, partners, and beneficial owners and produce all corporate books and records, including organizational documents and tax returns.  Trustee Dec., P. Ex. 76.  No such information or documents were ever produced.  Instead, Parmar and the Parmar Entities admitted that only Parmar was the manager of the Parmar Entities at the relevant times and that they were not in possession of any of the requested corporate documents.  Trustee Dec., P. Ex. 75.  In addition, in response to Plaintiffs' demand that the Parmar Entities designate a Rule 30(b)(6) witness for deposition, the Parmar Entities did not do so, and their counsel admitted that Parmar was the only witness with knowledge.  ECF No. 633.  Moreover, Parmar and the Parmar Entities are represented by the same counsel in this action, and Parmar signed counsel's engagement letter as manager of the Parmar Entities.  Trustee Dec., P. Ex. 78.

223.    Due to the Parmar Entities' failure to meaningfully respond to Plaintiffs' discovery demands, they should be precluded from disputing the alter ego claim and the Court should impose an adverse inference on this claim.  *See In re Try the World, Inc.*, No. 18-11764 (JLG), 2025 WL 242233, at *8 (Bankr. S.D.N.Y. Jan. 17, 2025) (granting adverse inference

where party failed to produce documents and rejecting argument that such an inference would "give rise to an improper windfall to the Trustee" when defendant "itself ha[d] failed to produce the very documents that could prove or disapprove such a windfall").

224.    Second, there is *zero* evidence that any of the Parmar Entities were solvent, conducted any business of any sort, maintained corporate formalities, such as keeping accurate books and records, paying dividends or holding meetings.  Instead, the record overwhelmingly establishes that all of the Parmar Entities were created by Parmar as vehicles to further the fraudulent scheme against CC Capital, including to receive Merger Proceeds and property purchased with Merger Proceeds and avoid collection from Parmar's creditors.

225.    As to CHLLC and First United, Parmar has admitted in sworn pleadings in this proceeding and in testimony provided in other actions that he was an officer, director or manager of these entities.  Trustee Dec., P. Ex. 77; Lazzara Dec., P. Exs. 40, 46 at pp. 8, 68-76; Rose Dec., P. Ex. 64 at 20:22-23; 45:5.  Parmar's statements regarding his role at these entities are admissible as party admissions under Fed. R. Evid. 801(d)(2).  *See Douds v. Seafarer's Int'l Union of N. America, Atlantic and Gulf District, AFL-CIO*, 148 F. Supp. 953, 957 (E.D.N.Y. 1957) ("Prior testimony in another proceeding is valid evidence as an admission."); *Warren v. Quality Care Services, Corp.*, 603 F. Supp. 1174, n. 8 (W.D.N.Y. 1985) (party's testimony from prior employment proceeding was not hearsay and was admissible when used against him in subsequent litigation).

226.    Through CHLLC and First United, and in his role as CEO and President of the Board of CHT, Parmar had majority ownership and complete control over CHT and made material misrepresentations on behalf of First United and CHLLC to induce CC Capital to enter into the Merger.  Lazzara Dec., ¶ 71, P. Ex. 40.  Accordingly, these entities functioned

as a façade whose real purpose was to assist Parmar in, among other things, falsifying and distributing documents containing misstatements of material fact. *See id.*

227.    Parmar also used the Proceeds Recipient Defendants and Riverside Property Defendants as vehicles to secrete and hide Merger Proceeds, including to purchase the Riverside Property for his benefit. Specifically, Parmar formed and utilized the Red Trust, Aquila Alshain and 21B One River Park to acquire the Riverside Property, although he placed title in the name of such entities purported to be owned and managed by his family members. Trustee Dec., P. Ex. 79 at pp. 50:16-24, 52:1-12, 69:7-10, 74-75, 88, Rose Dec., P. Ex. 63 at pp. 204-209, 211-212, 214.

228.    The Riverside Property was purchased with monies originating from the fraudulent Merger (*see* Lazzara Dec., ¶¶ 93-106, P. Exs. 45-54; Rose Dec., P. Ex. 67.e; P. Ex. 91) and admittedly had the "requisite nexus" to the conspiracy and was property that "constitutes or is derived from proceeds which Parmar obtained … as a result of the conspiracy." Rose Dec., P. Ex. 59 at p. 4.

229.    With respect to the Proceeds Recipient Defendants, Axis, Lexington, Pulsar, Vega, these entities were undisclosed Parmar-controlled shareholders of CHT and received, collectively with PPSR Partners, approximately $22 million in Merger Proceeds. Trustee Dec., P. Ex. 77 at Answer No. 4, 7; Lazzara Dec., P. Exs. 43, 46 at pp. 57-58, 54. There is no evidence that the Proceeds Recipient Defendants conducted any legitimate business. Rather, the Proceeds Recipient Defendants were just shell companies used by Parmar to divert a portion of the Merger Proceeds for his own benefit. *See* Lazzara Dec., ¶¶ 82-86, P. Exs. 43, 54.

230.    Plaintiffs have established their *prima facie* entitlement to reverse pierce the corporate veil of the Parmar Entities and hold such entities liable for Parmar's fraud.  *See In re Postiglione*, No. 8-16-75377-REG, 2019 WL 2590946, at *5 (Bankr. E.D.N.Y. June 24, 2019) (finding the numerous transactions where the debit card linked to the corporation was used by defendant "for personal expenses" was sufficient to satisfy the "domination" prong of the alter ego analysis); *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 127 (E.D.N.Y. 2012) (despite arguments that the relevant parties did not engage in fraud or intend to engage in fraud, the court granted summary judgment against them because domination caused diversion of funds and, therefore, injury); *In re Kwok*, 663 B.R. 124, 142 (Bankr. D. Conn. 2023) (Trustee "established that the [entity's] only business purpose is nominal ownership, operation, and maintenance of assets the Individual [defendant] beneficially owns and controls. This alone establishes that [the entity] is a mere instrumentality of the Individual [defendant].") (applying Delaware law).

### B.    Actual and Constructive Fraudulent Transfer Claims

#### i.    Colts Neck Property Mortgage: Parmar is Precluded From Challenging the Default Judgment Against Aquila Alpha, which is Binding on Parmar on Res Judicata and Collateral Estoppel Grounds

231.    This Court has already determined that Defendants are precluded from challenging the Default Judgment against Aquila Alpha.  Tr. 87:3-17.

232.    The Default Judgment is also binding on Parmar for res judicata and collateral estoppel purposes.

233.    "[A] determination in a prior judicial proceeding collaterally estops a claim by a nonparty only if that nonparty was represented by a party to the prior proceeding, or exercised some degree of actual control over the presentation on behalf of a party to that

proceeding." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Intl. B.V. v. Schreiber*, 327 F.3d 173, 184-185 (2d Cir. 2003); *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 367-68 (2d Cir. 1995) (determination of privity "requires a court to inquire whether a party controlled or substantially participated in the control of the presentation on behalf of a party of the prior action") (internal quotations and citations omitted).

234.    The evidence confirms that Parmar and Aquila Alpha were in privity as Parmar controlled Aquila Alpha at all relevant times, including (i) forming and controlling Aquila Alpha to acquire the Colts Neck Property Mortgage [Lazzara Dec., ¶¶ 27-40, 63-67, P. Exs. 20-32, 36-38; Rose Dec., P. Ex. 56 at 103:21-104:14, 108:8-10, 115:7-11]; and (ii) agreeing as part of his Plea Agreement – entered into *after* the Default Judgment was entered – to forfeit a bank account in the name of Aquila Alpha, admitting that it has "the requisite nexus to the" conspiracy to commit securities fraud charge [Rose Dec., P. Ex. 59 at p. 4 and Attachment 1; *see also* P. Ex. 57, 13:6-13 (Judge Acquaviva finding this persuasive evidence of the relationship)].

235.    Parmar had an opportunity to contest the Default Judgment, having appeared and actively defended this proceeding both before and after the time that the Default Judgment was entered and contested, yet never objected to or contested the Default Judgment or moved to vacate it, in either this Court or before any appellate court [ECF Nos. 51, 63, 264, 76, 93, 116, 226, 526; Trustee Dec., P. Exs. 71, 77]. *See In re W.T. Grant Co.*, 85 B.R. 243, 248 (Bankr. S.D.N.Y. 1988) ("[I]n determining whether a party is bound by a final judgment, the operative factor is whether or not such party remained in the suit until the final judgment was rendered.").

236.     As a party to this proceeding, who was in privity with Aquila Alpha and had appeared in and actively defended it before and after the Default Judgment was entered, Parmar is bound by the Default Judgment.  *See Mario Valente Collezioni, Ltd. v. AAK Ltd.*, 280 F. Supp. 2d 244, 254 (S.D.N.Y. 2003) (court's findings of fact and conclusions of law at evidentiary hearing binding in subsequent action against defendant's agent); *see also Smith v. Bayer Corp*. 564 U.S. 299, 313 (2011) (noting the general rule that "only parties can be bound by prior judgments").

### ii.      Parmar is Precluded From Raising Any Defense to the Fraudulent Transfer of the Colts Neck Property Mortgage by the New Jersey Summary Judgment Order

237.     Even assuming Parmar is not bound by the Default Judgment, Parmar is nonetheless estopped from raising any defense to the fraudulent transfer of the Colts Neck Property Mortgage by the Summary Judgment Order in the New Jersey Foreclosure Action, which upheld the validity of the Default Judgment, denied Parmar's identical challenges thereto, and granted summary judgment foreclosure of the Colts Neck Property Mortgage in favor of the Liquidating Trustee.  Rose Dec., P. Ex. 57.

238.     The Summary Judgment Order has the same preclusive effect as the Default Judgment.  Under the Full Faith and Credit Clause, this Court must give preclusive effect to state court judgments whenever the courts of that state would do so.  *See* 28 U.S.C. § 1738; *Burka v. New York City Transit Auth.,* 32 F.3d 654, 657 (2d Cir. 1994) ("In applying the doctrine of *res judicata,* [a court] must keep in mind that a state court judgment has the same preclusive effect in federal court as the judgment would have had in state court.").

239.     "Under New Jersey law, *res judicata* or claim preclusion is governed by the entire controversy doctrine, which requires a plaintiff in a civil action to seek complete relief

for vindication of the wrong he charges in that single suit." *Union Muffler Corp. v. Midas Int'l Corp.,* No. 91 Civ. 1522(JFK), 1992 WL 6186, at *2 (S.D.N.Y. Jan. 3, 1992) (internal quotations and citation omitted) (emphasis added). "New Jersey courts interpret this doctrine as foreclosing subsequent litigation not only of claims actually litigated but of all claims arising out of the same controversy that could have been raised in the earlier action." *Id.*

240. "[C]laim preclusion will prevent a litigant from relitigating disputes that had been resolved in an earlier proceeding if three requirements are met: (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one." *Niles v. Wilshire Inv. Grp., LLC*, 859 F. Supp. 2d 308, 338 (E.D.N.Y. 2012) (quoting *Schneider v. U.S.,* No. 06–3200(JBS), 2007 WL 4440976, at *4 (D.N.J. Dec. 17, 2007)).

241. All three elements are met. First, the Summary Judgment Order is deemed a valid, final judgment on the merits. "The Third Circuit has stated that summary judgment is a final judgment on the merits for the purposes of res judicata." *McLaughlin v. Bd. of Trustees of the Natl. El. Indus. Health Benefit Plan*, No. CV 16-3121, 2016 WL 5955530 (D.N.J. Oct. 13, 2016), *aff'd sub nom. McLaughlin v Bd. of Trustees of Natl. El. Indus. Health Benefit Plan*, 686 Fed. App'x 118 (3d. Cir. 2017) (citing *Hubicki v. ACF Indus., Inc.*, 484 F.2d 519, 524 (3d Cir. 1973)).

242. Second, privity is clearly satisfied since both Parmar and the Liquidating Trustee are parties to the New Jersey state court action and this proceeding.

243. Third, the claims in the two proceedings undoubtedly arise from the same transaction – the transfer of the Colts Neck Property Mortgage and the Default Judgment. In the Foreclosure Action, Parmar challenged the transfer of the Colts Neck Property Mortgage

on the same grounds raised here, specifically contesting the source of the funds used to purchase the Colts Neck Property Mortgage and CHT's insolvency at the time of the transfer and arguing fair consideration. *Compare* Parmar Dec., ¶¶ 617-624 *with* Lazzara Dec., P. Ex. 35 and Rose Dec., P. Ex. 67.c. These issues were extensively briefed before the state court, including with an expert report and supplemental briefing, and Parmar's challenges were necessarily rejected when the Court granted summary judgment in favor of the Liquidating Trustee. Lazzara Dec., P. Ex. 35; Rose Dec., Exs. 57, 67.c.

244. Accordingly, as the New Jersey court actually considered and rejected Parmar's claims, finding no issue of fact, the Summary Judgment Order is deemed a final judgment. *See In re Albanes*, 560 B.R. 155, 171 (Bankr. D.N.J. 2016) (holding New Jersey state court's grant of summary judgment to lender in foreclosure action was res judicata in subsequent federal action); *Estate of Hanges v. Metro. Prop. & Casualty Ins. Co.*, 202 N.J. 369, 384 n. 8 (N.J. 2010) ("[A]n order granting summary judgment and disposing of the case is a final judgment and is appealable as of right."); *Delacruz v. Alfieri*, 447 N.J. Super. 1, 23 (Sup. Ct., N.J. 2015) ("Claims or defenses that went to the validity of the mortgage, the amount due, or the right of [mortgage assignee] to foreclose had to be raised in the foreclosure proceeding or they were barred."); *Schneider*, 2007 WL 4440976, at \*5 (state court orders which terminated claims and found no issue of fact held to be a valid, final judgment on the merits).[9]

---

[9] The fact that a final judgment of foreclosure and sale has not yet been entered or that Parmar's time to appeal has not yet expired does not affect the finality of the Summary Judgment Order for res judicata purposes. *See Delacruz*, 447 N.J. Super. at 22 (Sup. Ct., N.J. 2015) ("Claims are considered resolved by final judgment if they were pleaded and disposed of by the court."); *Farah v. LaSalle Bank Nat'l Ass'n as Trustee for WAMU Mortgage Pass-Through Certificates Series 2006-AR7 Trust*, No. 15-cv-2602 (KM), 2020 WL 2521278, at \*12 (D.N.J. May 18, 2020) ("The New Jersey case law does not hold that an anticipated or pending appeal renders a judgment non-final for *res judicata* purposes.")

iii.    **Intentional and Actual Fraudulent Transfer of the Merger Proceeds and Riverside Property under the Bankruptcy Code and Delaware Law Against Parmar, the Proceeds Recipient Defendants, the Riverside Property Defendants (Counts V and VII)**

245.    The extensive evidence establishes that the transfer of the Merger Proceeds to the Proceeds Recipient Defendants (*i.e.*, Axis, Lexington, Pulsar, Vega, and PPSR Partners) and the Riverside Property to and through 21B One River and the other Riverside Property Defendants (*i.e.*, Red Trust, Aquila Alshain, and Ranga Bhoomi) were actual fraudulent transfers under Bankruptcy Code §§ 548(a)(1)(A), 550 and/or Bankruptcy Code § 544 and Delaware Code § 1304(a)(1).

a.    **Legal Standard**

246.    Section 548(a)(1)(A) of the Bankruptcy Code allows the Liquidating Trustee to

> [A]void any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, *if the debtor voluntarily or involuntarily made such transfer* or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted.

11 U.S.C. § 548(a)(1)(A).

247.    A transfer may be avoided as actually fraudulent under § 548(a)(1)(A), if (1) the debtor had an interest in the property transferred; (2) the transfer occurred within two years of the petition date; and (3) the transfer was made with actual intent to hinder delay or defraud creditors. *See Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 852-53 (N.D.N.Y. 2010).

248.    Section 544(b)(1) gives the Liquidating Trustee the power to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor." 11 U.S.C. § 544(b)(1). Section 544 "empowers the trustee to utilize, on behalf of

the estate, any legal theory of recovery that a creditor could assert under state law." *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 315 (S.D.N.Y. 2013).

249.    Under Delaware's Uniform Fraudulent Transfer Act ("DUFTA"), codified in Delaware Code §§ 1301, *et seq.*, a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay or defraud any creditor of the debtor." 6 Del. C. § 1304(a)(1).[10]

250.    Once a transfer is avoided, Bankruptcy Code § 550(a) allows the Liquidating Trustee to recover "the property transferred, or … the value of such property" from the initial transferee, the subsequent transferee, or the entity for whose benefit the transfer was made. 11 U.S.C. § 550(a).  This includes "recovery not only of the physical asset itself, but also of the value derived from the asset." *Shimer v. Fugazy (In re Fugazy Express, Inc.),* 114 B.R. 865, 875 (Bankr. S.D.N.Y. 1990).

### b.    Parmar's Guilty Plea and the Court's Prior Findings Establish All Elements of Actual Fraudulent Intent

251.    Actual fraud is necessarily established by Parmar's guilty plea and this Court's grant of summary judgment against Parmar on Plaintiffs' fraud-based claims.  Rose Dec., P. Exs. 59-60, 65.

---

[10] Delaware Code § 1304(a)(1) and Bankruptcy Code § 548(a)(1)(A) apply the same requirements, and the Court may look to cases interpreting the Bankruptcy Code in applying DUFTA. *See In re Pennysaver USA Publ'g, LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019) (noting that the elements of actual fraud under Delaware law and the Bankruptcy Code are substantially the same).

252.    Parmar specifically admitted at his Plea Allocution that (i) he "falsely manipulate[d] the value of [CHT] and its operating companies," (ii) he "falsely portray[ed] the growth of [CHT] in order to generate an inaccurate picture of [CHT's] revenue streams," (iii) he did so with intent to defraud, (iv) CC Capital was actually defrauded, and (v) he committed such fraud starting from May 2015, CHT's first equity raise, through January 2017, the time of the Merger closing.  Rose Dec., P. Ex. 60 at 17:12–19, 18:5–14, 19:5–7.

253.    In addition, this Court has already found in granting summary judgment that, as part of Parmar's guilty plea, Parmar has admitted to all elements of fraud in connection with the Merger and deemed Parmar civilly liable for fraud.  Rose Dec., P. Ex. 65.

254.    Since the Liquidating Trustee's fraudulent transfer claims seek the return of the fruits of Parmar's fraudulent acts – namely, the Merger Proceeds and the Riverside Property purchased with the Merger Proceeds – for which Parmar has admitted guilt and already been found civilly liable, the guilty plea and summary judgment ruling supports judgment on the Liquidating Trustee's actual and intentional fraudulent transfer claims.  *See In re Adler,* 247 B.R. 51, 89–90 (Bankr. S.D.N.Y. 1999) (finding actual intent to defraud based on, *inter alia,* defendants' guilty pleas to violations of securities fraud and citing to admissions during plea allocutions, wherein defendants agreed to manipulate stock prices to "create a demand for the stock and artificially inflate the price of the stock"); *In re Bayou Grp., LLC,* 439 B.R. 284, 307 (S.D.N.Y. 2010) ("[T]he guilty pleas of the Bayou principals combined with [an expert report] . . . provide[d] overwhelming evidence of actual fraudulent intent"); *In re Jacobs,* 394 B.R. 646 (Bankr. E.D.N.Y. 2008) (relying on, among other evidence, defendant's guilty plea to securities fraud in finding that Trustee established actual fraudulent transfer of debtor's mortgage proceeds to wife); *In re Pearlman,* 478 B.R. 448, 452 (M.D. Fla. 2012) ("Actual intent

may be shown through other evidence for example, a plea agreement."); *In re Fabian,* 458 B.R. 235, 266 (Bankr. D. Md. 2011) (finding debtor's guilty plea to a sale-leaseback scheme was "direct evidence of fraud" only "bolstered" by the Trustee's documentary evidence, including bank statements and checks).

### c. The Evidence Establishes All Elements of Actual Fraudulent Transfer

255.    First, it is undisputed that the Debtors had an interest in the Merger Proceeds – which consisted of (i) a $130 million loan to the Debtors for which Debtors gave liens on all of their assets and received nothing in return as the loan proceeds were disbursed to shareholders, including Parmar Entities, and (ii) an $82.5 million equity contribution – and which funds were then wholly disbursed to CHT's shareholders, as well as the Riverside Property purchased with and traced to such funds.  Lazzara Dec., ¶¶ 79-82, 100, 103; P. Ex. 41; Rose Dec., P. Exs. 67.e, 91.

256.    Second, each of the transfers occurred in 2017 and 2018, within two years of the Petition Dates.  *See* Lazzara Dec., ¶¶ 82, 85, 99, P. Exs. 43, 50.

257.    Third, all of the badges of fraud are established for actual fraudulent intent as to the transfers of the Merger Proceeds and Riverside Property.

258.    Actual intent can be inferred by the presence of numerous "badges of fraud," which are "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005).

259.    The badges of fraud commonly recognized by the Second Circuit include "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property

in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry." *In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983); *see also In re Sharp Int'l Corp.*, 403 F.3d at 56.[11]

### i.    The lack or inadequacy of consideration received

260.    In the Second Circuit, "reasonably equivalent value is determined by the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged." *In re Old Carco LLC*, 509 Fed. App'x 77, 78 (2d Cir. 2013) (internal citations and quotations omitted).  In assessing lack of fair consideration, "the court need not strive for mathematical precision but must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed . . . will have significantly harmed the innocent creditors of that [party]." *Id.*

261.    Here, the evidence demonstrates that the Riverside Property transfer was funded with monies rightfully belonging to CHT.  Parmar funded the purchase to 21B One River with a portion of the fraudulent Merger Proceeds that went to Axis and Vega.  Lazzara Dec., ¶¶ 100, 103, P. Ex. 43; Rose Dec., P. Ex. 67.e, P. Ex. 91.  Yet CHT's books and records show no evidence that 21B One River performed any services for or had any business dealings

---

[11] The same or substantially similar "badges of fraud" are codified in Delaware Code § 1304(b). *See In re Pennysaver USA Publ'g, LLC*, 602 B.R. at 270 (The "statutory elements [in Delaware Code § 1304(b)] are incorporated through case law into § 548 in the form of 'badges of fraud.'").

with CHT, CHT owed any preexisting debt to 21B One River, or that any antecedent debt was satisfied as a result of the diversion of CHT's funds.  Lazzara Dec., ¶¶ 105-106.

262.    With respect to the Merger Proceeds, Parmar admitted as part of his guilty plea – as recognized by this Court – that the Merger was an actual fraud and that CC Capital and the Secured Lenders and other investors in CHT were fraudulently induced to invest the Merger Proceeds.  Rose Dec., P. Exs. 59, 60, 65 at p. 15:22-16:8.  These admitted allegations have been proven by the Lazzara Dec., including that CC Capital and the Secured Lenders were provided with falsified financials, and based upon the Sham Acquisitions and materially inaccurate and falsified financial information, CHT was significantly overvalued in the Merger at a purchase price of $309.4 million.  Lazzara Dec., ¶¶ 8-24.

263.    Based on the Debtors' actual value as of the Merger, the Proceeds Recipient Defendants were paid far more than they were entitled to.  Lazzara Dec., ¶¶ 73-78.  In the end, CC Capital invested $82.5 million for a majority equity stake in an insolvent company, the Secured Lenders lent $130 million to an insolvent company against collateral worth less than $30 million, and CHT incurred $130 million in secured debt and received nothing in return, while the Proceeds Recipient Defendants received a windfall due to the falsely inflated value of CHT's stock at the time of the Merger.  *See id*.  In addition, because substantially all of the Debtors' assets were subject to the Merger Liens, the Merger had the effect of essentially stripping the Debtors of their assets.  *Id*.  In fact, the Debtors received no consideration when the proceeds of the secured loan from the Secured Lenders were used to purchase the shares held by the Proceeds Recipient Defendants and other shareholders.  *Id*.  Accordingly, the Debtors did not receive reasonably equivalent value for the secured debt and liens they incurred, as the CHT shares purchased with the loan proceeds do not qualify as an asset for

the company.  *See In re Jacobs*, 394 B.R. at 668 (finding debtor's wife failed to offer any evidence or authority establishing she provided fair consideration or reasonably equivalent value).

264.    While "inadequacy of consideration" need not be established to make a *prima facie* showing of an actual fraudulent transfer, the total lack of consideration CHT received in exchange for such transfers weighs strongly in favor of a finding of actual fraudulent intent here.  *In re MarketXT Holdings Corp.*, 376 B.R. at 402-03; *see also In re Bayou Grp., LLC*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007) ("[T]he plaintiff need not allege and prove that the transfer was for less than fair value if actual intent is alleged and proved under Section 548(a)(1)(A).").

> ii.    ***The family friendship or close associate relationship between the parties and the retention of possession, benefit, or use of the property in question***

265.    There can be no doubt of a close relationship between Parmar, CHT, and each of the recipients of the fraudulent transfers (*i.e.,* 21B One River and the Proceeds Recipient Defendants).

266.    At the time of the transfers, Parmar owned and controlled CHT, as its CEO and Chairman.  Rose Dec., P. Ex. 60 at 18:1-4.

267.    The evidence also demonstrates that Parmar controlled the Riverside Property Defendants and Proceeds Recipient Defendants.  Lazzara Dec., ¶¶ 93-106, P. Exs. 45-54; Trustee Dec., P. Ex. 77, at Answer Nos. 4, 6 (admitting that he is manager with 100% control of the Parmar Entities).

268.    Moreover, prior to the Merger, Parmar and the Parmar Shareholder Entities, including the Proceeds Recipient Defendants, owned and controlled a controlling block of approximately 53.54% of CHT's outstanding shares.  *See* Lazzara Dec., ¶ 70; P. Ex. 46.

269.    Thus, Parmar was in a position to, and did in fact, effect the transactions underlying the Merger and was on both sides of the fraudulent transfers.  In particular, Parmar admitted that he and his co-conspirators, through deception, manipulated the financial information on which the Merger was premised by, among other things, "falsely portray[ing] the growth of "CHT" and submitting to CC Capital a "spreadsheet of financial information containing various material misrepresentations and omissions regarding [CHT]" such as the Sham Acquisitions.  Rose Dec., P. Ex. 60 at 18:5–19:1.

270.    As CEO of CHT and a member of CHT's Board of Directors, with a controlling interest in CHT, Parmar's admission of fraudulent intent may be imputed to the Debtors.[12]

### iii.    The financial condition of the party sought to be charged both before and after the transaction in question

271.    Where, as here, the transfers were made with actual intent to hinder, delay, and/or defraud CHT's creditors, "it is not necessary to show that [CHT] was insolvent for the conveyance to be voidable as fraudulent."  *In re Vaniman Int'l*, Inc., 22 B.R. 166, 185 (Bankr. E.D.N.Y. 1982).  However, the financial hardship of CHT at the time of the transfers

---

[12] In analyzing a fraudulent conveyance claim, courts impute the fraudulent intent of the corporate actors who acted on behalf of the corporation to the corporation itself. *See In re Bayou Grp., LLC*, 439 B.R. at 304.  A basic principle of Delaware corporate law, by which the Debtors are governed, "is that the knowledge and actions of the corporation's officers and directors, acting within the scope of their authority, are imputed to the corporation itself." *Weisfelner v. Hoffner (In re Lyondell Chem. Co.)*, 554 B.R. 635, 647 (S.D.N.Y. 2016) (subsequent history and citations omitted). In addition, the fraudulent intent of a transferee may be imputed to a debtor-transferor, where the transferee dominated and controlled the disposition of the debtor's property. *See In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 91 (Bankr. S.D.N.Y. 1999).

and the existence of legitimate creditors weigh in favor of finding an actual fraudulent conveyance.

272.    First, this Court's prior determination in the related adversary proceeding that Debtors were insolvent in May 2017 as a matter of law [Rose Dec., P. Ex. 67 at 8:8-14, 14:18, 19:19-21] should be law of the case to establish that CHT was insolvent at the time of the transfer of the Riverside Property in April 2017, as well as the Merger closing in January 2017, only a few months earlier.

273.    As the court in *In re Kwok* explained: "[d]istinct from *res judicata*, it is within the Court's discretion whether prior determinations in [] jointly administered Chapter 11 cases and related adversary proceedings constitute law of the case."  No. 22-50073 (JAM), 2024 WL 3280607, at *10 (Bankr. D. Conn. July 2, 2024), *aff'd*, No. 3:24-CV-1185 (KAD), 2025 WL 2625264 (D. Conn. Sept. 11, 2025). "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," and, unlike res judicata, does not require identical parties.  *Id.* (quoting *Arizona v. California*, 460 U.S. 605, 618 (1984)).  Accordingly, the Court's prior insolvency finding is binding and dispositive here, further confirming that the Debtors were insolvent at the time of the challenged transfers.

274.    Moreover, the evidence independently establishes CHT's insolvency. Debtors took on $130 million in secured debt to finance the Merger, and the materially inaccurate and falsified financial statements provided to the AIM artificially inflated CHT's share price, leading the parties to the Merger to overvalue the company when the Debtors' actual value was far less than $309.4 million at the time of the Merger.  Lazzara Dec., ¶¶ 72-78, P. Ex. 41.

In addition, tax records demonstrate that CHT was operating on severe losses for the years immediately preceding and following the sale.  Lazzara Dec., ¶ 61; P. Exs. 35.a., 35.b., 35.c.

275.    Accordingly, on the date of the Merger and of the transfers at issue, the Debtors were insolvent.  *See* Lazzara Dec., ¶¶ 61-62, 72-78, 89-92; P. Exs. 35.a, 35.b., 35.c.

> **iv.    *The existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and the general chronology of the events and transactions under inquiry***

276.    Parmar has demonstrated a pattern and practice of using and diverting Debtor-funds to acquire assets for the benefit of himself.

277.    Most notably, Parmar has pled guilty to the fraud, admitting to providing material misrepresentations and omissions to defraud CC Capital into agreeing to an overvalued purchase price for the Merger, the proceeds of which were then transferred in part to the Proceeds Recipient Defendants and to purchase the Riverside Property, all for the purpose of hindering, delaying and/or defrauding CHT's creditors.  Rose Dec., P. Exs. 59, 60.

278.    Additionally, Parmar and his co-conspirators used money stolen from the Debtors to fund purchases of other real property, including the River Terrace Property and Broad Street Property.  *See Howard M. Ehrenberg in his Capacity as Liquidating Trustee of Orion Healthcorp, Inc., et. al. v. Elena Sartison*, Adv. Proc. No. 20-08051 (AST) at Dkt. No. 64.

279.    Accordingly, the transfers of the Merger Proceeds to the Proceeds Recipient Defendants and the Riverside Property to 21B One River were made with "actual intent to hinder, delay or defraud" creditors within the meaning of 11 U.S.C. § 548(a)(1)(A) and 6 Del. C. § 1304(a)(1).

280.    Plaintiffs are thus entitled to (i) divest Parmar of any interest he may have in the Colts Neck Property Mortgage; and (ii) avoidance and recovery of (a) the Merger Proceeds from Axis, Lexington, Pulsar, Vega and PPSR, and (b) the Riverside Property from 21B One River, under 11 U.S.C. § 544, 548, 550 and 6 Del. C. § 1304(a)(1).

**C.    Constructive Fraudulent Transfer of the Merger Proceeds and Riverside Property under the Bankruptcy Code and Delaware Law Against Parmar, the Proceeds Recipient Defendants, and the Riverside Property Defendants (Counts VI and VIII)**

281.    The extensive evidence establishes that the transfers of the Merger Proceeds to the Proceeds Recipient Defendants and the Riverside Property to 21B One River were constructive fraudulent transfers pursuant to Bankruptcy Code § 548(a)(1)(B), 550 and/or Delaware Code §§ 1304(a)(2) and 1305(a).

**i.    Legal Standard**

282.    Bankruptcy Code § 548(a)(1)(B) permits the Liquidating Trustee to avoid a transfer as constructively fraudulent if the debtor (1) transferred an interest in property; and (2)(a) was insolvent at the time of the transfer or became insolvent as a result thereof, (2)(b) was engaged or was about to engage in business for which the debtor's remaining property was an unreasonably small capital, or (2)(c) intended to incur or believed it would incur debts beyond its ability to pay as they matured; and (3) the debtor received less than a reasonably equivalent value in exchange for such transfer.  11 U.S.C. § 548(a)(1)(B)(i)-(ii).

283.    Delaware Code §§ 1304(a)(2) and 1305(a) contains similar provisions to the Bankruptcy Code, requiring that the debtor made a transfer without receiving reasonably equivalent value in exchange and (a) [w]as engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; (b) intended to incur, or believed or reasonably should have

believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due (*see* 6 Del. C. § 1304(a)(2)), or (c) was insolvent or became insolvent as a result of the transfer (*see* 6 Del. C. § 1305(a)). *See In re Pennysaver USA Publ'g, LLC,* 602 B.R. at 267 ("The elements to state a claim for fraudulent transfers under [the Delaware Code] are identical and mirror the elements required to state a claim for constructive fraud under Section 548(a)(1)(B).").

### ii. Lack of Consideration

284. Under the Bankruptcy Code, "a debtor who transfers property without fair consideration is presumed to be insolvent, and the burden shifts to the transferee to rebut the presumption." *Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC),* 490 B.R. 84, 97 (Bankr. S.D.N.Y. 2013); *see also In re USA United Fleet, Inc.,* 559 B.R. 41, 79-80 (Bankr. E.D.N.Y. 2016) (applying presumption of insolvency to trustee's constructive fraudulent conveyance claim brought under the Bankruptcy Code); *Mendelsohn v. Jacobowitz (In re Jacobs),* 394 B.R. 646, 672-73 (Bankr. E.D.N.Y. 2008) (presuming insolvency for claims under the Bankruptcy Code and New York's Debtor & Creditor Law where transfer was made without fair consideration).

285. Similarly, under Delaware Code §§ 1304 and 1305, a transfer is presumed fraudulent if made without fair consideration. *See Renco Grp., Inc. v. MacAndrews AMG Holdings LLC,* No. 7668-VCN, 2015 Del. Ch. LEXIS 25, at *34 (Del. Ch. Jan. 29, 2015) (noting that fraudulent intent is presumed where there is an inadequate exchange); *Dodge v. Wilmington Tr. Co.,* No. 1257-K, 1995 Del. Ch. LEXIS 26, at *13 (Del. Ch. Feb. 3, 1995) (Sections "1304 and 1305 presume fraud if the transfer was made without fair consideration."); *News Journal Co. v. Little Caesars of Del.,* No. 1999-04-241, 2000 Del. C.P.

LEXIS 77, at *9 (Del. Common Pleas Dec. 20, 2000) ("The claim made under § 1305 creates a presumption of fraudulence if the transfer is made without fair consideration.").

286.    Notwithstanding Parmar's guilty plea and prior findings and judgments, the Liquidating Trustee has established that CHT did not receive fair consideration, let alone any consideration, for the transfers of the Merger Proceeds and the Riverside Property.  Lazzara Dec., ¶¶ 74-78, 105-106.

287.    For the Riverside Property, Parmar funded the purchase to 21B One River with a portion of the fraudulent Merger Proceeds, originating from the $16 million paid to Axis and Vega.  Lazzara Dec., ¶¶ 93-103, P. Ex. 43; Rose Dec., P. Ex. 67.e; P. Ex. 91.  21B One River was created solely to hold the Riverside Property and although title to the property was placed in the name of 21B One River, it is beneficially owned by the Red Trust, of which Parmar was grantor.  Lazzara Dec., ¶¶ 99-101, P. Exs. 51-53.  Finally, CHT's books and records evidence that 21B One River did not perform services for or had any business dealings with CHT, CHT owed no preexisting debt to 21B One River, and no antecedent debt was satisfied as a result of the diversion of CHT's funds.  Lazzara Dec., ¶¶ 105-106.  Nor were there any communications between 21B One River and CHT prior to the sale of the Riverside Property.  Lazzara Dec., ¶ 106.

288.    As to the transfers of the Merger Proceeds, Parmar's admissions to fraudulently inducing CC Capital into agreeing to an overvalued purchase price for the Merger, the proceeds of which were then transferred in part to the Proceeds Recipient Defendants, are proven by the record.  Lazzara Dec., ¶¶ 73-76; P. Ex. 43.  Based on the Debtors' actual value as of the Merger, the Proceeds Recipient Defendants were paid far more than they were

entitled to, and the shares CHT received in return for the payment of the Merger Proceeds were worth far less than was paid. *See id.*

289.    Accordingly, because the evidence establishes that fair consideration was wholly lacking as to each of the transfers, the Liquidating Trustee is entitled to a presumption that CHT was insolvent or rendered insolvent under Bankruptcy Code § 548(a)(1)(B) and that the transfer was fraudulent under Delaware Code §§ 1304(a)(2) and 1305(a). dr

### iii.    CHT was Insolvent at the Time of the Transfers

290.     CHT's insolvency at the time of each of the transfers is nonetheless established by the evidence. *See supra,* ¶¶ 271-275.

### iv.    The Transfers Were Made at a Time When CHT Had Unreasonably Small Capital and CHT Was Unable to Pay its Debts

291.    For the same reason CHT was insolvent, the evidence further establishes that, at the time of the transfers of the Merger Proceeds and Riverside Property, CHT was also engaged or about to be in engaged in business for which it had unreasonably small capital and would incur debts beyond its ability to pay.

292.    At the time of the disbursement of the Merger Proceeds and transfer of the Riverside Property, CHT's financial condition was significantly overstated and its significant liabilities resulting from Parmar's fraud were not reflected on its financial statements. Lazzara Dec., ¶¶ 14, 76-77, 90-92. As such, CHT was worth far less than $309.4 million at the time of the Merger. *See id.* In the end, CHT incurred $130 million in debt, and because substantially all of the Debtors' assets were subject to the Merger Liens, the Merger had the effect of essentially stripping the Debtors of their assets. Lazzara Dec., ¶¶ 78, 81-82, P. Ex. 41. As a result, CHT incurred debt that it had no ability to repay.

293.    Plaintiffs are thus entitled to (i) divest Parmar of any interest he may have in the Colts Neck Property Mortgage; and (ii) avoidance and recovery of (a) the Merger Proceeds from the Proceeds Recipient Defendants, and (b) the Riverside Property from 21B One River, under 11 U.S.C. §§ 544, 548(a)(1)(B) and 550 and 6 Del. C. §§ 1304(a)(2), and 1305(a).

**D.    Common Law Fraud, Fraudulent Inducement, Violation of Section 10(b) of the Exchange Act, and Securities Fraud Under 6 Del. C. § 73-201 Against CHLLC and First United (Counts XV and XVII, XVIII, XIX)**

**i.    The Summary Judgment Ruling Should be Law of the Case to Establish CHLLC and First United's Liability for the Same Fraud**

294.    This Court's finding of liability against Parmar for conspiracy-based fraud, common law fraud, fraudulent inducement and securities fraud violations, necessarily establishes CHLLC and First United's liability for each of Plaintiffs' fraud-based claims.

295.    Under the law of the case doctrine, "a decision on an issue of law made at one stage of the case becomes a binding precedent to be followed in subsequent stages of the same litigation." *In re Ticketplanet.com*, 313 B.R. 46, 60 (Bankr. S.D.N.Y. 2004); *see also In re AMR Corp.*, 567 B.R. 247, 254 (Bankr. S.D.N.Y. 2017) (holding that claims brought in amended complaint were barred by the court's prior decisions in the same case). "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." *In re AMR Corp.*, 567 BR at 254. It "operates to create efficiency, finality, and obedience within the judicial system." *Id*.

296.    Moreover, "[w]here *res judicata* bars parties in subsequent actions from relitigating what has already been decided, law of the case 'holds that a court should adhere to its earlier decisions in subsequent stages of litigation unless *compelling reasons* counsel otherwise.'" *In re Motors Liquidation Co.*, 576 B.R. 313, 321 (Bankr. S.D.N.Y. 2017) (emphasis

added) (prior determination that one party did not assume liability for punitive damages was law of the case and defendant failed to offer a reason "much less a compelling one—for the Court to reverse course from its own decision just last month") (citing *Tomasino v. Estee Lauder Cos., Inc.*, No. 13-CV-4692 (ERK) (RML), 2015 WL 1470177, at \*1–2 (E.D.N.Y. Mar. 31, 2015) ("[B]ecause the supposedly preclusive order arose in the same case—and not a previous action—*res judicata* does not apply. Rather, defendants must rest their arguments on the law of the case doctrine.")).

297.    Claims resolved on summary judgment, in particular, warrant application of the law of the case doctrine as there is "no reason to expect" further litigation of such matters following the "expenditure of time and financial resources" assumed during discovery. *Tomasino*, 2015 WL 1470177, at \*3 (citing *L–Tec Electronics Corp. v. Cougar Electronic Org., Inc.*, 198 F.3d 85 (2d Cir. 1999) ("Although, [the *L-Tec* court] based its decision on *res judicata* principles, the decision is better understood as an application of the law of the case doctrine . . . .")); *see also In re Moise*, 575 B.R. 191, 200 (Bankr E.D.N.Y. 2017) (applying the law of the case doctrine where the "claims in [the] adversary proceeding [were] nothing more than a "do over" of the adverse rulings against plaintiff.").

298.    In granting partial summary judgment against Parmar, the Court specifically found that Parmar admitted, as part of his guilty plea, to intentionally defrauding CC Capital by making material misrepresentations and omissions in connection with the Merger, including by providing to CC Capital financial information containing material misrepresentations and omissions, and that such admissions established all elements of Plaintiff's fraud-based claims.  Rose Dec., P. Ex. 65.  CHLLC and First United, through Parmar, executed the Subscription Agreement affirming that CHT's financial information

was truthful and accurate, when they were in fact, admittedly false.  Lazzara Dec., ¶ 71, P. Ex. 40; Rose Dec., P. Exs. 59, 60.

299.    As CHLLC and First United acted through Parmar to further the fraud to which Parmar has already pled guilty and been found liable, CHLLC and First United should be held liable for the fraud to the same extent as Parmar under the law of the case.

### ii.    The Evidence Independently Establishes CHLLC's and First United's Liability for Fraud

300.    To establish either fraudulent inducement or common law fraud under Delaware law, a plaintiff must prove "(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance." *Abry Partners V, LP v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

301.    The same analysis applies to claims under Section 10(b) of the Exchange Act. *See Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 54 (D. Del. 2002).  Section 10(b) of the Exchange Act requires a showing that "[1] in connection with the purchase or sale of securities, [2] the defendant acting with scienter, [3] made a false material representation or omitted to disclose material information and that [4] plaintiff's reliance on defendant's conduct caused [plaintiff] injury."  *Caiola v. Citibank, N.A.* 295 F.3d 312, 321 (2d. Cir. 2002). "Scienter means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *S.E.C. v. Tandem Mgt. Inc.*, No. 95 CIV. 8411 (JGK), 2001 WL 1488218, at *9 (S.D.N.Y. Nov. 21, 2001) (internal quotation marks omitted).

302.    The elements of securities fraud under Delaware law are nearly identical, requiring that a person (i) employ any device scheme or artifice to defraud; (ii) make any untrue statement of material fact or omit a material fact necessary to make the statements made, in light of the circumstances, not misleading; and (iii) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. *See* 6 Del. C. § 73-201.

303.    Aside from the guilty plea, the evidence overwhelmingly establishes each and every element of the claims, including that, in connection with the sale of CHT securities, CHLLC and First United (i) falsely represented in the Subscription Agreement that CHT's financials were accurate; (ii) had knowledge – through their manager Parmar, who executed the Subscription agreement in that capacity – that the financials were false; (iii) did so in order to induce CC Capital to enter into the Merger, and that (iv) CC Capital and Bank of America justifiably relied on such representations.  Lazzara Dec., ¶¶ 69-77, P. Ex. 40; DiBlasi Aff., ¶ 4; Trustee Dec., Pl. Ex. 82 at ¶ 4.

304.    With respect to reliance, although not an element of a criminal Section 10(b) charge, reliance is presumed where, as here, Parmar admittedly made material omissions. *See Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972) (holding that positive proof of reliance is unnecessary where failure to disclose material facts is alleged).  Even if reliance was not presumed, reliance on CHLLC's and First United's misrepresentations cannot credibly be disputed, as both Bank of America and CC Capital funded the Merger Proceeds based on the fraudulent financials and omissions, which falsely inflated the value of CHT. DiBlasi Aff., ¶ 4; Trustee Dec., Pl. Ex. 82 at ¶ 4.

305.     Accordingly, CC Capital is entitled to liability against CHLLC and First United for common law fraud, fraudulent inducement and securities fraud violations under Section 10(b) of the Exchange Act and 6 Del. C. § 73-201.[13]

### E.      Conspiracy Based Fraud Against the Parmar Entities (Count XI)

306.     Civil conspiracy under Delaware law encompasses the requirements necessary to establish the elements of conspiracy to commit securities fraud— "(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff." *Allied Cap. Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).

307.     A conspiracy claim does not require, "even at trial, to prove the existence of an explicit agreement.  Rather, a claim for conspiracy can rely on circumstantial evidence from which a reasonable factfinder can conclude there was an agreement. Similarly, intent can be inferred from circumstantial evidence." *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, No. CV 12067-VCG, 2019 WL 7369198, at *30 (Del. Ch. Dec. 31, 2019) (concluding the evidence was "sufficient to draw the inference that [controlling entities] knew of the allegedly-fraudulent financial [statements] related to the Merger, and that [controlling entities] assisted or agreed with [controlled entity] to induce plaintiff's reliance thereon" where (1) controlling entity was involved in controlled entity's accounting practices and "exerted influence over those practices" in a "suspect manner" and (2) controlling entity had "motive to inflate

---

[13] In addition to Parmar and the other Board Member Defendants, the Second Amended Complaint alleges securities fraud against the "Seller Defendants," defined as CHLLC, First United, LLC and Alpha Cepheus, LLC. Trustee Dec., P. Ex. 70. This Court already granted a default judgment against Alpha Cepheus, LLC. ECF No. 424.

financials to increase [controlled entity's] stake in the Merger" as controlling entity "held most of [controlled entity's] equity").

308. Each of the elements is established by the evidence.

309. First, the evidence establishes that a confederation existed, as the Parmar Entities were each controlled by Parmar and, thus, knowingly participated in the conspiracy. Trustee Dec., P. Ex. 77; Lazzara Dec., P. Exs. 40, 46 at pp. 8, 68-76; Rose Dec., P. Ex. 64 at 20:22-23; 45:5.

310. Second, there can be no doubt as to a wrongful act, as Parmar has admitted to conspiring to commit securities fraud, including by providing CC Capital with falsified financials with intent to defraud. Rose Dec., P. Exs. 59, 60; *see Wavedivision Holdings, LLC v. Highland Cap. Mgmt. L.P.*, No. 08C-11-132JOH, 2011 WL 5314507, at *17 (Del. Super. Ct. Nov. 2, 2011) ("[B]ecause judgment has been granted for all defendants on the [underlying tort], the Court must also grant judgment for defendants on the civil conspiracy" claim as it is "predicated on an underlying wrong.").

311. The Parmar Entities acted in concert with Parmar to serve as vehicles of the fraudulent scheme, including by (i) CHLLC and First United reaffirming CHT's representations which were known to be false (Lazzara Dec., Ex. 40); and (ii) the Proceeds Recipient Defendants and Riverside Property Defendants serving as holding companies to divert Merger Proceeds and the Riverside Property for Parmar's benefit. Lazzara Dec., ¶¶ 82-87, 93-106, P. Exs. 43, 45-54.

312. Finally, there is no doubt that CC Capital and the Secured Lenders were damaged, as they funded the Merger Proceeds relying on the materially false financial information. DiBlasi Aff., ¶ 4; Trustee Dec., Pl. Ex. 82 at ¶ 4.

313.    Accordingly, liability should be found against the Parmar Entities on the conspiracy-based fraud claim.

**F.    Aiding and Abetting Fraud Against the Parmar Entities (Count XVI)**

314.    The Parmar Entities should be held liable for aiding and abetting the fraud committed against CC Capital.

315.    As stated above, the record establishes that Parmar dominated each of the Parmar Entities such that they were mere instrumentalities operating as his alter-ego in furtherance of the fraudulent conspiracy scheme.  *See supra* § II.A; *Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC*, 842 F. Supp. 2d 502, 522 (S.D.N.Y. 2012) (finding that LLC was mere alter ego of its members where operations were completely mingled with those of its members; LLC had no employees, LLC did not lease its office space, rather, one of its members did, and office space did not have signage or plaque indicating presence of LLC, only that of member) (applying Delaware law).

316.    In addition, as the record also supports a finding of conspiracy to commit fraud against the Parmar Entities, a finding for aiding and abetting fraud is warranted.  *See Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 63-65 (Del. Ch. 2015) (collecting cases and finding that, in the fraud context, establishing liability under a conspiracy theory also establishes a claim of aiding and abetting).

317.    Insofar as these entities were one and the same with Parmar, each had knowledge of the fraud and substantially assisted in the commission of such fraud committed by Parmar by acting as shell entities for the transfer and concealment of Merger Proceeds and by allowing and assisting Parmar in concealing and attempting to render inaccessible Merger Proceeds that were exchanged for other assets.  *See id.; Manichaean Cap., LLC v. Exela Techs.,*

*Inc.,* 251 A.3d 694, 713 (Del. Ch. 2021) (holding that entities can be held liable for the actions of the individual that dominates and controls them because, otherwise, the fraudulent individual "could hide assets in plain sight to avoid paying a judgment."); *LVI Grp. Invs., LLC*, 2019 WL 7369198, at \*31.  Accordingly, judgment should be granted on CC Capital's aiding and abetting fraud claim.

### G.    Damages against Parmar and the Parmar Entities

318.    Damages for securities fraud are typically "out-of-pocket" losses.  *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) ("Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages."); *In re Crazy Eddie Sec. Litig.* 948 F. Supp. 1154, 1165 (E.D.N.Y. 1996) ("Although damages in securities fraud actions may be calculated in several different ways, they ordinarily are based on out-of-pocket losses.").  "Out-of-pocket" losses entitle the defrauded buyer to "'to recover only the excess of what he paid over the value of what he got.'"  *Mazuma Holding Corp. v. Bethke*, 21 F. Supp. 3d 221, 235 (E.D.N.Y. 2014 (quoting *Acticon AG*, 692 F.3d at 38).  In other words, such damages measure "the price paid for the security less the security's value on the date of the transaction and absent any fraud[.]"  *Id.* (quoting *In re UBS Auction Rate Sec. Litig.,* No. 08–cv–2967 (LMM), 2009 WL 860812, at \*4 (S.D.N.Y. Mar. 30, 2009)). "The purpose of the out-of-pocket measure of relief is to 'return[] [the defrauded party] to the position he occupied before the fraud.'"  *Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F. Supp. 169, 176 (S.D.N.Y. 1995).  Delaware law also recognizes "out of pocket" damages for common law fraud. *See LCT Cap., LLC v. NGL Energy Partners LP*, 249 A.3d 77, 91 (Del. 2021) (recognizing both out-of-pocket and benefit-of-the-bargain damages for fraudulent misrepresentation).

319.    Out-of-pocket damages are not the only permissible damages measure: "[C]ourts have utilized their discretion to endorse several different compensatory damages theories," including rescissory damages. *Panos*, 880 F. Supp. at 176; *see also Clark v. John Lamula Invs., Inc.*, 583 F.2d 594, 597-98 (2d Cir. 1978); *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970); *Maher v. Global Factors LLC*, No. 22-cv-6506 (LJL), 2024 WL 3356985, at *30-31 (S.D.N.Y. 2024) (applying rescissory damages to 10(b) violation). Recessionary damages provide for "the consideration paid for such security with interest thereon, less the amount of any income received thereon." *Pinter v. Dahl*, 486 U.S. 622, 641 n. 18 (1988); *see also In re UBS Auction Rate Secs. Litig.*, 2009 WL 860812, at *5 (recognizing rescissory remedy for Rule 10b–5 violation). Courts have ordered "damages equal to rescission" when rescission is not literally possible – *i.e.* the stock has been sold. *See Randall v. Loftsgaarden*, 478 U.S. 647, 655-56 (1986) (analyzing damages under Exchange Act §12(2), and holding that rescissory damages may be utilized even if plaintiff no longer owns the security); *In re WorldCom, Inc.*, 377 B.R. 77, 92 (Bankr. S.D.N.Y. 2007) ("If rescission is not possible, however, it is well settled that a court should award damages equal to rescission.").

### i.    Rescissory Damages are Appropriate

320.    Plaintiffs seek rescissory damages in the total amount $122,665,864.20, plus pre-judgment interest, calculated as the full $212 million in Merger Proceeds reduced by distributions received in the bankruptcy proceeding. Specifically:

- CC Capital seeks $66,434,581.42, measured by the amount of CC Capital's $82,500,000 investment, minus the $16,065.418.58 in distributions received in the bankruptcy proceeding. DiBlasi Aff. at ¶ 4, 8.

- The Liquidating Trustee, as assignee of the Secured Lenders' claims, seeks $56,231,282.83, measured by the amount of the Merger Financing of $130,000,000,

minus $71,387,059.91 received in bankruptcy distributions. Trustee Dec., P. Ex. 81 at ¶¶ 5, 9, 13; P. Ex. 82 at ¶¶ 2, 9.[14]

321.    This Court already determined, as a matter of law, the precise amounts invested and lost by CC Capital and the Secured Lenders: (i) CC Capital contributed approximately $82.5 million of cash to CHT Holdco; (ii) CHT obtained $130 million in financing secured financing (plus a $15 million commitment) under the Prepetition Credit Agreement.  Trustee Dec., P. Ex. 69 at ¶ 47.  In addition, the Secured Lenders were granted an allowed secured claim of $50 million and a deficiency claim of $108,287,223.39, and CC Holdco was granted an allowed unsecured claim of $82.5 million relating to its Merger investment – neither of which can be challenged by Defendants. Trustee Dec., P. Ex. 68 at ¶¶ 1-2; P. Ex. 80 at p. 4; Tr. 89:9-22.

322.    Recessionary damages are "'justified where, as here, the evil is not the price at which [Plaintiffs] bought but the fact of being induced to buy and invest for some future growth ... without disclosure of the material misrepresentation." *Maher*, 2024 WL 3356985, at *30 (quoting *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1173 (2d Cir. 1970)).

323.    Here, Parmar's misrepresentations, which admittedly included "falsely manipulat[ing] the value of [CHT] and its operating companies and subsidiaries" and "falsely portray[ing] the growth of [CHT] in order to generate an inaccurate picture of CHT's revenue streams" were made to induce CC Capital to acquire the Debtors and for the Secured Lenders to provide the financing for same.  Rose Dec., P. Ex. 60 at 18:5–14).  In addition to inducing

---

[14] The Liquidating Trustee has not included the Secured Lenders' $30 million post-Merger loan for the acquisition of NYNM as part of its damages analysis.  Trustee Dec., P. Ex. 81 at ¶ 2.  However, to the extent the Court considers the bankruptcy sale of NYNM assets as a setoff or otherwise relevant to any damages award, the NYNM loan should also be included, such that total damages would be $86,231,282.83 ($160 million deducted by the approximately $71.3 in distributions).

CC Capital to acquire CHT at an inflated price, Parmar's misrepresentations went to the heart of the Merger transaction, fabricating out of whole-cloth subsidiaries that were supposed to make up major segments of CHT's core businesses. Instead, CC Capital acquired shares of a company stripped of its assets and rendered insolvent, while the Secured Lenders were left with valueless liens. At the same time, Parmar was diverting a significant portion of the funds for his personal benefit.

324. As the court stated in *Maher* in awarding rescissory damages on a 10(b) claim:

> [T]his is not a case in which the plaintiff seeks to hold liable a third party, such as a company making a misstatement for the excess in price the plaintiff had to pay to purchase securities in the open market. Nor is this a case in which the value of the securities purchased by Plaintiffs is readily determinable. Plaintiffs purchased directly from Defendants and thus Defendants themselves were enriched directly by the fraud. There was no secondary market for the securities and thus their value, absent the fraud, cannot be measured by Plaintiffs.

2024 WL 3356985, at *31.

Rescissory damages are, therefore, appropriate to restore CC Capital and the Secured Lenders to their pre-Merger financial positions. *See Clark v. John Lamula Invs., Inc.*, 583 F.2d 594, 597-98 (2d Cir. 1978) (awarding to defrauded buyer the difference between purchase price and subsequent resale price as damages).

325. Judgment should therefore enter against Parmar and the Parmar Entities, jointly and severally, in the principal amount of $66,434,581.42 in favor of CC Capital and $56,231,282.83 in favor of the Liquidating Trustee, plus pre-judgment interest at the rate set forth in 6 Delaware Code § 2301 from January 30, 2017, the date of the closing of the Merger,

to entry of judgment, plus post-judgment interest on damages calculated at the statutory rate set forth in 28 U.S.C. § 1961.[15]

### ii.    Out-of-Pocket Expenses

326.    Even under an out-of-pocket measure, Plaintiffs are entitled to the full Merger Proceeds, less distributions.  Indeed, months after the go-private Merger closed, CC Capital discovered that CHT's financials for prior years were false and that revenue and EBITDA were significantly overstated.  This "served to perpetuate the existence of an insolvent company that was not viable.  It is reasonable to infer that once [Parmar's] fraudulent scheme was uncovered, there was no possibility that the company could survive." *In re Crazy Eddie Secs. Litig.*, 949 F. Supp. at 1165.  And, as CHT could not, among other things, service the massive debt incurred as a result of the Merger, Debtors were put into bankruptcy and liquidated.  Accordingly, as a result of Parmar's fraud, CC Capital and the Secured Lenders were left with worthless stock and debt, respectively, and thus should be entitled to claim the full amount of their loss.  *See id.* (awarding defrauded investors full cost of stock as damages where company was rendered worthless by fraud).

---

[15] While Parmar is facing a potential restitution order in the Criminal Proceeding, any proceeds recovered in the Criminal Proceeding from forfeited assets will be remitted to the United States, and CC Capital, the Liquidating Trustee and any other claimants to such funds must proceed with the remissions process under 28 C.F.R. Part 9, which is the responsibility of the Attorney General. *See* 18 U.S.C. 981; *McCarthy v. Martinelli*, 2023 WL 385405, at *2 (E.D.N.Y. 2023) ("Congress granted the Attorney General sole discretion to address claims by victims through a remissions process that occurs after the successful prosecution of the forfeiture case.") (quoting *U.S. v. Approximately $133,803.53 in U.S. Currency Seized from Washington Mutual Bank, N.A.*, 683 F. Supp. 2d 1090 (E.D. Cal. 2010)).  To the extent any funds are recovered, Parmar should not be permitted now to an offset of those amounts against the total judgment amount in this proceeding, but is free to raise the single satisfaction rule after the judgment is entered.  *See* 11 U.S.C. § 550(d) (noting that the Trustee is entitled to only a single satisfaction).

327.    Mr. Lazzara confirms that the actual value received in the form of the consolidated CHT and subsidiaries at the time of the Merger was negative ($27,802,194).  *See* Lazzara Dec. ¶ 89.

328.    The calculation of the estimated value received by CC Holdco uses the net assets reported in the audited balance sheet at December 31, 2016, the closest financial statement reporting date to the January 30, 2017 take-private Merger transaction, as a starting figure.  *See* Lazzara Dec. ¶ 90, P. Ex. 54.a.  The December 31, 2016 balance sheet was then adjusted for (i) the known inflationary effects resulting from recording the "acquisitions" of the Sham Entities; and (ii) the additional liabilities resulting from the publicly misrepresented secondary equity raises used to raise monies to allegedly acquire the Sham Entities.  *See* Lazzara Dec. ¶ 91.  The net assets received by CC Holdco are calculated to equal negative ($27,802,194), resulting in the Secured Lenders and CC Capital incurring damages in an amount equal to no less than $240,304,500.  *See* Lazzara Dec. ¶¶ 88, 91.

329.    The basis for this calculation is a comparison of the difference between the consideration given by CC Holdco and the Merger Financing, equal to $212,502,260, and the value received in the form of the consolidated CHT and its subsidiaries in the amount of negative ($27,802,194).  *See* Lazzara Dec. ¶ 89.

330.    Offsetting these damages by the distributions received in bankruptcy results in total "out-of-pocket" damages of $152,852,021.50.[16]

---

[16] To the extent Defendants attempt to argue in their post-trial briefing that Mr. Lazzara's testimony is improper expert opinion, Defendants did not separately move to preclude Mr. Lazzara's testimony, and their untimely objection was rejected by this Court.  Tr: 30:18-31:17. Moreover, Plaintiffs are not required to prove damages through an expert: "[a] plaintiff is entitled to offer competent evidence from any relevant source from which damages may be ascertained with reasonable certainty; there is no obligation that a claimant support claims of damages only through expert witnesses." *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 238 F. Supp. 2d 604, 607 (S.D.N.Y. 2002), *aff'd*, 92 F. App'x 812 (2d Cir. 2004).

331. Finally, the Court may consider the bankruptcy sale in its consideration of Debtors' actual value. Such sale makes clear that the Merger consideration was grossly inflated and that Parmar's fraud erased nearly all value, as the Debtors' assets sold for less than $30 million. Specifically:

- Non-NYNM assets, which effectively included all of the assets of the Debtors owned at the time of the Merger, sold for $12.6 million. *See In re Orion HealthCorp, Inc., et al.*, Case No. 18-71748, ECF No. 354.

- NYNM assets, which were acquired after the Merger closed, sold for $16.5 million. Case No. 18-71748, ECF No. 445.

- Total gross proceeds for the sales of the Debtors' operating businesses equaled $29.1 million and the net sale proceeds were $24.1 million. *See* Monthly Operating Report for July 2018; Case No. 18-71748, ECF No. 477.

332. Defendants are precluded from controverting the post-bankruptcy value of the estate obtained in the bankruptcy sale. Tr: 88:20-89:8. And, although the Court left open the question of the Debtors' value at the time of the Merger (*see id.*), here, the Court-approved bankruptcy sales process [No. 18-71748, ECF No. 273] – which was deemed "non-collusive, formulated and implemented in good faith, [] substantively and procedurally fair to all parties, and obtained the highest or otherwise best value" – established the Debtors' true market value. Case No. 18-71748, ECF No. 354 at D.

---

There is no doubt that Mr. Lazzara is a relevant source given his personal knowledge of the extensive investigation of the Debtors and its business operations that he personally conducted and oversaw. Lazzara Dec., ¶¶ 2-6. Indeed, "[a] witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise ….'" *U.S. v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007). Mr. Lazzara's testimony concerning the Debtors' actual value at the time of the Merger is not expert opinion, but is rather based on his personal familiarity with Debtors' books and records and addressed how the Sham Entities artificially inflated and impacted the Debtors' financial statements and the value of Debtors if those Sham Entities were excluded and their impact considered. Lazzara Dec., ¶¶ 73-75, 89-92. This is clearly proper lay witness testimony under Federal Rule 701. *See Rigas*, 490 F. 3d at 224 (allowing testimony of forensic accountant, who was retained by new management to examine company's records and investigate transactions of prior management, regarding what financial statements would actually show if fraudulent debt reclassifications had not occurred).

333.    Bankruptcy Courts have long held that the best offer received in a competitive bidding process reflects "market value."  *See In re CPJFK, LLC*, 496 B.R. 290, 301 (Bankr. E.D.N.Y. 2011) (crediting testimony that competitive sales process yielded market value for debtor's assets); *In re Motors Liquidation Co.*, 430 B.R. 65, 85 (S.D.N.Y. 2010) (quoting favorably that "value generated through the Court approved auction process reflects the market value of [debtor's] assets and the conversion of the assets into cash is "the contemplated result under § 363(b)."").  Indeed, "where collateral was actually sold during the pendency of the case (and where the terms of the sale were fair and arrived at on an arm's-length basis), the actual sale price should be used to measure the property's value, as contrasted to some 'earlier hypothetical valuation.'"  *Urban Commc'n PCS Ltd. P'ship v. Gabriel Cap.*, *L.P.* 394 B.R. 325, 336 (S.D.N.Y. 2008) (quoting *Ford Motor Credit v. Dobbins*, 35 F.3d 860, 870 (4th Cir. 1994)).

334.    Thus, at most, the Debtors' actual value (excluding the post-Merger NYNM assets) was no more than $13 million at the time of the Merger.  *See In re Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992) (determining that fraud had to be taken into account for purposes of evaluating insolvency and stating "fair market valuation entails a hypothetical sale, not a hypothetical company").

335.    Notably, Defendants did not offer at trial any admissible evidence of an alternative valuation of Debtors.   Tr. 90:18-92:19 (striking portions of Parmar's direct testimony declaration).

### iii.    Pre- and Post-Judgment Interest

336.    Post-judgment interest need not be specifically requested; it is mandated by federal statute.  *In re USN Commc'ns, Inc.*, 280 B.R. 573, 602 (Bank. Del. 2022) (citing 28 U.S.C § 1961(a)).

337.    In contrast to the mandatory nature of an award for post-judgment interest, the award of pre-judgment interest is discretionary and permissible under federal law in certain circumstances.  *In re 45 John Lofts, LLC*, 650 B.R. 602, 621 (Bankr. S.D.N.Y. 2023) (finding an award of pre-judgment interest was warranted where plaintiff was deprived of the value of its property when the property was sold and the proceeds of the sale were fraudulently conveyed.). "Nevertheless, most courts find that awarding prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds."  *In re USN Commc'ns Inc.*, 280 B.R. at 602.

338.    An award of prejudgment interest "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court."  *In re 45 John Lofts, LLC*, 650 B.R at 833-34.  Accordingly, an award of prejudgment interest must not result in a windfall to the plaintiff nor is such an award appropriate when a defendant acted innocently and without reason to know of the wrongfulness of his actions.  *Id.* at 834.  Within the Court's discretion, however, prejudgment interest should be awarded absent a sound reason to deny it.  *Id.*

339.     Prejudgment interest is appropriate given that Plaintiffs have been deprived of the value of the Merger Proceeds.  *See In re 45 John Lofts, LLC*, 650 B.R. at 621 (finding an award of pre-judgment interest was warranted where plaintiff was deprived of the value of its property when the property was sold and the proceeds of the sale were fraudulently conveyed.); *In re USN Commc'ns Inc.*, 280 B.R. at 602 ("Nevertheless, most courts find that awarding prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds.").

340.     Prejudgment interest should be awarded at the rate set forth in 6 Del. Code § 2301, from January 30, 2017, the date of the fraudulent transfer of the Merger Proceeds to entry of judgment.

**NOW THEREFORE, IT IS HEREBY:**

**ORDERED** that final judgment may be entered (i) in favor of Plaintiffs and against the Parmar Entities on Counts XI and XXXVII of the Second Amended Complaint; (ii) in favor of CC Capital and against the Parmar Entities on Count XVI of the Second Amended Complaint; (iii) in favor of Plaintiffs and against Parmar, the Proceeds Recipient Defendants and the Riverside Property Defendants on Counts I, V, VI, VII, and VIII of the Second Amended Complaint; and (iv) in favor of CC Capital and against CHLLC and First United on Counts XV, XVII, XVIII and XIX of the Second Amended Complaint; and it is further

**ORDERED** based on the foregoing judgment and the previously entered summary judgment against Parmar, that Parmar and the Parmar Entities are jointly and severally liable to (i) CC Capital in the amount of $66,434,581.42, and (ii) the Liquidating Trustee in the amount of $56,231,282.83; and it is further

**ORDERED** that (i) CC Capital shall recover from Parmar and the Parmar Entities, jointly and severally, the principal sum of $66,434,581.42, and (ii) the Liquidating Trustee shall recover from Parmar and the Parmar Entities, jointly and severally, the principal sum of $56,231,282.83, plus pre-judgment interest at the rate set forth in 6 Delaware Code § 2301 from January 30, 2017, the date of the fraudulent transfer, to entry of judgment, plus post-judgment interest on damages calculated at the statutory rate set forth in 28 U.S.C. § 1961; and it is further

**ORDERED** that Plaintiffs shall recover (i) from Axis the principal sum of $8,765,997.44; (ii) from Lexington the principal sum of $2,051,000.00; (iii) from Pulsar the principal sum of $4,598,652.58; (iv) from Vega the principal sum of $8,693,406.69; and (v) from PPSR the principal sum of $700,123.50, plus pre-judgment interest at the rate set forth in 6 Delaware Code § 2301 from January 30, 2017, the date of the fraudulent transfer, to entry of judgment, plus post-judgment interest on damages calculated at the statutory rate set forth in 28 U.S.C. § 1961; and it is further

**ORDERED** that the Riverside Property was purchased with the Debtors' funds and are the property of the Debtors' estates, Parmar and the Parmar Entities, including, but not limited to, the Riverside Property Defendants, have no ownership interest in the Riverside Property, and all equitable and legal ownership of the Riverside Property resides with the Liquidating Trustee; and it is further

**ORDERED** that the Liquidating Trustee is appointed attorney-in-fact for each of Parmar and the Parmar Entities for the purpose of executing any and all documents on such defendants' behalf to effectuate the turnover of ownership of and transfer of title to the

- 83 -

Riverside Property to the Liquidating Trustee or such other entity as the Liquidating Trustee designates; and it is further

**ORDERED** that any transfer of the ownership of and title to the Riverside Property authorized by this Order is deemed to have occurred pursuant to the Plan previously confirmed by this Court under 11 U.S.C. § 1129, and is accordingly exempt from all stamp or similar taxes to the fullest extent allowed under 11 U.S.C. § 1146.  This Order shall bind any taxing authority, recorder of deeds or similar official for any county, state, or governmental unit in which any instrument related to the transfer of title to the Riverside Property to the Liquidating Trustee or related to any transaction contemplated hereunder or under the Plan is to be recorded with respect to any taxes of the kind specified in 11 U.S.C. § 1146(a); and that it is further

**ORDERED** that Parmar is bound by the Default Judgment entered October 28, 2021 against Aquila Alpha in this adversary proceeding and cannot challenge said judgment or that the 2016 transfer of the Colts Neck Property Mortgage by to Aquila Alpha was an actual and constructive fraudulent transfer under Bankruptcy Code §§ 544, 548(a)(1)(A), 548(a)(1)(B) and 550 and Delaware Code §§ 1304(a)(1), (a)(2) and 1305(a); and that it is further

**ORDERED** that the Liquidating Trustee is authorized to release and disburse the funds constituting the Robinson Brog Escrow, including all accrued interest in partial satisfaction of the final judgment against Parmar; and it is further

**ORDERED** that CHLCC's right title and interest in the JP Morgan Escrow fund, including all accrued interest, is transferred to the Liquidating Trustee in partial satisfaction of the final judgment against CHLCC.

- 85 -

Dated: New York, New York
       December 17, 2025

**THOMPSON COBURN LLP**


By: _s/ Brigitte R. Rose_
       Mark T. Power
       John P. Amato
       Joseph Orbach
       Brigitte R. Rose
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
jamato@thompsoncoburn.com
mpower@thompsoncoburn.com
jorbach@thompsoncoburn.com
brose@thompsoncoburn.com


*Counsel to the Liquidating Trustee*

**TROUTMAN PEPPER LLP**


By: _s/ Matthew R. Brooks_
       Matthew R. Brooks
       875 Third Avenue
       New York, NY 10022
       212-704-6000
       matthew.brooks@troutman.com

J. Timothy Mast (admitted *pro hac vice)*
Bianca DiBella (admitted *pro hac vice)*
600 Peachtree St. NE, Suite 3000
Atlanta, GA 30308
Tel. 404-885-3000
tim.mast@troutman.com
bianca.dibella@troutman.com

*Counsel to CC Capital CHT Holdco LLC and CHT Holdco LLC*